**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ORLANDO ROSALES SALMERON and
JOHN DOE
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCOS D. CHARLES, in his official capacity as Executive Associate Director for Enforcement and Removal Operations; MATTHEW ELLISTON, in his official capacity as Field Office Director, ICE Enforcement and Removal Operations, Miami Field Office; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and U.S. CUSTOMS AND BORDER PROTECTION,

Defendants.

**Case No. ___________________**

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

*"My room had one toilet. It was not separated from the rest of the room in any way. We had to use it in front of one another, with no privacy at all. There were cameras in the area where we used the toilet." ~Declarant 4*

*"On the tenth day, an official called my name and asked whether I would sign the voluntary departure or deportation papers. I refused. The official said I would have to stay there longer and mockingly said, 'Good luck.'" ~Declarant 2*

*"The room was so crowded that some people were forced to sleep next to the toilet because there was no other space to sit or stand." ~Eduardo Lezama*

Plaintiff Orlando Rosales Salmeron and Plaintiff John Doe (collectively "Plaintiffs"),[1] by and through undersigned counsel, allege as follows:

**INTRODUCTION**

1. ICE publicly presents its Miramar office as a routine location for immigration check-ins and appointments. Behind its doors, however, ICE has converted short-term holding rooms, garages, and offices into a secretive, makeshift detention facility where as many as 150 people at a time are packed into overcrowded rooms. A whistleblower allegation, later reported in congressional letters released in September 2026, placed the Miramar Facility's population at 342 people in a facility with a capacity of 56 on a single day in August 2026.[2] People are forced to sleep on hard floors beside exposed toilets, and are denied adequate food, water, medical care, bodily privacy, and confidential access to counsel for days and even weeks at a time. Some are even pressured to sign voluntary departure forms in languages they do not fully comprehend.

---

[1] Due to the sensitivity of this case, Plaintiff John Doe is proceeding under a pseudonym, subject to approval from this Court and a forthcoming motion to proceed under pseudonym.

[2] *See* Letter from Democratic Members of the H. Comm. on Oversight & Gov't Reform & the H. Comm. on Homeland Sec. to Joseph V. Cuffari, Inspector Gen., U.S. Dep't of Homeland Sec. 5 (Sept. 21, 2026), https://oversightdemocrats.house.gov/imo/media/doc/2026-09-21garciathompsonfrosttodhsoigrefloridawbsappendixa.pdf.

2. This is a civil action for declaratory and injunctive relief challenging: (1) unconstitutional conditions of civil confinement, (2) restrictions on access to counsel, (3) coercive practices used to obtain immigration-related signatures or waivers, and (4) failures to perform discrete duties required by ICE Directive 11087.2 at the U.S. Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") location at 2805 SW 145th Avenue, Miramar, Florida 33027, the Miramar Facility.

3. The holding rooms, garages, sallyports, offices, and any other areas at the Miramar Facility in which Defendants confine people are referred to collectively as the "Miramar Facility."

4. Plaintiffs and the putative Class members are held in civil immigration detention. They are not held for punishment. The Fifth Amendment forbids the federal government from subjecting them to conditions that amount to punishment or deprive them of basic necessities.

5. ICE's publicly accessible agency materials present the Miramar Facility as an appointment, check-in, and bond-acceptance location associated with the Miami Field Office. ICE does not publicly identify a separate "Miramar Field Office," and, as of the filing of this Complaint, does not identify the Miramar Facility in its public detention-facilities directory or maintain a Miramar detention-facility webpage containing procedures for locating detained people, confidential attorney communication, legal visitation, medical services, mail, complaints, or other detention-related matters.[3]

[3] U.S. Immigr. & Customs Enf't, *Detention Facilities*, https://www.ice.gov/detention-facilities?state=FL&office=&name= (last visited Sept. 30, 2026); U.S. Immigr. & Customs Enf't, *ICE ERO Bond Acceptance Facilities*, https://www.ice.gov/detain/ice-ero-bond-acceptance-facilities (last visited Sept. 30, 2026) (listing 2805 SW 145th Avenue as a bond-acceptance location). *See, e.g.,* U.S. Immigr. & Customs Enf't, *Broward Transitional Center*, https://www.ice.gov/detain/detention-facilities/broward-transitional-center (last visited Sept. 30, 2026); U.S. Immigr. & Customs Enf't, *FDC Miami*, https://www.ice.gov/detain/detention-facilities/fdc-miami (last visited Sept. 30, 2026).

6. Notwithstanding that public administrative designation, Defendants use the Miramar Facility's holding rooms and other areas as a de facto detention facility, confining people overnight and for multiple days without the infrastructure, staffing, transparency, and safeguards necessary for prolonged detention. People are packed into small holding rooms, forced to sleep on hard floors beside exposed toilets, and denied reliable access to adequate food, water, hygiene, medical care, bodily privacy, and confidential communication with counsel. Some were also threatened with continued detention if they refused to sign "voluntary" departure forms.

7. ICE Directive 11087.2 ("Directive") governs ERO holding facilities, such as the Miramar Facility.[4] The Directive defines "short-term" confinement as a period not exceeding twelve hours absent exceptional circumstances; directs daily-schedule field offices to empty holding facilities at the conclusion of daily operations; requires water at all times and a meal at least every six hours; protects access to prescribed medication and bodily privacy; requires safe and clean hold rooms, monitoring, and written logs; and assigns senior ERO and field-office officials responsibility for compliance.

8. On July 2, 2026, Representative Debbie Wasserman Schultz, a Member of the United States House of Representatives representing Florida's 25th Congressional District, conducted an unannounced oversight visit of the Miramar Facility. Rep. Wasserman Schultz observed approximately 150 detained people in four holding rooms, including more than seventy men packed shoulder-to-shoulder in one room and roughly forty women in a substantially smaller room. Miramar Facility personnel (ICE officials) stated that detained people received approximately one bottle of water per day and three meals of approximately 7.5 ounces each.

---

[4] U.S. Immigr. & Customs Enf't, Off. of Enf't & Removal Operations, Directive 11087.2, *Operations of ERO Holding Facilities* (Jan. 31, 2024), https://www.ice.gov/doclib/foia/policy/directive11087.2.pdf.

The visit also documented floor sleeping, exposed toilets, and the absence of dedicated space for confidential in-person attorney access.[5]

9. Rep. Wasserman Schultz's visit documented a facility-wide practice of using short-term holding rooms as a de facto overnight and multi-day detention site without corresponding infrastructure or safeguards. The deprivations reinforce one another: crowding worsens heat, sleep deprivation, sanitation, medical risk, and the humiliation of eating and sleeping beside exposed toilets.

10. People detained at the Miramar Facility also lack meaningful confidential access to legal counsel. ICE officials told Rep. Wasserman Schultz that the facility has no dedicated space for in-person attorney visits. Detained people receive, at most, limited outgoing telephone access, and attorneys and families report difficulty locating and communicating with the detained people before they are transferred or removed. According to reports by attorneys and families, the Miramar Facility lacks a reliable procedure for prompt, confidential communication with current or prospective counsel before transfer or removal.

11. Families, detained people, advocates, and subsequent public reports describe the same conditions before and after the July 2 visit, including stays beyond seventy-two hours, floor sleeping, inadequate food and water, lack of showers and clean clothing, no medical care, restricted telephone access, and no confidential attorney communication.

---

[5] Press Release, Rep. Debbie Wasserman Schultz, *Wasserman Schultz Makes Unannounced Miramar ICE Facility Oversight Visit* (July 2, 2026), https://wassermanschultz.house.gov/news/documentsingle.aspx?DocumentID=3514; Halle Vazquez, *Rep. Wasserman Schultz describes "horrific" conditions during visit inside Miramar ICE facility*, WLRN (July 2, 2026), https://www.wlrn.org/immigration/2026-07-02/rep-wasserman-schultz-describes-horrific-conditions-during-visit-inside-miramar-ice-facility.

12. Advocates, detained people, and families also report that some detained people are urged or pressured to sign voluntary-departure, self-deportation, or other removal-related documents while confined in these conditions.

13. On September 21, 2026, whistleblowers reported that people held at the Miramar Facility are housed in severely overcrowded conditions, must use filthy bathrooms with human waste overflowing, and are forced to sleep on concrete floors in shackles. Additionally, according to the same whistleblowers, detained people are continuously under bright lights and have no access to basic hygiene products.[6]

14. Whistleblowers also stated that Defendants are abusing the people detained at the Miramar Facility by placing them in life-threatening conditions, including elderly and sick people, due to severe overcrowding because the facility is operating approximately 600% over capacity. Whistleblowers also reported prolonged shackling, including shackling elderly people with serious health issues and limited mobility for 16 hours a day.[7]

15. Whistleblowers also detailed an abject lack of proper medical care at the Miramar Facility and provided examples of individuals who did not receive needed medical treatment, including a woman who was seven months pregnant detained for three weeks without medical care, a

---

[6] Press Release, H. Comm. on Oversight & Gov't Reform, *Ranking Members Robert Garcia, Bennie Thompson, and Maxwell Frost Demand Answers From ICE On Dangerous Conditions In Florida Immigration Facilities* (Sept. 21, 2026), https://oversightdemocrats.house.gov/news/press-releases/ranking-members-robert-garcia-bennie-thompson-and-maxwell-frost-demand-answers-from-ice-on-dangerous-conditions-in-florida-immigration-facilities; CBS Miami Team, *Whistleblower report shows "horrific" conditions inside Florida ICE facilities, including Miramar*, CBS News (Sept. 22, 2026), https://www.cbsnews.com/miami/news/miramar-ice-facility-photos-whistleblower-september-2026/; H. Comm. on Oversight & Gov't Reform (@OversightDems), *We have received whistleblower reports alleging dangerous conditions...*, X (Sept. 21, 2026, 9:35 AM), https://x.com/OversightDems/status/2102044073431298327?s=46&t=YxXhHw2zMVGrdAc089AqVA.

[7] H. Comm. on Oversight & Gov't Reform, *Ranking Members Demand Answers*, *supra* note 5; CBS Miami Team, *supra* note 5; H. Comm. on Oversight & Gov't Reform (@OversightDems), *We have received whistleblower reports, supra* note 5.

person with hypertension detained for 17 days, and a person in their 60s with HIV/AIDS detained for more than 14 days.[8]

16. Following the whistleblowers' report, the U.S. House Committee on Oversight and Government Reform launched an investigation into the horrific conditions at the Miramar Facility.[9]

17. These crowded, squalid, and punitive conditions and practices have been publicly reported and brought to Defendants' attention for months. Defendants nonetheless continue to use the Miramar Facility for prolonged detention without ensuring compliance with the Constitution or applicable federal law and policy. Defendants have publicly disputed or denied reports of deficiencies.

18. The allegations concerning conditions at the Miramar Facility are not unique. In recent litigation involving ICE short-term holding or processing facilities in New York City, Baltimore, the Chicago area, Los Angeles, and San Francisco, plaintiffs have alleged and challenged, in varying combinations, the prolonged confinement of detainees in facilities designed for short-term processing or holding; severe overcrowding; inadequate sleeping arrangements, including sleeping on floors; open or inadequately screened toilets and other unsanitary conditions; insufficient food and drinking water; lack of showers and basic hygiene supplies; inadequate medical screening or care and denial or interruption of prescribed medications; and barriers to access to, and confidential communication with, counsel.[10]

---

[8] H. Comm. on Oversight & Gov't Reform (@OversightDems), *We have received whistleblower reports, supra* note 5.

[9] H. Comm. on Oversight & Gov't Reform, *Ranking Members Demand Answers*, *supra* note 5.

[10] *See, e.g.*, *Perdomo v. Noem*, No. 2:25-cv-05605-MEMF-SP (C.D. Cal. July 2, 2025); *Sequen v. Albarran*, No. 5:25-cv-06487-PCP (N.D. Cal. Nov. 25, 2025); *Gonzalez v. Noem*, No. 25 C 13323 (N.D. Ill. Oct. 30, 2025); *D.N.N. v. Baker*, No. 1:25-cv-01613-JRR (D. Md. July 11, 2025); *Mercado v. Noem*, No. 25-cv-6568 (S.D.N.Y. Aug. 8, 2025).

19. Those lawsuits, together with public reporting, congressional oversight, and ICE's own nationwide policies concerning ERO holding facilities, placed the government and the responsible senior officials on notice that using short-term hold rooms for prolonged confinement without corresponding sleeping, sanitation, medical, privacy, and attorney-access safeguards predictably creates serious risks of constitutional violations and departures from Directive 11087.2. Defendants nevertheless continue to use the Miramar Facility in the same manner, supporting the inference that the challenged conditions result from recurring institutional policies and operational choices rather than isolated errors.

20. Defendants are causing significant, ongoing, and irreparable harm to Plaintiffs and the putative Class members. Court intervention is required to enjoin these violations.

21. Plaintiffs seek immediate declaratory and injunctive relief to end these ongoing unconstitutional violations.

## JURISDICTION AND VENUE

22. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and laws of the United States, including the First and Fifth Amendments to the United States Constitution, the Immigration and Nationality Act ("INA"), including 8 U.S.C. §§ 1362 and 1229a(b)(4)(A), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

23. This Court may grant temporary, preliminary, and permanent injunctive relief on Plaintiffs' constitutional claims under its traditional equitable authority and Federal Rule of Civil Procedure 65, and may grant relief on Plaintiffs' APA claims under 5 U.S.C. §§ 702 and 706.

24. This Court has the authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

25. The United States has waived sovereign immunity under the APA, 5 U.S.C. §§ 702 and 706.

26. Venue is proper in this District under 28 U.S.C. § 1391(b) and § 1391(e), because at the time of the filing of this action, Plaintiffs are detained in Defendants' custody within this District; the Miramar Facility is located in Broward County and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred and continue to occur in this District; and Defendants are officers or employees of the United States acting in their official capacities or under color of legal authority.

## PARTIES

**Plaintiffs**

27. ORLANDO ROSALES SALMERON ("Mr. Salmeron") is a noncitizen who has been detained in civil immigration custody at the Miramar Facility for multiple days. He remains confined there as of the filing of this Complaint.

28. During his confinement at the Miramar Facility, Mr. Salmeron has been subjected to the conditions and restrictions challenged in this Complaint. He has been confined in crowded spaces that lack adequate sleeping arrangements, sanitation, privacy, and access to basic necessities. His confinement has continued overnight and for multiple days.

29. Mr. Salmeron has not been provided with a bed, cot, mattress, or adequate bedding. He has attempted to sleep on the floor in the same crowded space where people spend their waking hours. These conditions interfere with his ability to sleep and cause physical discomfort and fatigue.

30. Mr. Salmeron receives inadequate food and drinking water. He also lacks access to showers, clean clothing, and basic hygiene supplies. The crowded and unsanitary conditions make it difficult to maintain personal hygiene.

31. Mr. Salmeron lacks adequate privacy when using the toilet. Toilet facilities are exposed to the view of other detained people and facility staff and are inadequately separated from the areas where people eat and sleep. These conditions cause humiliation and distress.

32. Mr. Salmeron experiences uncomfortable and unsafe temperatures and inadequate ventilation. Together with crowding, inadequate rest, and limited access to basic necessities, these conditions adversely affect his physical well-being.

33. Mr. Salmeron is not well medically and does not have access to medical care or necessary medication.

34. Mr. Salmeron is represented by an immigration attorney, but Defendants restrict his ability to communicate with that attorney, confidentially or otherwise. He cannot make or receive confidential attorney calls, meet with his attorney in person, or review or sign legal documents provided by his attorneys while confined at the Miramar Facility. He also lacks a reasonable opportunity to locate, retain, or communicate confidentially with other attorneys concerning his detention, immigration proceedings, or other legal matters, including managing his finances, addressing property and housing obligations, and arranging for his family's care in the event of removal. These restrictions impede his ability to obtain timely legal advice concerning both immigration and other matters affecting his rights and responsibilities.

35. Mr. Salmeron's experiences result from the common conditions, procedures, and practices governing confinement at the Miramar Facility. Defendants fail to provide him with the safeguards required by the provisions of ICE Directive 11087.2 as identified in this Complaint.

36. As a result, Mr. Salmeron experiences physical discomfort, sleep deprivation, humiliation, and anxiety. Mr. Salmeron remains exposed to these conditions and restrictions and seeks the declaratory and injunctive relief requested in this Complaint on behalf of himself and the proposed Class.

37. Plaintiff John Doe ("Mr. Doe") is a non-citizen who resides in Homestead, Florida. He was arrested by ICE on the evening of September 30, 2026, while returning to his home and was subsequently transferred to the Miramar ICE facility, where he remains detained as of the filing of this Complaint.

38. Plaintiff Mr. Doe has diabetes and hypertension and has been unable to access his prescribed medication while detained at Miramar. Since arriving at Miramar, he has experienced overcrowding, inadequate food and drinking water, an inability to speak confidentially with counsel, and inadequate access to hygiene supplies and facilities. He is one of the many class members currently detained at the Miramar Facility who are suffering the conditions described in this Complaint.

**Defendants**

39. **Defendant Markwayne Mullin** is the Secretary of the United States Department of Homeland Security ("DHS"). He directs each of the component agencies within DHS, including U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"). Secretary Mullin is therefore responsible for the administration and enforcement of immigration laws, including ICE's administration of holding and detention facilities, such as the Miramar Facility, and ensuring ICE and CBP's compliance with the Constitution and other applicable laws and policies. He is a legal custodian of Plaintiffs and the members of the putative Class. He is sued in his official capacity.

40. **Defendant United States Department of Homeland Security ("DHS")** is a Department of the Executive Branch of the United States government, headquartered in Washington, D.C., and is responsible for enforcing federal laws governing customs, border control, and immigration. The Miramar Facility is under the control and administration of DHS. DHS is a

legal custodian of Plaintiffs and the members of the putative Class. DHS controls and administers the policies and practices challenged in this action.

41. **Defendant David J. Venturella** is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). He is responsible for ICE's detention operations, policies, practices, and procedures nationwide, including those governing Enforcement and Removal Operations ("ERO") holding facilities. He is a legal custodian of Plaintiffs and the members of the putative Class. He is sued in his official capacity.

42. **Defendant United States Immigration and Customs Enforcement ("ICE")** is a federal law enforcement agency within DHS. Defendant ICE is responsible for the enforcement of immigration laws, including the detention and removal of immigrants. Defendant ICE is a legal custodian of Plaintiffs and the members of the putative Class.

43. **Defendant Marcos D. Charles** is the Executive Associate Director for ICE's Enforcement and Removal Operations ("ERO"). He is responsible for ERO's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. He is a legal custodian of Plaintiffs and the members of the putative Class. Under Directive 11087.2, the ERO Executive Associate Director is responsible for ensuring compliance with the Directive throughout ERO. He is sued in his official capacity.

44. **Defendant Matthew Elliston** is the Field Office Director for ICE ERO's Miami Field Office. ICE's public materials assign the Miramar Facility to the Miami Field Office, and the Miami Field Office exercises operational and supervisory authority over the Miramar Facility and the officers and personnel who confine people there. Under Directive 11087.2, the Field Office Director is responsible for ensuring that personnel follow the Directive in operating ERO holding facilities within the Field Office's organization and area of responsibility. He has authority to implement and enforce the relief requested in this action. Defendant Elliston is a

legal custodian of Plaintiffs and the members of the putative Class. He is sued in his official capacity.

45. **Defendant United States Customs and Border Protection ("CBP")** is a component of DHS, headquartered in Washington, D.C., and is responsible for enforcing federal immigration law at the border and, more recently, in the South Florida area, including arresting and detaining non-citizens and ensuring that its agents are properly trained and comply with the Constitution and other laws and policies. Upon information and belief, CBP personnel are present and perform official duties inside the Miramar Facility and act under the authority, direction, and control of CBP.

46. **Defendant Rodney Scott** is the Commissioner of United States Customs and Border Protection ("CBP"), oversees all DHS assets in ongoing immigration operations in South Florida, and is responsible for the administration, supervision, and direction of CBP and its personnel, including CBP officers and agents assigned to perform immigration-enforcement, processing, custody, or related functions in the South Florida area or at the Miramar Facility. CBP's organizational structure places the agency's operational components under the authority and direction of the Commissioner, who is responsible for ensuring CBP officers' compliance with the Constitution and other applicable laws and policies. Defendant Scott is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. ICE Policies Governing ERO Holding Facilities

47. On January 31, 2024, ICE issued Directive 11087.2, titled Operations of ERO Holding Facilities ("Directive").[11] The Directive remained in effect at all times relevant to this Complaint. From June 24, 2025, until the Nationwide Hold Room Waiver ("Waiver") was

[11] *See* U.S. Immigr. & Customs Enf't, *supra* note 3.

vacated on June 23, 2026, ICE purported to modify the Directive's 12-hour restriction through the Waiver discussed below.

48. The Directive's stated purpose is to provide ERO officers with policy and procedures for operating holding facilities located within their respective field offices. It defines a "holding facility" as a facility containing hold rooms primarily used for the short-term confinement of people who have recently been detained or are being transferred to or from a court, detention facility, other holding facility, or other agency. Directive §§ 1.1 and 3.2.

49. The Directive defines "short-term" as a period not to exceed twelve (12) hours absent exceptional circumstances. It separately instructs officers to empty holding facilities upon the conclusion of daily operations at field offices operating on a daily schedule and states that, absent exceptional circumstances, no detained person should be housed in a holding facility longer than twelve hours. Directive §§ 3.2 n.3 and 5.1(1).

50. The Directive makes the ERO Executive Associate Director responsible for ensuring compliance throughout ERO and makes Field Office Directors or their supervisory designees responsible for ensuring that field-office personnel follow its procedures. Directive §§ 4.1 and 4.3.

51. Field Office Directors must ensure that detained people are properly screened so that serious mental health conditions are expeditiously identified and people showing acute mental health distress are referred to mental health professionals. They also must develop and maintain written medical-emergency procedures and response plans. Directive § 4.3.

52. ERO officers are responsible for ensuring that detained people receive a meal at least every six (6) hours, Directive § 4.4.1(2), and that hold rooms are safe, clean, equipped with restroom facilities, and free of dangerous objects, Directive § 4.4.1(3).

53. ERO officers must continuously account for and monitor detained people. Physical hold-room checks must occur at least every fifteen minutes, and officers must monitor for signs of physical or mental health conditions, hostility, self-harm, or harm to others that may require closer supervision or emergency medical care. Directive § 5.1.

54. The Directive requires access to drinking water in hold rooms at all times. If a room lacks restroom facilities, officers should remain within sight or earshot so that detained people may request and receive regular access to a restroom. Directive §§ 5.2(2) and 5.2(3).

55. The Directive requires officers to permit detained people to perform bodily functions and change clothing without being viewed by staff of another gender except in exceptional and unusual circumstances or when incidental to routine cell checks. Officers of another gender must announce their presence when entering an area where detained people are likely to be performing bodily functions or changing clothing. Directive § 5.6.

56. The Directive requires officers to allow detained people to keep personal inhaled medication and to have access to other prescribed medication as necessary. Directive § 5.7(2).

57. The Directive requires a detention log for every person brought into custody, recording among other things the person's age, language, disability or vulnerability, reason for placement, time in, mealtimes, time out, and final disposition. It also requires inspection of each hold room every twelve (12) hours and documentation in a Hold Room Inspection Log. Directive § 5.8.

58. The Directive requires an annual compliance assessment for every ERO holding facility and an annual field-office review of the Directive's application through the Holding Facilities Self-Assessment Tool. Directive §§ 2.6 and 4.3.

59. The Directive expressly states that it does not displace other holding-facility requirements or procedures found in applicable ICE detention standards. Directive § 1.3.

60. On June 24, 2025, ICE issued the Waiver, referenced above—a memorandum titled Nationwide Hold Room Waiver, which purported to waive the twelve-hour (12-hour) limit nationwide and permit detention in ERO hold rooms for up to seventy-two (72) hours absent exceptional circumstances.

61. The Waiver took effect immediately and did not modify the Directive's other safeguards or require field offices to add beds, showers, medical units, confidential legal-access space, or other infrastructure needed for overnight and multi-day detention.

62. On June 23, 2026, a day before the Waiver's expiration, the United States District Court for the Northern District of California vacated the Waiver under 5 U.S.C. § 706(2)(A). The court found, among other things, that ICE had failed to consider the suitability of short-term hold rooms for overnight or multi-day confinement and the conflict with existing detention standards.[12]

**B. ICE Publicly Identifies the Miramar Site as an Administrative Check-In, Appointment, and Bond-Acceptance Location, Not as a Detention Facility**

63. ICE's public materials identify the location at 2805 SW 145th Avenue, Miramar, Florida, as "Miami, FL," assign it to the Miami Field Office, list appointment and check-in hours there, and separately list the same address as an ERO bond-acceptance location. ICE does not publicly identify a separate "Miramar Field Office" or designate the Miramar Facility as a detention facility. The Miramar Facility is listed as an ICE ERO sub-office with responsibility over Florida and other jurisdictions. ICE uses secure areas at the Miramar Facility to hold people before release, removal, or transfer. [13]

[12] *Sequen v. Albarran*, No. 5:25-cv-06487-PCP, slip op. at 11, 71 (N.D. Cal. June 23, 2026), ECF No. 205 (vacating the Nationwide Hold Room Waiver under 5 U.S.C. § 706(2)(A)); Order Denying Motion for Stay Pending Appeal, *Sequen*, No. 5:25-cv-06487-PCP (N.D. Cal. July 10, 2026), ECF No. 217.

[13] U.S. Immigr. & Customs Enf't, *ICE Field Offices*, https://www.ice.gov/contact/field-offices?page=2 (last visited Sept. 30, 2026) (stating that locations listed on the general field-

64. As of the filing of this Complaint, the Miramar Facility does not appear on ICE's public list of detention facilities nor does ICE publicly identify the Miramar Facility as a detention facility operating under the Performance-Based National Detention Standards ("PBNDS") or National Detention Standards ("NDS").[14] The Miramar Facility should function as an ICE ERO holding facility or hold-room site, subject to ICE's holding-facility directive, Directive 11087.2. Because Miramar is not listed as a detention facility, ICE does not publicly disclose through its detention-facility directory that people may be confined at the Miramar Facility overnight, for multiple days, or publish the facility-specific contact, legal-access, visitation, medical, property, and complaint information that ICE publishes for facilities that do appear in that directory.[15]

65. ICE's public check-in guidance describes check-ins as reporting appointments for people who have been released from custody and expressly states that the guidance does not apply to people who are detained. ICE nevertheless lists the Miramar Facility as a check-in location, and reports and congressional oversight materials establish that people who report there for check-ins or other administrative appointments may be taken into custody and confined at the Facility overnight or for multiple days.

66. Beginning no later than approximately October 2025, upon information and belief, Defendants began routinely using holding rooms and other areas/enclosures at the Miramar Facility to

office page are not check-in locations and directing users to the separate check-in page); U.S. Immigr. & Customs Enf't, *Miami, FL*, https://www.ice.gov/node/62080 (last visited Sept. 30, 2026) (identifying the address at 2805 SW 145th Avenue, Miramar, Florida, listing appointment hours, and identifying "Miami Field Office" as the field-office name); U.S. Immigr. & Customs Enf't, *Check-In Locations*, https://www.ice.gov/contact/check-in (last visited Sept. 30, 2026) (listing the Miramar address as "Miami, FL" under the Miami Field Office).

[14] *D.N.N. v. Liggins,* No. 1:25-cv-01613-JRR, slip op. at 5 (D. Md. Mar. 6, 2026), ECF No. 170 ("The PBNDS do not apply to holding cells, including the Baltimore Hold Rooms"); U.S. Immigr. & Customs Enf't*, Detention Facilities, supra* note 2.

[15] *See* U.S. Immigr. & Customs Enf't, *Detention Facilities*, *supra* note 2.

confine people awaiting processing, transfer, release, voluntary departure, or removal. Defendants thereby converted the Facility from a publicly identified administrative check-in and appointment location into a de facto site of overnight and multi-day detention.

67. The Miramar Facility falls within Directive 11087.2's functional definitions. The Directive defines a "holding facility" as a facility containing hold rooms primarily used for the short-term confinement of people who have recently been detained or are being transferred to or from another location, and defines a "hold room" as a holding cell, cell block, or other secure enclosure within a holding facility. The Directive's application therefore turns on Defendants' operation and use of the secure areas for confinement, not merely on the label ICE places on the larger premises.[16]

68. Because ICE does not publicly identify Miramar as a place where people may be confined overnight or for multiple days, ICE does not publish reliable Miramar-specific procedures through which attorneys and family members can determine whether a person is confined there, arrange confidential communication, request legal visitation, deliver prescribed medication, or obtain information concerning transfer or release.

69. Upon information and belief, the Miramar Facility was not designed or retrofitted for routine overnight or multi-day confinement. Its holding areas include small, crowded rooms with toilets in the same space where people eat and sleep; no ordinary beds or sleeping areas; limited shower and hygiene access; no dedicated space for confidential legal visitation; and, upon information and belief, no continuously staffed on-site medical unit capable of providing intake screening, medication administration, and routine treatment for the population confined there. Rep. Wasserman Schultz reported more than seventy people in one room, floor sleeping, one bottle of water per day, small meals, and no attorney-specific access or visitation space.

---

[16] *See* U.S. Immigr. & Customs Enf't, *supra* note 3.

70. Since its operation as a de facto detention facility in or about October 2025, ICE's public facility-inspection page has identified no inspections of the Miramar Facility.[17] The Directive separately requires annual compliance assessments for ERO holding facilities and annual field-office review through the Holding Facilities Self-Assessment Tool. [18] Upon information and belief, Defendants have not completed or disclosed those required assessments for the Miramar Facility.

**C. Defendants Routinely Use the Miramar Facility for Overnight and Multi-Day Detention**

71. Since at least late 2025, community organizations, families, attorneys, and formerly/currently detained people have repeatedly reported that ICE confines people at the Miramar Facility for multiple days before transfer, release, or removal. Congressional oversight materials also cite reported data identifying numerous stays exceeding seventy-two hours during 2025, including some substantially longer stays.

72. In addition, congressional oversight observations reported dozens of people confined together for multiple days, while sleeping on the floor with thin, foil blankets and receiving inadequate food, water, bathing access, and information about their custody.

73. Public reports after the inspection describe still longer detention. In one reported case, the family of a woman detained in July 2026 stated that she remained at Miramar for eight days, wore the same clothing throughout, could not shower, and slept on the floor without padding

[17] U.S. Immigr. & Customs Enf't, *Facility Inspections*, https://www.ice.gov/detain/facility-inspections (last visited Sept. 30, 2026); Vazquez, *supra* note 4.

[18] *See* U.S. Immigr. & Customs Enf't, *supra* note 3, at § 2.6 ("Annual compliance assessments shall be required for all facilities operated by ERO, located in ERO field offices, or jointly operated by ERO and HSI in shared offices"); *id*. § 4.3(7) ("[c]onducting an annual review of the application of this policy via the Holding Facilities Self-Assessment Tool at each holding facility within their area of responsibility to ensure ongoing compliance").

before transfer to another detention facility. Her family reported that she lost 15 pounds while detained at Miramar.[19]

74. Other public accounts describe people held for three days in a room with approximately seventy people, receiving little food or water and using a single toilet, and people held four or five days without showers, adequate food, meaningful telephone access, or confidential access to counsel.[20]

75. The repeated accounts before, during, and after the congressional inspection on July 2, 2026, demonstrate that prolonged confinement at the Miramar Facility is not an isolated mistake. It is a continuing policy and practice affecting a fluid and constantly changing population.

**D. Severe Overcrowding and Floor Sleeping**

76. During the July 2 inspection, Representative Wasserman Schultz observed approximately 150 people confined in four holding rooms, including more than seventy men in one room and approximately forty women in a substantially smaller room “packed like sardines, in conditions [she] wouldn’t wish on [her] worst enemy.”[21] Congressional letters released in September later reported whistleblower allegations of a population reaching 342 on one day in August.[22]

---

[19] Carlton Gillespie, *Family, friends, congresswoman call for release of St. Thomas soccer captain from ICE custody*, WLRN (July 30, 2026), https://www.wlrn.org/immigration/2026-07-30/ice-broward-transitional-center-pompano-florida.

[20] Rafael Olmeda, *Congresswoman describes ‘inhumane’ conditions at Miramar ICE facility*, S. Fla. Sun Sentinel (July 2, 2026), https://www.sun-sentinel.com/2026/07/02/congresswoman-describes-inhumane-conditions-at-miramar-ice-facility/; Abel Fernández, *Immigrants say they are being held for days in a Miami ICE office under ‘horrific’ conditions*, El País (July 9, 2026), https://english.elpais.com/usa/2026-07-09/immigrants-say-they-are-being-held-for-days-in-a-miami-ice-office-under-horrific-conditions.html; C.J. Ciaramella, *This ICE Office Detains People for Days in Overcrowded Holding Cells*, Reason (Aug. 25, 2026), https://reason.com/2026/08/25/this-ice-office-detains-people-for-days-in-overcrowded-holding-cells/.

[21] Vazquez, *supra* note 4.

[22] *See* Syra Ortiz Blanes, *Extreme overcrowding and abuse plague Florida ICE facilities, whistleblowers say*, Miami Herald (Sept. 21, 2026), https://www.miamiherald.com/news/local/immigration/article317326498.html.

77. The people detained report that the crowding left people with little room to sit or lie down and required them to eat, sleep, urinate, and defecate in the same confined space.

78. Defendants do not provide ordinary beds, cots, mattresses, or adequate sleeping accommodations in the holding rooms. Some people were forced to stand or sit while others attempted to sleep on hard or concrete floors with a thin foil blanket.[23]

79. Due to the severe overcrowding, some detained people are being forced to sleep in offices, including on top of desks, with no toilets in the room.

80. The rooms are designed for short-term processing and cannot safely accommodate overnight sleeping. The absence of sufficient floor space and sleeping surfaces predictably produces sleep deprivation, pain, exhaustion, and heightened medical and psychological risk.

81. Severe overcrowding and floor sleeping do not further any legitimate nonpunitive governmental objective. At minimum, these conditions are excessive in relation to any administrative need to process people for release, removal, or transfer.

**E. Inadequate Food and Drinking Water**

82. The Miramar Facility personnel informed Rep. Wasserman Schultz that detained people receive three small meals per day, each weighing approximately 7.5 ounces, and approximately one bottle of water per day.

83. Rep. Wasserman Schultz described the meals as "small microwavable entrees."[24] Reports from formerly and currently detained people and their families similarly describe very small portions, hunger, and food that is sometimes difficult or impossible to eat.

[23] *See* Wasserman Schultz, *supra* note 4; Vazquez*, supra* note 4.
[24] Hatzel Vela, *Congresswoman alleges overcrowding, lack of privacy at ICE processing facility in Miramar*, NBC 6 S. Fla. (July 2, 2026), https://www.nbcmiami.com/news/local/congresswoman-allegations-miramar-ice-processing-facility/3828909/.

84. Detained people report receiving inadequate and, in some instances, spoiled food and insufficient drinking water at the Miramar Facility. They report receiving small portions of inedible meals, including expired or foul-tasting food; some detained people refused to eat, while others experienced severe gastrointestinal symptoms and had to stop eating, resulting in many detained people losing significant weight.

85. Detained people also report that drinkable water is not freely and continuously available inside the holding rooms. The Miramar Facility personnel stated that additional water is available "on demand," but the detained people must draw an officer's attention to receive it.

86. In densely crowded, hot rooms, one bottle of water per day is plainly inadequate and creates a predictable risk of dehydration, dizziness, fainting, and other heat-related harm.

87. Defendants' practices conflict with the Directive's requirements that detained people receive a meal at least every six hours and have access to drinking water in holding rooms at all times.

88. Adequate food and clean drinking water are essential human necessities. The quantity, frequency, digestibility, and accessibility of food and water at the Miramar Facility are inadequate for people held overnight and for multiple days, and this has caused and continues to harm the detained people.

**F. Denial of Hygiene, Sanitation, and Bodily Privacy**

89. ICE personnel informed Rep. Wasserman Schultz that detained people could shower every other day. However, people detained at Miramar report that they have gone for days or weeks without a shower, access to hygiene products, or a change of clothes.

90. During the oversight visit, a supply cupboard was empty, although personnel stated it was being restocked. Staff asserted that menstrual supplies were available, but reports received by advocates describe denials or delays in obtaining hygiene products, clothing, and menstrual products.

91. People detained at the Miramar Facility for several days report that they do not receive basic hygiene items or clean clothing, with some people remaining in the same clothes for days or weeks until they are transferred. Reports describe inadequate access to toothbrushes, toothpaste, soap, menstrual products, and changes of clothing.

92. The only toilet in each holding room is located in the same small space where dozens of people eat and sleep. The toilet is open to view.[25] There is no privacy. A toilet in each of the overcrowded rooms is exposed, forcing detained people to use the bathroom in view of other detained people and, upon information and belief, ICE officers of other genders, in an unsanitary environment.

93. Some detained people reported cameras angled at the toilets. Detained people must urinate, defecate, and manage menstruation in view of other detained people at the Miramar Facility. Upon information and belief, staff can observe the toilet area in various ways, including direct monitoring and video surveillance, and the surveillance system may capture or record intimate bodily functions.

94. Defendants do not consistently provide privacy from observation by people or staff of another gender, even though the Directive and DHS regulations limit cross-gender viewing during bodily functions and require staff to announce their presence.[26] Toilets are exposed to other detained people and, often visible to surveillance cameras, making detained people reluctant or unable to defecate.

95. Crowding dozens of people around a single exposed toilet, without reliable bathing or hygiene supplies, creates unsanitary conditions and heightens the risk of infectious disease, skin conditions, humiliation, and psychological injury.

---

[25] Olmeda, *supra* note 19.

[26] 6 C.F.R. § 115.115(d) (2026); *see* U.S. Immigr. & Customs Enf't, *supra* note 3 (citing ICE Directive 11062.2, *Sexual Abuse and Assault Prevention and Intervention* (May 22, 2014)).

**G. Excessive Heat, Inadequate Ventilation, Extreme Temperatures**

96. The holding rooms become oppressively hot when dozens of people are packed shoulder-to-shoulder for hours or days. During the July 2 inspection, detained people cried out about the heat, and Rep. Wasserman Schultz described the rooms as very hot.

97. Overcrowding, enclosed rooms, hard floors and walls, limited ability to move, and inadequate access to drinking water compound the heat burden. Many detained people complained about the excessive heat and its effects.

98. People detained overnight cannot meaningfully cool themselves, rest, or sleep. Defendants do not provide sufficient ventilation, space, or other relief to offset the heat created by the population held in the rooms. Conditions also vary over time: some detained people report extreme cold, and the foil blankets provided are inadequate to keep them warm enough to rest or sleep.

99. Extreme heat conditions predictably cause excessive sweating, dehydration, dizziness, fainting, headaches, anxiety, sleep deprivation, and exacerbate underlying medical conditions.

**H. Inadequate Medical Care and Medication Access**

100. Upon information and belief, the Miramar Facility lacks a continuously staffed on-site medical unit capable of conducting timely medical intake, triage, routine treatment, and medication administration for the large population held there.

101. The Miramar Facility personnel informed Rep. Wasserman Schultz that medical incidents occurred on average approximately every day or every other day. They described calling 911, rendering first aid, and transporting people to a hospital when necessary. An ambulance arrived at the facility during Rep. Wasserman Schultz's press conference following her visit.[27]

---

[27] Vazquez*, supra* note 4.

102. Indeed, 911 calls from the Miramar Facility have risen sharply with emergency medical personnel and firefighters being repeatedly dispatched for medical complaints.[28]

103. Between July 1, 2025 and July 1, 2026, Miramar Fire Rescue recorded 194 calls for emergency medical services at the Miramar Facility with the pace of 911 calls significantly increasing over the summer as ICE arrests surged and the Miramar Facility became a de facto detention center, including 49 calls in the month of June alone and eight calls on a single day on July 1, 2026.[29]

104. The emergencies include diabetic emergencies, unconsciousness and fainting, strokes, heart problems, chest pain, breathing problems, abdominal pain, seizures, bleeding, and allergic reactions.[30]

105. Families and advocates report difficulty delivering prescribed medicine and basic medical supplies to detained relatives. Families and advocates are turned away, receive inconsistent instructions, or cannot confirm whether medication reaches the detained person. Detained people are not provided with needed medications, nor are those who have medication in their belongings allowed to access them.

106. People in crowded, hot rooms with inadequate food, water, sleep, and hygiene face an elevated risk of acute medical and mental health crises. Those risks are especially serious for older adults, pregnant or nursing people, people with disabilities, and people with diabetes, hypertension, respiratory conditions, or mental health needs.

107. Upon information and belief, Defendants fail to provide adequate medical screening, reliable medication access, and routine clinically appropriate evaluation and treatment. Although the

---

[28] Vera Lucia Pappaterra, *Medical Emergencies see sharp rise at Miramar ICE facility in midst of overcrowding*, Miami Herald (Aug. 5, 2026), https://www.miamiherald.com/news/local/immigration/article316761925.html.
[29] *Id.*
[30] *Id.*

Miramar Facility personnel have reported calling 911, rendering first aid, and transporting people to hospitals for emergencies, reliance on emergency services does not substitute for timely screening, medication administration, and nonemergency care during overnight or multiday confinement. *See Dang v. Sheriff, Seminole County,* 871 F.3d 1272, 1280 (11th Cir. 2017) (recognizing that an official may act with deliberate indifference by delaying treatment of a serious medical need, even when medical care is ultimately provided); *see also Burton v. Espino,* No. 24-12549, slip op. at 7–13 (11th Cir. Aug. 25, 2026) (reversing summary judgment on deliberate-indifference claims based on evidence that a physician refused to assess or treat reported head injuries and seizures and later declined specialist-recommended physical therapy for allegedly nonmedical reasons).

**I. Denial of Meaningful Access to Counsel**

108. People detained at the Miramar Facility are not provided meaningful, confidential access to attorneys. ICE represented to Rep. Wasserman Schultz that the facility has no dedicated space for in-person attorney visits and does not permit family visitation.[31]

109. Detained people are generally allowed one, very brief (three-to-four-minute) outgoing telephone call per day that is monitored and recorded. The Miramar Facility does not provide a system for private, unmonitored, and unrecorded legal calls.

110. Upon information and belief, calls occur in or near crowded holding rooms and staff-controlled areas, where other detained people or officers may overhear. Upon information and belief, detained people with limited English proficiency may lack interpretation or assistance navigating the telephone system.

111. Attorneys who seek to visit or speak with established clients report that their requests are ignored, delayed, or denied. Detained people who have counsel are unable to access their

[31] Wasserman Schultz, *supra* note 4.

counsel and those who do not already have counsel lack a practical means to retain an attorney or legal-service organization before transfer or making a removal-related decision.

112. ICE officers at the Miramar Facility have informed detained people that they cannot speak to an attorney while at the Miramar Facility and must wait until they are transferred to another facility.

113. Attorneys and family members report difficulty locating people held at the Miramar Facility. Upon information and belief, the ICE Online Detainee Locator does not promptly identify the Miramar Facility as a detained person's location and may not promptly reflect transfers, delaying counsel's ability to locate and communicate with detained people.

114. Even if the PBNDS do not formally govern the Miramar Facility's hold rooms, the provisions concerning confidential legal visitation and free or direct legal calls demonstrate feasible safeguards for people held overnight or for multiple days. Defendants may not use a short-term classification to hold people for days while unreasonably obstructing communication with counsel.

115. Defendants cannot avoid meaningful access to counsel protections by shifting labels. If the Miramar Facility operates as a detention facility, the PBNDS require confidential legal visitation, free and direct legal calls, and reasonable limits on restrictions governing the number and duration of legal calls. If the Miramar Facility is instead a short-term holding facility, Defendants cannot confine people there overnight or for days while denying the basic access to counsel safeguards necessitated by that prolonged confinement.

116. ICE's public identification of the Miramar Facility as an appointment and check-in location, rather than as a location where people may be held overnight or for multiple days, contributes to the challenged obstruction of counsel. ICE does not maintain a publicly identified Miramar detention-facility page or publish reliable Miramar-specific procedures through which

attorneys can confirm that a person is confined there, schedule a confidential call, request legal visitation, or intervene before transfer, removal, or presentation of an immigration-related document.

117. The denial of timely and confidential access to counsel prevents people from understanding their custody, challenging detention, seeking bond or habeas relief, preserving immigration claims, reviewing documents, and making informed decisions before transfer or removal. Defendants must provide a reasonable and meaningful means of confidential attorney communication.

**J. Pressure to Sign Removal-Related Documents**

118. Upon information and belief, and based on the reports described above, ICE officers have pressured detained people held at the Miramar Facility to sign voluntary-departure, self-deportation, or other removal-related documents by representing that signing will accelerate release or end confinement under the challenged conditions.

119. ICE personnel informed Rep. Wasserman Schultz that officers offer voluntary departure to people held at the Miramar Facility and denied that anyone is pressured to accept it. However, detained people report materially different policies and practices. They were frequently threatened with prolonged detention or prison and pressured to sign voluntary departures, including signing documents that were not in the detained people's native language.

120. When asked what safeguards were in place to prevent officers from using the denial of food, water, medicine, clothing, showers, family contact or other coercion to pressure detained people into signing documents, facility personnel referred only to management directives. They did not identify any independent review process, opportunity for confidential legal consultation, or other concrete protection against coercion.

121. Families, advocates, and detained people report repeated requests for detained people to sign voluntary-departure or self-deportation documents, including a report that being provided with clean clothing was conditioned on signing voluntary-departure or self-deportation paperwork.

122. Coercing civilly detained people to forfeit their due process rights is not a legitimate governmental objective.

123. Federal regulation prohibits immigration officers from using threats, coercion, or physical abuse to induce a person to waive rights or make a statement. 8 C.F.R. § 287.8(c)(2)(vii). Any waiver of immigration rights must be knowing and voluntary.

124. The combination of prolonged confinement, deprivation of necessities, isolation from counsel and family, uncertainty about location and transfer, and repeated presentation of removal-related documents creates an inherently coercive environment.

125. DHS's response to recent images from the ICE facility in Miramar is also telling. Those images raise questions about overcrowding, sanitation, and the conditions detainees are facing, with photos reportedly showing people sleeping on the floor and using makeshift sanitation facilities. DHS disputed the characterization of the site as a detention facility and said, "Being in detention is a choice," encouraging people to voluntarily leave the country through the CBP Home app.[32]

126. Framing continued detention under the conditions described herein as the consequence of a "choice" not to abandon one's legal claims—shows that Defendants are aware of the unconstitutional conditions and intend detention conditions to operate as punishment and

[32] *See* Miguel Santiesteban, *New images raise questions about conditions at ICE Facility in Miramar*, NBC 6 South Florida (Sept. 22, 2026) (reporting statement provided by U.S. Dep't of Homeland Sec.), https://www.nbcmiami.com/news/local/new-images-raise-questions-about-conditions-at-ice-facility-in-miramar/3862410/.

pressure on detained people to relinquish legal protections, rather than as conditions reasonably related to any legitimate, nonpunitive governmental objective.

127. DHS' statement that "detention is a choice" considered together with ICE's acknowledged practice of offering voluntary departure at the Miramar Facility without any safeguards to ensure access to counsel, supports a plausible inference that continued confinement and the harsh conditions alleged herein are used, at least in part, as leverage to induce detained people to accept voluntary departure, self-deport, or otherwise relinquish legal rights. Reports supporting this inference include: officers at the Miramar Facility repeatedly present detained people with removal-related documents, condition necessities on signing such documents, and pressure detained people to purchase tickets or self-deport.

128. Using prolonged confinement, deprivation of basic necessities, or isolation from counsel and family to obtain a purported waiver or departure agreement does not further a legitimate nonpunitive objective. Irrespective of Defendants' subjective purpose, the challenged conditions are excessive in relation to any legitimate processing, custody, or transfer objective, and they are not reasonably related to, and are excessive in relation to, any legitimate nonpunitive objective.

### K. Trump Administration's Deportation Priorities Continue to Exacerbate Conditions at the Miramar Facility

129. This administration's mass removal priorities coupled with the recent ending of Haiti's Temporary Protected Status ("TPS") will exacerbate all the conditions described above.

130. President Trump stated on the campaign trail and repeatedly since being in office that the administration would conduct the largest mass deportation operation in American history with a stated goal of achieving up to one million deportations per year.[33]

131. Current data show that the pace of immigration detentions is increasing, with ICE arrests surging this summer. The administration has recorded its highest monthly arrest totals to date, with an estimated 49,000 people detained in July and 51,000 in August, while immigration arrests climbed to near-record levels in nearly every state.[34]

132. In South Florida in particular, this surge is likely to intensify with the revocation of Haiti's TPS, which ended on July 27, 2026, because Broward County, where the Miramar Facility is located, has the largest Haitian-ancestry population with nearly 120,000 residents reporting Haitian ancestry.[35]

133. The administration's stated priorities, the current pattern of increased immigration arrests and detention, and termination of TPS have created the direct and foreseeable consequences currently taking place at the Miramar Facility where Defendants continue to use the facility as a de facto detention center despite knowing that it lacks beds, adequate medical infrastructure, confidential space for attorney visits, and other accommodations necessary for overnight or multi-day confinement.

---

[33] Press Release, The White House, *The One Big Beautiful Bill Will Crack Down on Illegal Immigration* (May 17, 2025), https://www.whitehouse.gov/releases/2025/05/the-one-big-beautiful-bill-will-crack-down-on-illegal-immigration/.

[34] Jazzmine Ulloa, Miriam Jordan, Luis Ferré-Sadurní, and David Ovalle, *A Quiet Surge That Unfolded 'Everywhere All at Once' This Summer,* N.Y. TIMES (Sept. 27, 2026), https://www.nytimes.com/2026/09/27/us/ice-surge-immigration-arrests.html.

[35] Alli Coritz, Ricardo Henrique Lowe, Jr. & Jessica E. Peña, *Over Half of Those Who Reported Their Race as Black or African American Identified as African American, Jamaican or Haitian*, U.S. Census Bureau (Oct. 17, 2023), https://www.census.gov/library/stories/2023/10/2020-census-dhc-a-black-population.html.

134. Because Defendants continue to use the Miramar Facility for overnight and multi-day confinement without adequate infrastructure, any sustained increase in enforcement and corresponding detention at the Miramar Facility will predictably aggravate the existing overcrowding, floor sleeping, as well as inadequate access to water, food, hygiene, medical care, bodily privacy, and counsel.

135. This foreseeable increase in the population exposed to the Miramar Facility's overcrowded, unhygienic, and overall inadequate conditions makes the risk of continued and worsening harm concrete and imminent and heightens the need for prompt class-wide declaratory and injunctive relief.

**L. Defendants' Knowledge and Continued Conduct**

136. Through their respective agency, supervisory or operational roles, Defendants possess direct operational control over the Miramar Facility, its staffing, occupancy, detention logs, inspection logs, food and water distribution, medical response, telephone access, transfer decisions, and use of removal-related documents.

137. Defendants have received notice through complaints from detained people, formerly detained people, their family members, immigration counsel, advocacy organizations, public reporting, congressional inquiries, and Rep. Wasserman Schultz's July 2 inspection and public report.

138. As shown above, Defendants' statement that "detention is a choice" also supports that Defendants are aware of the inhumane conditions of confinement and create them to pressure detained people to surrender their legal rights by signing "voluntary" deportation documents.

139. During the inspection, the Miramar Facility personnel stated that the facility had not undergone an inspection since it began its current prolonged use for detention in approximately October 2025. At minimum, that statement shows the absence of meaningful and regular review despite known, obvious, and serious risks, and regulatory guidelines.

140. The Miramar Facility personnel observed and permitted the challenged conditions, including overcrowded holding rooms, one bottle of water per day, small meals, intermittent showers, frequent medical incidents requiring 911, and no space for attorney visitation.

141. On September 30, 2026, Rep. Wasserman Schultz conducted a follow-up inspection and found multiple people inside who had been detained there for more than six days. She observed the hold rooms still packed with people on floors that appeared not to have been mopped for months and a broken, leaking sink. The facility personnel admitted plumbing problems to Rep. Wasserman Schultz and stated that showers are not provided regularly and instead only when an officer deems necessary. [36]

142. Rep. Wasserman Schultz also reported that the Miramar Facility has no medical unit and that detained people have been denied access to medical care despite more than two dozen emergency calls. [37]

143. The conditions described above persist despite Defendants' actual and continuing knowledge of them. Defendants have continued the practice of holding people in civil detention at the Miramar Facility for extended periods of time beyond ICE's own directives under deplorable and inhumane conditions that violate the Constitution.

144. Subjecting civilly detained people to any of the conditions described above is not rationally related to a legitimate nonpunitive purpose and is excessive in relation to any administrative need.

145. Unless enjoined, Defendants will continue to subject Plaintiffs and the putative Class to ongoing and irreparable harm.

[36] Press Release, Rep. Debbie Wasserman Schultz, *Wasserman Schultz Conducts Surprise Miramar ICE Facility Inspection Following Whistleblower Report* (Sept. 30, 2026), https://wassermanschultz.house.gov/news/documentsingle.aspx?DocumentID=3538.
[37] *Id.*

## CLASS ACTION ALLEGATIONS

146. Plaintiffs bring this action on behalf of themselves and a putative Class (the "Class") under Federal Rule of Civil Procedure 23(a) and 23(b)(2), defined as:

> **All persons who are now detained, or will in the future be detained, in civil immigration custody at the Miramar Facility located at 2805 SW 145th Avenue, Miramar, Florida 33027.**

147. The Class consists of people awaiting processing, release, removal, or transfer and is inherently transitory. Although an individual's confinement may end before a class-certification motion can be decided, a constantly changing population remains exposed to the same challenged practices. Plaintiffs will move promptly for class certification.

148. **Numerosity.** Joinder is impracticable. Approximately 150 people were detained at the Miramar Facility during the July 2 inspection, and the population changes continuously as people are arrested, processed, transferred, removed, or released. Many Class members have limited English proficiency, lack counsel and resources, and cannot bring individual litigation during brief and isolated confinement. Additionally, the Class is likely to grow because the termination of Haiti's TPS designation has exposed additional South Florida residents to potential immigration arrest and detention.

149. **Commonality.** Defendants operate one facility under uniform or substantially similar policies and practices. The case presents common questions capable of class-wide resolution, including:

   a. whether Defendants' facility-wide policy and practice of using a location publicly presented as an administrative appointment, check-in, and bond-acceptance site—and not publicly identified as a detention facility—for overnight and multi-day confinement, without the infrastructure and safeguards ordinarily associated with detention, violates the Fifth Amendment;

b. whether Defendants' policy and practice of using Miramar's short-term holding rooms for overnight and multi-day confinement, under the conditions alleged herein, subjects Plaintiffs and Class members to unconstitutional punishment in violation of the Fifth Amendment;

c. whether Defendants' facility-wide practices concerning severe overcrowding, floor sleeping, inadequate food and drinking water, inadequate hygiene and sanitation, oppressive heat and inadequate ventilation, inadequate medical screening and care, and lack of toilet privacy—individually or in combination—deprive Plaintiffs and Class members of basic human needs protected by the Fifth Amendment;

d. whether Defendants' failure to implement written policies limiting the number of people detained at the Miramar Facility results in punitive conditions that violate the Fifth Amendment;

e. whether Defendants' facility-wide policies and practices expose detained people during toilet use or changing to observation by other detained people or staff or, upon information and belief, to unshielded visual or video surveillance, in violation of the Fifth Amendment right to bodily privacy;

f. whether Defendants maintain a facility-wide policy or practice that unreasonably obstructs detained people's ability to locate, retain, consult with, and communicate confidentially with current or prospective counsel, in violation of the First and Fifth Amendments;

g. whether Defendants' failure to adopt any compliance mechanism to enforce their unwritten cell population limits leads to punitive conditions violating the Fifth Amendment;

h. whether Defendants' failure to adopt written medical care policies constitutes deliberate indifference to serious medical needs that violates the Fifth Amendment;

i. whether the challenged conditions and restrictions are reasonably related to legitimate nonpunitive governmental objectives or are excessive in relation to those objectives;

j. whether Defendants permit a practice of using coercion, deprivation of necessities and material misrepresentation to obtain immigration-related signatures or waivers;

k. whether the discrete duties prescribed by Directive 11087.2—including requirements concerning meals, drinking water, access to prescribed medication, and the maximum duration of confinement in an ERO holding facility—are legally required agency actions and, if so, whether Defendants have unlawfully withheld or unreasonably delayed those actions at the Miramar Facility in violation of 5 U.S.C. § 706(1);

l. whether Defendants' common policies, practices, acts, and omissions create or maintain objectively serious deprivations of basic human needs or substantial risks of serious harm and, to the extent deliberate indifference must be shown, whether Defendants knew of and failed to take reasonable measures to address those deprivations and risks; and

m. what declaratory and injunctive relief applicable on a class-wide basis is necessary to remedy the conditions.

150. **Typicality.** Plaintiffs' claims are typical because they were subjected to, or face an imminent risk of being subjected to, the same facility-wide conditions, duration practices, and restrictions on access to counsel challenged on behalf of the Class.

151. **Adequacy.** Plaintiffs have no interests antagonistic to the Class and will fairly and adequately protect its interests. The putative Class is represented by experienced attorneys from the Southern Poverty Law Center and Americans for Immigrant Justice. Putative Class counsel

have extensive experience litigating class action lawsuits and complex systemic cases in federal court on behalf of detained immigrants and incarcerated people.

152. The putative Class meets the requirements of Fed. R. Civ. P. 23(b)(2). Defendants have acted on grounds generally applicable to the putative Class through their policies and practices of detaining people at the Miramar Facility in punitive conditions of confinement, including the denial of access to counsel, in violation of Plaintiffs' and the putative Class members' rights. Therefore, declaratory and injunctive relief are appropriate with respect to the putative Class as a whole.

153. The putative Class also satisfies Federal Rule of Civil Procedure 23(b)(1)(A). Prosecuting separate actions concerning the same facility-wide policies and practices would create a substantial risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants. Individual orders addressing occupancy limits, duration of confinement, sleeping accommodations, sanitation, medical care, bodily privacy, telephone access, and confidential attorney communication could impose conflicting operational requirements governing the same holding rooms, personnel, and detained population. Resolution of these issues in a single class action will establish uniform standards applicable to Defendants' operation of the Miramar Facility.

154. Each member of the putative Class is or will be entitled to seek declaratory or injunctive relief from the challenged conditions and attorney-access practices, subject to the jurisdictional limits applicable to the requested relief.

155. Plaintiffs and Class members have suffered and continue to face pain, hunger, thirst, sleep deprivation, humiliation, exposure to unsanitary conditions, exacerbation of medical and mental health conditions, risk of new illness or injury, impaired access to legal relief, and psychological and emotional harm.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Fifth Amendment Due Process Clause**
*Unconstitutional Conditions of Civil Confinement*

156. Plaintiffs reallege and incorporate by reference paragraphs 1–148 as if fully set forth herein.

157. Defendants have a policy and practice of detaining Plaintiffs and Class members for extended periods at the Miramar Facility.

158. Under the Fifth Amendment, Defendants must provide for Plaintiffs' and Class members' health, safety, and well-being while in custody and may not subject them to punitive conditions of civil confinement.

159. The conditions alleged above—including severe overcrowding, floor sleeping, inadequate food and drinking water, inadequate hygiene and sanitation, exposed toilets, and oppressive heat, as well as, upon information and belief, inadequate medical staffing and procedures, routine denial or delay of medication and medical treatment, camera capture or recording of toilet use, observation of bodily functions by staff of another gender, and the use of harsh conditions to pressure detained people to sign removal-related documents—are not rationally related to a legitimate nonpunitive purpose and are excessive in relation to any such purpose.

160. The risk of continued and worsening harm is heightened by the July 27, 2026 termination of Haiti's TPS designation and the resulting increase, upon information and belief, in the number of South Florida residents exposed to immigration arrest, processing, and detention. Defendants' continued operation of the Miramar Facility without adequate capacity or infrastructure makes recurrence of the challenged conditions foreseeable and imminent.

161. Defendants' policies and practices subject Plaintiffs and Class members to unlawful punitive conditions of civil confinement.

162. People in civil detention may not be subjected to conditions that amount to punishment. Where a restriction or condition is not reasonably related to a legitimate governmental objective, or is excessive in relation to that purpose, a court may permissibly infer that it is punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535, 538–39 (1979).

163. Defendants have knowingly converted a location that ICE publicly presents as an appointment, check-in, and bond-acceptance site—and does not publicly identify as a detention facility—into a site for overnight and multi-day confinement without supplying the sleeping accommodations, medical infrastructure, medication procedures, sanitation, confidential legal-access space, staffing, and other safeguards necessary for that use. That facility-wide operational decision makes the challenged harms foreseeable, supports an inference of actual knowledge, and demonstrates that the conditions are not reasonably related to, or are excessive in relation to, any legitimate nonpunitive objective.

164. Defendants knew and know of the challenged conditions and the substantial risks they create through their direct control of the Facility, custody and incident records, complaints, recurring medical events, public reports, and congressional oversight, yet they continue the challenged practices without adequate corrective measures. Defendants' knowing continuation of conditions posing substantial risks to health and safety supports Plaintiffs' claim that Defendants acted with deliberate indifference.

165. Defendants' public messaging and the Miramar Facility-specific practices alleged above support an inference that the challenged conditions are maintained, at least in part, to pressure detained people to accept voluntary departure or self-deportation.

166. The challenged conditions bear no reasonable relationship to, and are excessive in relation to, any legitimate processing, custody, or transfer objective.

167. Defendants' policies and practices, individually and together in their totality, subject individuals in civil detention to punitive conditions in violation of the Due Process Clause of the Fifth Amendment.

168. Defendants' actions have caused, are causing, and, unless enjoined, will continue to cause Plaintiffs and Class members irreparable constitutional, physical, medical, and psychological harm.

169. Plaintiffs and the Class are entitled to declaratory and injunctive relief.

**COUNT II**
**Violation of the First and Fifth Amendments; 8 U.S.C. §§ 1362, 1229a(b)(4)(A)**
*Lack of Access to Counsel*

170. Plaintiffs reallege and incorporate by reference paragraphs 1–162 as if fully set forth herein.

171. Defendants' policies and practices substantially burden Plaintiffs' and Class members' ability to locate, retain, consult, and communicate confidentially with current or prospective counsel, in violation of the First and Fifth Amendments and, for persons in removal proceedings, the statutory protections codified at 8 U.S.C. §§ 1362 and 1229a(b)(4)(A).

172. The right to counsel is also rooted in the U.S. Constitution. The Eleventh Circuit has recognized that noncitizens have "a right to be represented by counsel of their choice in deportation proceedings" and that "[t]he right to counsel in the immigration context is an integral part of the procedural due process to which the alien is entitled." *Frech v. U.S. Att'y Gen.*, 491 F.3d 1277, 1281 (11th Cir. 2007); *see also Cobourne v. INS*, 779 F.2d 1564, 1566 (11th Cir. 1986).

173. Defendants' practices, including the absence of a reliable means to locate people detained at the Miramar Facility, and arrange confidential legal calls or visits, substantially burden the Plaintiffs' and the putative Class members' ability to retain, consult, and communicate with counsel, in violation of the First and Fifth Amendments.

174. By and through Defendants' ongoing violations of and departures from their own policies, they are engaged in conduct that deprives the Plaintiffs and the putative Class members of effective access to counsel, in violation of the First and Fifth Amendments and federal law.

175. Plaintiffs and putative Class members have suffered and will imminently suffer irreparable injury as a result of Defendants' policy, practice, and failures to act, including loss of a meaningful opportunity to obtain urgent legal advice, and are entitled to injunctive relief to avoid any further injury.

**COUNT III**
**Violation of the Fifth Amendment Due Process Clause and the Administrative Procedure Act, 5 U.S.C. §§ 704, 706(2)(A)–(B)**
*Coerced and Involuntary Signatures and Waivers of Rights*

176. Plaintiffs reallege and incorporate by reference paragraphs 1–168 as if fully set forth herein.

177. Defendants maintain or permit a policy and practice at the Miramar Facility of coercing, threatening, deceiving, or otherwise pressuring detained people to sign voluntary-departure and other immigration-related documents that waive or relinquish legal or procedural rights or authorize departure or removal from the United States.

178. Defendants also maintain or permit a policy and practice of presenting immigration-related documents in English, or in another language the detained person does not understand, without meaningful translation or explanation and without a reasonable opportunity to read the document or consult available counsel.

179. To procure signatures on these documents, Defendants use or permit coercive, threatening, or deceptive practices, including:

a. representing that signing is the quickest or only means of leaving the Miramar Facility or obtaining relief from the challenged conditions;

b. conditioning or threatening to condition access to clothing, medication, food, water, showers, telephone access, family communication, or other necessities on signing;

c. threatening continued confinement, transfer, removal, or other adverse treatment for refusing to sign;

d. materially misrepresenting the nature or legal consequences of a document; and

e. denying or materially delaying a reasonable opportunity to consult available counsel before signing.

180. When ICE obtains a detained person's agreement to depart without placing that person in formal removal proceedings, the person may lose the opportunity to appear before an immigration judge, contest removability, apply for relief from removal, obtain administrative review, or petition for judicial review. Depending on the document used, immigration court may provide no practical procedure through which the person can later challenge whether the agreement was obtained knowingly and voluntarily. A coerced signature may therefore produce immediate and potentially irreversible consequences, including departure or removal from the United States before counsel or a court can intervene.

181. The Due Process Clause of the Fifth Amendment prohibits Defendants from procuring or relying upon a purported waiver of legal or procedural rights unless the waiver is knowing and voluntary.

182. Defendants' use of threats, coercion, deprivation of necessities, material misrepresentations, untranslated or inadequately explained documents, or denial of a reasonable opportunity to consult available counsel renders any resulting signature or waiver unknowing or involuntary and violates the Due Process Clause.

183. Federal regulation also prohibits immigration officers from using threats, coercion, or physical abuse to induce a person to waive rights or make a statement. 8 C.F.R. § 287.8(c)(2)(vii).

184. Based on their failure to follow the requirements of 8 C.F.R. § 287.8(c)(2)(vii) through a policy and practice of using threats, coercion, and other forms of abuse to pressure people into

waiving their rights and signing immigration documents, Defendants are also violating the Due Process Clause under the doctrine established in United States ex rel. *Accardi v. Shaughnessy,* 347 U.S. 260, 266-68 (1954), which requires Defendants to comply with their own administrative regulations.

185. Defendants' affirmative adoption, implementation, and systemic execution of standard operating procedures and policies of procuring signatures on untranslated documents and using coercion or threats to obtain signatures and waivers of rights constitute final agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704. This systemic framework marks the consummation of the agency's decision-making process and constitutes an action from which immediate, binding legal consequences flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

186. Defendants' final agency action is not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(A), because it is contrary to Defendants' own regulation, 8 C.F.R. § 287.8(c)(2)(vii), which is enforceable against Defendants under *Accardi,* 347 U.S. at 266-68.

187. To the extent the final agency action authorizes, permits, or ratifies the practices alleged above, it is contrary to 8 C.F.R. § 287.8(c)(2)(vii), not in accordance with law under 5 U.S.C. § 706(2)(A), and contrary to constitutional right under 5 U.S.C. § 706(2)(B).

188. Defendants' final agency action is also contrary to constitutional right, within the meaning of 5 U.S.C. § 706(2)(B), because it violates the Due Process protections of the Fifth Amendment.

189. Defendants' final agency action is also arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with the law under 5 U.S.C. § 706(2)(A).

190. Plaintiffs and affected Class members have suffered legal wrong and are adversely affected and aggrieved within the meaning of 5 U.S.C. § 702. Defendants' practices have caused and, unless enjoined, will continue to cause irreparable harm, including involuntary relinquishment

of legal and procedural rights, impairment or loss of immigration claims, and departure, transfer, or removal based upon invalid waivers.

191. Plaintiffs and the Class are entitled to declaratory and injunctive relief under the Fifth Amendment and an order under 5 U.S.C. § 706(2) holding unlawful and setting aside Defendants' adopted or ratified agency actions, policies and practices.

**COUNT IV**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706**
*Agency Action Unlawfully Withheld*

192. Plaintiffs reallege and incorporate by reference paragraphs 1–184 as if fully set forth herein.

193. The APA, 5 U.S.C. § 706(1), directs federal courts to compel agency action unlawfully withheld or unreasonably delayed.

194. ICE issued Directive 11087.2, *Operations of ERO Holding Facilities* (the "Directive"), to govern the operation and conditions of ERO holding facilities, which includes the Miramar Facility as it currently operates. The Directive assigns responsible ERO and field-office officials duties to ensure compliance with its procedures.

195. When a federal agency adopts rules that affect the fundamental rights of individuals, including self-imposed policies and processes that limit otherwise discretionary decisions, the agency is bound to follow its own rules. *Accardi,* 347 U.S. at 266-68. A failure to do so not only violates the APA but also violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

196. In direct violation of the Directive and applicable DHS regulations, Defendants:

a. have failed to ensure that hold rooms are safe, clean, and equipped with restroom facilities, Directive § 4.4.1(3);

b. have failed to provide adequate screening to identify serious mental health conditions, refer people experiencing acute mental health distress to appropriate professionals, and

maintain and implement adequate written medical-emergency procedures and response plans, Directive § 4.3;

c. have failed to empty the Miramar Facility upon the conclusion of daily operations and instead continue to confine people there overnight and for multiple days, including beyond the Directive's defined period for short-term confinement, Directive § 5.1(1);

d. have denied or delayed detained people's access to prescribed medication as necessary, Directive § 5.7(2);

e. have failed to provide detained people access to drinking water in holding rooms at all times, Directive § 5.2(2);

f. have failed to conduct 12-hour hold-room inspections, Directive § 5.8(2);

g. have failed to provide detained people a meal at least every six hours, Directive § 4.4.1(2); and

h. have failed to implement and carry out at the Miramar Facility the required policies and procedures enabling detained people to shower, where showers are available, perform bodily functions, and change clothing without being viewed by staff of the opposite gender, subject to the specified exceptions, and requiring opposite-gender staff to announce their presence. Directive § 5.6.

197. Each identified provision imposes a discrete, mandatory duty triggered by an ascertainable event, circumstance, or deadline, including a person's placement in a hold room, need for prescribed medication, passage of six hours without a meal, or conclusion of daily operations. Defendants have repeatedly failed to perform these specifically required actions when they became due. Those omissions constitute agency action unlawfully withheld or unreasonably delayed within the meaning of 5 U.S.C. § 706(1).

198. Plaintiffs and Class members have suffered legal wrong and are adversely affected and aggrieved by Defendants' omissions within the meaning of 5 U.S.C. § 702. Defendants' omissions have caused and threaten prolonged confinement, hunger, thirst, missed or delayed medication, humiliation, and risks to health, safety, and bodily privacy.

199. Plaintiffs lack another adequate remedy that would compel Defendants to perform the specific duties identified above. Plaintiffs and the Class are entitled to relief under 5 U.S.C. § 706(1), including an order compelling the responsible Defendants to perform the discrete, required actions unlawfully withheld or unreasonably delayed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Certify this action as a class action under Federal Rule of Civil Procedure 23(a) and Rule 23(b)(2), or, in the alternative, under Rule 23(a) and Rule 23(b)(1)(A), appoint the named Plaintiffs as Class Representatives, and appoint undersigned counsel as Class Counsel;
2. Enter judgment in favor of Plaintiffs and the Class and against Defendants;
3. Declare that Defendants' policy and practice of unreasonably obstructing Class members' ability to be located by and to access, retain, consult, and communicate confidentially with current or prospective counsel violates the First Amendment and the Fifth Amendment, and, where applicable, 8 U.S.C. §§ 1362 and 1229a(b)(4)(A);
4. Declare that the conditions to which Defendants subject Class members at the Miramar Facility constitute punishment in violation of the Fifth Amendment;
5. Declare that Defendants violate the Fifth Amendment by procuring immigration related signatures or purported waivers through threats, coercion, deprivation or threatened deprivation of basic necessities, material misrepresentation, untranslated or inadequately

explained documents, continued confinement, or denial of a reasonable opportunity to consult counsel; and

6. Grant temporary restraining, preliminary, and permanent injunctive relief to the named Plaintiffs, and to the extent authorized by law, enjoin Defendants, their officers, agents, servants, employees, attorneys, successors in office, and other persons in active concert or participation with them who receive actual notice, as follows:

   a. **With respect to Count I:**

      1. establish, disclose, and enforce maximum safe occupancy limits based on usable square footage, facility design, fire and life-safety requirements, sanitation, toilet access, and the ability of each person held overnight to lie down away from toilets;

      2. provide each Class member held overnight or for more than twelve hours with a clean sleeping mat, cot, bed, or other safe sleeping surface; clean bedding; and sufficient space to lie down without sleeping in or immediately adjacent to a toilet area;

      3. clean and sanitize all holding rooms, toilets, and common areas on an ongoing basis and provide adequate toilet paper, soap, towels, toothbrushes, toothpaste, menstrual products, and other basic hygiene supplies;

      4. provide physical and operational privacy measures enabling Class members to use toilets, shower, and change clothing outside the view of other detained people, unnecessary staff observation, staff of the opposite gender except under the limited circumstances permitted by applicable law, and unshielded visual or video surveillance, while preserving legitimate safety monitoring;

5. provide reasonable access to showers, including shower access for each Class member held overnight or for more than twelve hours, and regular shower access with soap during continued confinement;
6. provide Class members held overnight or for more than twelve hours with clean clothing and a private area in which to change;
7. provide nutritionally adequate, unexpired meals in sufficient quantities at intervals not exceeding six hours, with reasonable accommodations for medical, religious, and dietary needs;
8. provide continuous access to potable drinking water in quantities sufficient for Class members' hydration needs, without requiring them to depend on whether an officer happens to hear or respond to a request;
9. conduct prompt, standardized medical and mental health screening; provide access to prescribed medications; and provide timely emergency and non-emergency medical and mental health evaluation, treatment, and outside referral when clinically indicated;
10. maintain safe interior temperatures and adequate ventilation, taking into account room occupancy, duration of confinement, and individual medical vulnerabilities; and
11. order Defendants to provide every Class member, promptly upon arrival, written and oral notice of the person's rights concerning conditions of confinement and medical care in a language the person understands, with interpretation or other assistance for people with limited English proficiency, communication disabilities, or limited literacy.

**b. With respect to Count II:**

1. provide Class members the means to make outgoing calls that are confidential, unmonitored, unrecorded, free, and not subject to categorical time limits to current or prospective counsel, with interpretation when necessary, within three hours of arrival or sooner if transfer, removal, questioning, or presentation of an immigration-related document is expected before the three-hour period expires;
2. provide a reasonable opportunity for a confidential legal call during each subsequent twelve-hour period of confinement;
3. provide sufficient telephones and private calling locations to accommodate legal calls without automatic disconnection or unnecessary time restrictions;
4. permit current or prospective counsel to request and schedule confidential calls with detained Class members promptly and, for requests made during business hours, within three hours;
5. permit confidential in-person legal visitation seven days per week, for at least eight hours per day on regular business days and four hours per day on weekends and holidays;
6. maintain a staffed procedure through which attorneys can promptly confirm whether a person is confined at Miramar and arrange communication with that person;
7. accurately update a Class member's location in ICE's Online Detainee Locator System within three hours of arrival at or transfer from the Miramar Facility or provide an equally reliable, publicly available mechanism for confirming the person's location;

8. maintain publicly available written information explaining the procedures for confidential attorney calls and legal visitation at Miramar; and

9. order Defendants to provide every Class member, promptly upon arrival, written and oral notice of the person's rights concerning access to counsel in a language the person understands, with interpretation or other assistance for people with limited English proficiency, communication disabilities, or limited literacy.

**c. With respect to Count III:**

1. enjoin Defendants from using any threat, coercion, abuse, deprivation or threatened deprivation of necessities, material misrepresentation, or other pressure to obtain a signature, waiver, agreement to depart or be removed, or relinquishment of any constitutional, statutory, or procedural right;

2. require Defendants, whenever they present or seek a signature on an immigration-related document, to provide a complete copy, meaningfully translate and explain the document, allow a reasonable opportunity to review it, and facilitate confidential consultation with current or prospective counsel before obtaining the signature;

3. enjoin Defendants from threatening extended detention, imprisonment, transfer, or other adverse custody consequences for refusing to sign, or conditioning access to food, water, medication, clothing, showers, telephone access, family communication, improved conditions, or release from Miramar on execution of an immigration-related document;

4. enjoin Defendants from treating or relying upon a signature obtained through the challenged practices as a knowing and voluntary waiver;

5. to the extent the Court determines that the protocol alleged in Count III constitutes final agency action, hold that action unlawful and set it aside under 5 U.S.C. § 706(2)(A) and (B);
6. order Defendants to provide every Class member, promptly upon arrival, written and oral notice of the person's rights concerning the execution of immigration-related documents; and
7. order Defendants to provide the Notice of Rights and all forms, agreements, stipulations, waivers, and other communications affecting a Class member's immigration status, proceedings, detention, departure, or removal in a language the person understands, with interpretation or other assistance for people with limited English proficiency, communication disabilities, or limited literacy.

**d. With respect to Count IV:**

1. compel the responsible Defendants under 5 U.S.C. § 706(1) to perform the discrete actions required by Directive 11087.2, including:
    a. declaring that Directive § 5.1(1) requires the Miramar Facility to be emptied at the conclusion of daily operations if the Miramar Facility is a sub-office or field office location operating on a daily schedule; and, to the extent authorized by 5 U.S.C. § 706(1) and 8 U.S.C. § 1252(f)(1), compel the responsible officials to perform that duty by lawful means selected by Defendants;
    b. providing a meal at least every six hours;
    c. providing access to potable water in holding rooms at all times;
    d. permitting detained people to retain personal inhaled medication and access other prescribed medication as necessary; and

e. permitting detained people to perform bodily functions and change clothing without being viewed by staff of another gender except in the limited circumstances specified in the Directive and DHS regulations.

7. Enjoin Defendants from retaliating against Plaintiffs, Class members, declarants, witnesses, attorneys, family members, or advocates for asserting rights, reporting conditions, providing evidence, or participating in this action;
8. Order Defendants to preserve all records relevant to the challenged practices, including occupancy records, detention logs, time-in and time-out data, meal records, medical and medication records, incident reports, surveillance-system information, telephone records, legal-access requests, inspection records, and immigration-document presentation and signature records;
9. Retain jurisdiction to enforce the injunction; require Defendants to file periodic compliance reports with the Court and serve them on Class Counsel; permit Class Counsel reasonable access to nonprivileged compliance information and participation in compliance conferences; and appoint an independent monitor or special master if necessary to ensure compliance;
10. Award Plaintiffs reasonable attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable authority; and
11. Grant such other and further relief as the Court deems just and proper.

Date: October 1, 2026

Respectfully submitted,

/s/ **Paul R. Chavez** (FL Bar No. 1021395)
pchavez@aijustice.org
**Jennifer Smith** (FL Bar No. 964514)
jsmith@aijustice.org
AMERICANS FOR IMMIGRANT JUSTICE
P.O. Box No 520037
2200 NW 72nd Ave.
Miami, FL 33152
Phone: 305-573-1106
Attorneys for Plaintiffs

/s/ **Anne Janet Anderson** (FL Bar No. 18092)
annejanet.hernandez@splcenter.org
**Maite Garcia** (FL Bar No. 99770)
maite.garcia@splcenter.org
**Andrew Udelsman** (FL Bar No. 1051696)
andrew.udelsman@splcenter.org
**Jeanette Ynfante***
jeanette.ynfante@splcenter.org
**Courtney O'Donnell***
courtney.odonnell@splcenter.org
SOUTHERN POVERTY LAW CENTER
P.O. Box 370037 Miami, FL 33137
Phone: 305-537-0589
Attorneys for Plaintiffs

**Pro hac vice* application forthcoming