**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
MIAMI DIVISION

ORLANDO ROSALES SALMERON and JOHN DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCOS D. CHARLES, in his official capacity as Executive Associate Director for Enforcement and Removal Operations; MATTHEW ELLISTON, in his official capacity as Field Office Director, ICE Enforcement and Removal Operations, Miami Field Office; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and U.S. CUSTOMS AND BORDER PROTECTION,

Defendants.

Case No. 1:26-cv-26911

**PLAINTIFFS' EXPEDITED MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## INTRODUCTION

Defendants are using an administrative office as a jail, crowding hundreds of people into rooms built for a fraction of that number. The U.S. Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") sub-field office in Miramar, Florida ("Miramar") was designed for administrative processing and short-term holding—a few hours, at most. It has no beds, few showers, no medical staff, and holding cells with open toilets in plain view of other people and surveillance cameras. Defendants hold people there for days and weeks on end.

The scale of deprivation is astounding. On July 2, 2026, Representative Debbie Wasserman Schultz inspected Miramar unannounced and found roughly 150 people crammed "shoulder-to-shoulder and wall-to-wall," forced "to sleep on a hard floor and made to use the toilet in front of others."[1] They were "packed in like sardines."[2] ICE officers have since reported to members of Congress that Miramar, rated for 56 people, held as many as 342 on a single day in August 2026, with more than a hundred sleeping shackled on the concrete floor of a garage.[3] When Rep. Wasserman Schultz returned on September 30, 2026, people inside told her they had been held for six days, and she found broken sinks and filth-covered floors.[4]

Eight people recently held at Miramar confirm what the Congresswoman saw. Between April and September 2026, each spent four to seventeen days there—shackled in a garage or packed into cells with no room to lie down, sleeping in shifts on concrete floors beside open toilets,

---

[1] Press Release, Rep. Debbie Wasserman Schultz, *Wasserman Schultz Makes Unannounced Miramar ICE Facility Oversight Visit* (July 2, 2026), https://wassermanschultz.house.gov/news/documentsingle.aspx?DocumentID=3514.

[2] Halle Vazquez, *Rep. Wasserman Schultz Describes 'Horrific' Conditions During Visit Inside Miramar ICE Facility*, WLRN (July 2, 2026), https://www.wlrn.org/immigration/2026-07-02/rep-wasserman-schultz-describes-horrific-conditions-during-visit-inside-miramar-ice-facility.

[3] Letter from Rep. Robert Garcia, H. Comm. on Oversight & Gov't Reform, Rep. Bennie G. Thompson, H. Comm. on Homeland Sec., and Rep. Maxwell Alejandro Frost, to David J. Venturella, Acting Dir., U.S. Immigr. & Customs Enf't, at 2 & app. A at 3, 6 (Sept. 21, 2026), attached as Exhibit 1 ("Whistleblower Letter").

[4] Press Release, Rep. Debbie Wasserman Schultz, *Wasserman Schultz Conducts Surprise Miramar ICE Facility Inspection Following Whistleblower Report* (Sept. 30, 2026), https://wassermanschultz.house.gov/news/documentsingle.aspx?DocumentID=3538 ("Sept. 30 Press Release").

without showers, adequate food, or medical care, and unable to reach a lawyer.[5] They get at most two brief, monitored calls a day, sometimes in the middle of the night. They may receive no visitors, and even retained lawyers cannot reach them. Held incommunicado, people are pressured to sign away their rights and removed from the country before a lawyer can speak with them.

Courts across the country have granted classwide relief concerning comparable conditions in ICE hold rooms. *See Barco Mercado v. Mullin*, --- F. Supp. 3d ----, 2026 WL 2874458 (S.D.N.Y. Sept. 24, 2026) (New York); *Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084 (N.D. Cal. 2025) (San Francisco); *Gonzalez v. Noem*, No. 25-cv-13323, 2025 WL 3204602 (N.D. Ill. Nov. 17, 2025) (Chicago); *D.N.N. v. Liggins*, 822 F. Supp. 3d 543 (D. Md. 2026) (Baltimore).

Plaintiffs request a temporary restraining order ("TRO") and, after a hearing, a preliminary injunction requiring Defendants to stop holding people at Miramar beyond twelve hours and, while anyone is held there, to provide the basic necessities the Constitution and Defendants' own standards require. Plaintiffs also request provisional class certification under Rule 23(b)(2).

Under Local Rule 7.1(d)(2), Plaintiffs request a ruling on the TRO by October 9, 2026. A ruling is needed by then because the conditions at Miramar are indefensibly dangerous and coercive. Every day of delay subjects new class members to the irreparable harms described below.

## FACTUAL BACKGROUND

Miramar is an ICE ERO sub-field office intended for administrative processing and supervision appointments.[6] It does not appear on ICE's public list of detention facilities. It began

---

[5] Decl. of Carlos Herrera-Velasquez ("Herrera-Velasquez Decl."), Ex. 2; Decl. of Elsa del Carmen Joya Reyes ("Joya Reyes Decl."), Ex. 3; Decl. of Ignacio Hernandez-Fuentes ("Hernandez-Fuentes Decl."), Ex. 4; Decl. of Alvaro Guillemot ("Guillemot Decl."), Ex. 5; Decl. of Alvaro Arvelo Garcia ("Arvelo Garcia Decl."), Ex. 6; Decl. of Domingo Vi Asicona ("Vi Asicona Decl."), Ex. 7; Decl. of Sandra Elena Valera Pereira ("Valera Pereira Decl."), Ex. 8; Decl. of Jane Doe ("Jane Doe Decl."), Ex. 9; *see also* Decl. of Jacqueline Hurst ("Hurst Decl."), Ex. 10.

[6] Hatzel Vela, *Immigration Advocates Want Oversight at Miramar ICE Facility Amid Overcrowding Claims*, NBC 6 S. Fla. (July 1, 2026), https://www.nbcmiami.com/news/local/immigration-advocates-call-for-oversight-at-miramar-ice-facility/3827928/ (quoting ICE statement that the facility "functions as a check-in location for individuals on a non-detained docket and serves as a processing site for daily operational arrests").

operating as a de facto detention facility in or about October 2025, and in July 2026 ICE officials told Rep. Wasserman Schultz that it had not been inspected since. Vazquez, *supra* note 2.

ICE Directive 11087.2 provides that "[a]bsent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours." Directive 11087.2 § 5.1.1.[7] On June 23, 2026, a "Nationwide Hold Room Waiver" purporting to extend that limit to 72 hours was vacated in full as arbitrary and capricious. *Pablo Sequen v. Albarran*, 835 F. Supp. 3d 1061, 1121–31 (N.D. Cal. 2026). Defendants have not complied: At Miramar, "men and women are reportedly being routinely detained in horrific conditions" for days and even weeks on end. Whistleblower Letter at 2; *id.* app. A at 2; Jane Doe Decl. ¶ 4 (held seventeen days).

People at Miramar are held in civil detention; many have no criminal record at all. *See, e.g.*, Hernandez-Fuentes Decl. ¶ 20 (no criminal record in forty years in the United States); Valera Pereira Decl. ¶ 2 (never previously arrested). Many were pursuing immigration relief and complying with ICE supervision. *See, e.g.*, Valera Pereira Decl. ¶ 2 (has a pending asylum application); Vi Asicona Decl. ¶ 18 (same); Guillemot Decl. ¶¶ 3–4 (pending T-visa application); Herrera-Velasquez Decl. ¶ 17 (appealing immigration case); Joya Reyes Decl. ¶¶ 3, 5 (detained at annual ICE supervision appointment after fourteen years of compliance). Many were arrested while working or driving legally. *See, e.g.*, Valera Pereira Decl. ¶ 3 (arrested while driving Uber); Arvelo Garcia Decl. ¶ 24 (while driving Lyft); Hernandez-Fuentes Decl. ¶ 3 (on way to work); Herrera-Velasquez Decl. ¶ 3 (at a stoplight); Vi Asicona Decl. ¶¶ 3–5 (retrieving his brother's car); Guillemot Decl. ¶¶ 5–7 (working on the beach). Officers often offered little or no explanation; they told Ms. Valera Pereira only that she was going to Miramar for a "check-in." Valera Pereira Decl. ¶ 3.

### A. The Conditions of Confinement

During her July 2, 2026, inspection, Rep. Wasserman Schultz observed approximately 150 people detained at Miramar—roughly 70 men in a cell of about 225 square feet, about three square

[7] ICE Directive 11087.2, Operations of ERO Holding Facilities (Jan. 31, 2024), attached as Exhibit 11.

feet per person, and roughly 40 women in a cell of about 98 square feet, about two square feet per person—far exceeding each room's stated capacity. Vazquez, *supra* note 2. Mr. Herrera-Velasquez was held for seven days with about seventy men in a room of roughly 16 by 21 feet—less than five square feet apiece. Herrera-Velasquez Decl. ¶¶ 2, 8. Mr. Hernandez-Fuentes shared a room the size of a one-car garage with fifty people. Hernandez-Fuentes Decl. ¶ 5. At one point twenty-nine women were confined in Ms. Joya Reyes's cell, leaving "not even enough room to sit on the ground," so she often stood. Joya Reyes Decl. ¶ 13. Jane Doe was held with about twenty-five women in a room roughly three steps by four, packed so tightly that their bodies touched by day and women had to step over one another to reach the toilet at night. Jane Doe Decl. ¶¶ 5–6, 8. ICE officers report 50 to 70 people in cells rated for 21. Whistleblower Letter app. A at 3.

Detained people have no beds or mattresses; they sleep sitting up or in shifts on bare concrete, beside open toilets, with at most an aluminum blanket to serve as mattress or cover.[8] Some stand all night for lack of floor space. Herrera-Velasquez Decl. ¶ 9; Jane Doe Decl. ¶ 34. The overhead lights are always on. Joya Reyes Decl. ¶ 13; Hernandez-Fuentes Decl. ¶ 19; Valera Pereira Decl. ¶ 9.

Detained people routinely go more than six hours without food or drinkable water, cannot shower, and lack toothbrushes, soap, menstrual products, and clean clothing.[9] Officers gave Mr. Guillemot one 200-milliliter bottle of water a day and refused his requests for more, leaving him to drink yellowish, foul-smelling tap water. Guillemot Decl. ¶¶ 17–18; *see* Jane Doe Decl. ¶ 19 (sink water smelled like lake water). Women refilled bottles and washed underwear at the toilet-side sink and received one or two sanitary pads a day. Joya Reyes Decl. ¶ 8; Valera Pereira Decl. ¶¶ 12, 15. Ms. Joya Reyes's meals bore expiration dates as old as 2020, and one day her cell was fed at 1:00 p.m. and not again until the next day. Joya Reyes Decl. ¶ 15; *see also* Valera Pereira

---

[8] Herrera-Velasquez Decl. ¶¶ 9–10, 13; Hernandez-Fuentes Decl. ¶ 7; Guillemot Decl. ¶¶ 10, 12; Joya Reyes Decl. ¶ 13; Valera Pereira Decl. ¶ 8; Jane Doe Decl. ¶¶ 6, 9.

[9] Joya Reyes Decl. ¶¶ 8, 15, 19; Guillemot Decl. ¶¶ 15, 17–18; Herrera-Velasquez Decl. ¶ 15; Hernandez-Fuentes Decl. ¶¶ 16–17; Arvelo Garcia Decl. ¶¶ 17, 19–20; Valera Pereira Decl. ¶¶ 12, 14; Jane Doe Decl. ¶¶ 13, 15.

Decl. ¶ 14 (fed once or twice a day, sometimes with expired food). Declarants lost as much as ten pounds. Guillemot Decl. ¶ 20; Joya Reyes Decl. ¶ 21; Vi Asicona Decl. ¶ 15; Jane Doe Decl. ¶ 18.

Four of the men were never permitted to shower. Guillemot Decl. ¶ 15; Herrera-Velasquez Decl. ¶ 15; Hernandez-Fuentes Decl. ¶ 16; Arvelo Garcia Decl. ¶ 19. Ms. Valera Pereira went eight days without one, Valera Pereira Decl. ¶ 12, and Mr. Arvelo Garcia never received a toothbrush in ten days, Arvelo Garcia Decl. ¶ 17. Jane Doe was allowed one rushed shower in seventeen days, after eleven without. Jane Doe Decl. ¶¶ 13–14. She wore the same clothes throughout—her family had brought clean ones, but she did not receive them until she was transferred. *Id.* ¶ 15. When Ms. Joya Reyes asked to bathe after ten days in the same clothes, an officer allowed a three-minute shower, without soap, while handcuffed. Joya Reyes Decl. ¶ 19.

The holding-room toilets sit in open view of other detained people and active surveillance cameras. Guillemot Decl. ¶ 14; Hernandez-Fuentes Decl. ¶ 6; Joya Reyes Decl. ¶ 14; Valera Pereira Decl. ¶ 10; Jane Doe Decl. ¶¶ 8, 12. Men used the toilet "in plain sight of everyone, to our shame." Vi Asicona Decl. ¶ 12. People sleep all around the toilets and even sitting on them. Herrera-Velasquez Decl. ¶¶ 11, 13; Jane Doe Decl. ¶ 11; Arvelo Garcia Decl. ¶ 14. Mr. Herrera-Velasquez went four days without a bowel movement; when he finally begged to use a hallway bathroom, the guard refused to remove his handcuffs so that he could clean himself. Herrera-Velasquez Decl. ¶ 14.

When the cells overflow, Defendants hold people in the hallway—handcuffed day and night—in offices, and in a garage. Hernandez-Fuentes Decl. ¶¶ 10, 22; Herrera-Velasquez Decl. ¶¶ 8, 14. Up to a dozen women were held in an office with a desk and no toilet; some slept on the desk. Valera Pereira Decl. ¶ 13. Jane Doe was among about fifteen women who spent a night in an office while two male officers sat at a desk. Jane Doe Decl. ¶ 12. Two declarants spent their first days in the garage with 150 to 200 men, shackled, with only portable toilets outside and so little room that men took turns sleeping. Arvelo Garcia Decl. ¶¶ 4–12; Vi Asicona Decl. ¶¶ 8–9. Shackled at the ankles, Mr. Arvelo Garcia could not avoid stepping in the urine that covered the portable-toilet floors, and the men tracked it back onto the floor where they slept. Arvelo Garcia

Decl. ¶¶ 7, 10–11. From the women's cell, Jane Doe could see roughly 200 men, many handcuffed and seated in rows. Jane Doe Decl. ¶¶ 32–34. ICE officers corroborate these accounts: They report more than a hundred people sleeping in the sally port in handcuffs, leg irons, and belly chains; portable toilets "completely soiled with urine and feces"; and a cell toilet that overflowed urine and feces onto the floor. Whistleblower Letter app. A at 3, 6–7.

Temperatures swing to both extremes. Mr. Hernandez-Fuentes and Mr. Herrera-Velasquez, held in July and August, describe very hot rooms with no fans or air conditioning. Hernandez-Fuentes Decl. ¶ 8; Herrera-Velasquez Decl. ¶ 16; *see also* Jane Doe Decl. ¶ 10 (hot room due to number of people). On Ms. Joya Reyes's seventh day, a woman fainted from the heat and was taken to the hospital. Joya Reyes Decl. ¶ 16. Ms. Valera Pereira's cell, by contrast, was kept so cold that the women huddled together for warmth. Valera Pereira Decl. ¶¶ 8, 16.

Reports describe no medical staff on-site, and in July 2026, ICE officers told Rep. Wasserman Schultz that at least one medical emergency a day requires a 911 call. Vazquez, *supra* note 2; *see* Whistleblower Letter at 2 (officers "rely on 911 and the emergency department for all medical care"). Officers also report that no one is medically screened; when a detained person disclosed having tuberculosis, the facility took no steps to isolate the person. Whistleblower Letter at 2; *id.* app. A at 10. Officers kept some women's prescribed medications with their belongings and, despite repeated requests and promises, never brought them; women with diabetes and migraines went without medication. Jane Doe Decl. ¶¶ 20–21. Others who sought medical attention were refused. Valera Pereira Decl. ¶ 19. Ms. Joya Reyes repeatedly sought medical attention—for severe headaches, for diarrhea—and was ignored or refused. Joya Reyes Decl. ¶¶ 15, 17. On her sixth day she lost consciousness. *Id.* ¶ 18. Mr. Hernandez-Fuentes, who has high blood pressure, received necessary medication sporadically, and on about his fourth day he began shaking and an ambulance was called. Hernandez-Fuentes Decl. ¶¶ 9, 12–14. Mr. Herrera-Velasquez arrived with his legs bleeding from his arrest and received no treatment. Herrera-Velasquez Decl. ¶¶ 4, 7. Mr. Hernandez-Fuentes watched handcuffed people vomit on the hallway floor. Hernandez-Fuentes Decl. ¶ 23.

### B. Denial of Access to Counsel

People detained at Miramar cannot communicate confidentially or predictably with counsel. They may not meet counsel in person or speak on a confidential line; at most they are allowed one or two five-minute calls a day, at random times, within earshot of officers and other detainees. Guillemot Decl. ¶ 13; Herrera-Velasquez Decl. ¶ 18; Joya Reyes Decl. ¶ 10; Valera Pereira Decl. ¶ 16; Jane Doe Decl. ¶¶ 22–23. Ms. Joya Reyes asked for a call as many as fifty times before she was allowed one on her third day, and on one day the only call she was offered was at 3:00 a.m. Joya Reyes Decl. ¶¶ 9–10, 12. Mr. Hernandez-Fuentes was not allowed a single call during his five days at Miramar. Hernandez-Fuentes Decl. ¶ 15. Mr. Arvelo Garcia was allowed one three-minute call to his wife and was not permitted to call his lawyer. Arvelo Garcia Decl. ¶ 18. Ms. Valera Pereira, who had counsel in her pending asylum case, asked repeatedly to speak with a lawyer; officers refused and told her to wait until she was transferred. Valera Pereira Decl. ¶ 17. ICE officers report that they have been instructed not to facilitate attorney calls, that detained people are told to wait until they are transferred, and that supervisors directed officers to isolate people who file habeas petitions. Whistleblower Letter app. A at 14. When Ms. Joya Reyes's husband hired a lawyer, the lawyer had no way to reach her. Joya Reyes Decl. ¶ 11. Another woman, held about twenty-seven days, could not receive a document her lawyer needed her to sign. Jane Doe Decl. ¶ 25. Defendants permit no in-person legal or family visits. Wasserman Schultz Press Release, *supra* note 1; Vazquez, *supra* note 2; Jane Doe Decl. ¶ 15. Attorneys are not allowed into the detention area. Jane Doe Decl. ¶ 26.

Counsel cannot even arrange a call. When a legal assistant tried to set one up for a person held at Miramar, the extension ICE's phone menu designates for detained individuals went to a full voicemail box, the menu's emergency option disconnected the call, and requests sent to ICE's designated email addresses went unanswered. Hurst Decl. ¶¶ 3–5.

ICE's published detention standards provide evidence of feasible confidential legal access: The Performance-Based National Detention Standards ("PBNDS") and National Detention Standards ("NDS") mandate "legal visitation seven days a week, including holidays," with

confidential communication. PBNDS §§ 5.6(V)(F), 5.7(V)(J).[10] The NDS also bar limits on legal calls shorter than twenty minutes and require that they be private. *See Barco Mercado*, 2026 WL 2874458, at *5.

### C. Defendants' Knowledge and Coercive Purpose

Defendants know what is happening at Miramar. Detained people complain directly to the officers who guard them and are ignored or mocked. *See* Guillemot Decl. ¶ 23; Joya Reyes Decl. ¶¶ 9, 15, 17, 19; Valera Pereira Decl. ¶¶ 17, 19; Jane Doe Decl. ¶¶ 12, 21. Extensive press coverage and congressional inspections have corroborated those complaints.[11] ICE's own officers have complained to management, which has responded by moving detainees out and cleaning the facility before congressional visits and by threatening officers who raise concerns. Whistleblower Letter app. A at 7, 16–17. Rather than remedy the conditions, Defendants blame the people subjected to them: In a July 1, 2026, statement in response to concerns about Miramar, ICE declared that "[b]eing in detention is a choice[.]" Vela, *supra* note 6. DHS repeated the line on September 22, 2026, after whistleblower photographs from inside Miramar became public.[12]

While holding people *incommunicado*, officers press them to sign voluntary-departure papers as the fastest way out of these deplorable conditions. Guillemot Decl. ¶¶ 21, 25; Hernandez-Fuentes Decl. ¶ 24; Herrera-Velasquez Decl. ¶ 17; Joya Reyes Decl. ¶ 20; Valera Pereira Decl. ¶ 18; Jane Doe Decl. ¶ 29. Officers told Ms. Valera Pereira that her asylum case would be denied. Valera Pereira Decl. ¶ 18. Officers handed Jane Doe a document about her case that no one explained to her in Spanish; she watched them press hardest on women who were crying and heard

[10] ICE, Performance-Based National Detention Standards 2011 (rev. 2016) §§ 5.6(V)(F), 5.7(V)(J), https://www.ice.gov/detention-standards/2011; ICE, National Detention Standards 2019, https://www.ice.gov/detention-standards/2019.

[11] *See, e.g.*, Vela, *supra* note 6; Sanela Sabovic, *Whistleblower Report Details Poor Living Conditions at Multiple Florida ICE Facilities, Including in Miramar*, Local 10 News (Sept. 21, 2026), https://www.local10.com/news/local/2026/09/21/whistleblower-report-details-poor-living-conditions-at-multiple-florida-ice-facilities-including-in-miramar/; Vazquez, *supra* note 2; Wasserman Schultz Press Release, *supra* note 1.

[12] Miguel Santiesteban, *New Images Raise Questions About Conditions at ICE Facility in Miramar*, NBC 6 S. Fla. (Sept. 22, 2026), https://www.nbcmiami.com/news/local/new-images-raise-questions-about-conditions-at-ice-facility-in-miramar/3862410/.

them warn that those who did not leave could spend ten or fifteen years in prison. Jane Doe Decl. ¶¶ 27–30. When Mr. Herrera-Velasquez said he was appealing his case, the officer told him that would be hard and that he should sign. Herrera-Velasquez Decl. ¶ 17. When Ms. Joya Reyes refused, an official told her she would be held longer. Joya Reyes Decl. ¶ 20. Officers also threatened to send Mr. Guillemot to a place "where there were alligators." Guillemot Decl. ¶ 22.

## LEGAL STANDARD

A temporary restraining order or preliminary injunction requires (1) a substantial likelihood of success on the merits, (2) irreparable injury absent relief, (3) a balance of harms favoring the movant, and (4) consistency with the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Windsor v. United States*, 379 F. App'x 912, 916–17 (11th Cir. 2010).

The relief Plaintiffs seek is prohibitory, not mandatory: The relevant status quo is "the last uncontested status quo between the parties," *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)—here, Miramar's operation as the sub-field office it was built to be, before Defendants converted it in October 2025. An order requiring the party that recently disturbed the status quo to reverse course restores rather than alters it. *See D.N.N.*, 822 F. Supp. 3d at 585; *Pablo Sequen*, 810 F. Supp. 3d at 1126 n.117. In any event, Plaintiffs prevail even under the heightened standard for mandatory relief, which requires that "the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits.

#### A. The Conditions of Confinement at Miramar Violate the Fifth Amendment.

The Due Process Clause protects "all 'persons' within the United States," including those whose "presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Because immigration detention is "civil, not criminal," it must be "nonpunitive in purpose and effect." *Id.* at 690. The conditions at Miramar violate due process on two independent grounds: (1) They amount to punishment, *see Magluta v. Samples*, 375 F.3d 1269,

1273 (11th Cir. 2004); and (2) Defendants are deliberately indifferent to the deprivations of basic necessities they inflict, *see Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1574 (11th Cir. 1985).

**1. The Conditions at Miramar Are Punitive.**

Conditions of detention amount to unconstitutional punishment where they are imposed with an intent to punish, are "not reasonably related to a legitimate goal," are "arbitrary or purposeless," or are "excessive in relation to" any legitimate purpose. *Bell v. Wolfish*, 441 U.S. 520, 538–39, 561 (1979); *Magluta*, 375 F.3d at 1273. An expressed intent to punish suffices, but it is not required: A detainee may also prevail by showing that the "challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015); *see Pablo Sequen*, 810 F. Supp. 3d at 1127 & n.119. The Supreme Court has recognized that people in civil detention are entitled to "more considerate treatment" than those serving criminal sentences. *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982).

Ordinarily a plaintiff must ask the court to infer punitive purpose from the absence of any rational justification. *See Bell*, 441 U.S. at 538–39. Here, Defendants have said it outright: In response to widespread concerns about conditions at Miramar, ICE declared that "[b]eing in detention is a choice" and urged people to self-deport. Vela, *supra* note 6; Santiesteban, *supra* note 12. Such "statements from senior officials suggest that harsh conditions of confinement are a deliberate feature of the enforcement program intended to induce self-deportation[.]" *Barco Mercado v. Noem*, 800 F. Supp. 3d 526, 575–76 (S.D.N.Y. 2025); *D.N.N.*, 822 F. Supp. 3d at 595–96.

Inside, officers press detained people daily to sign voluntary-departure forms. Guillemot Decl. ¶ 21; Joya Reyes Decl. ¶ 20; Hernandez-Fuentes Decl. ¶ 24; Herrera-Velasquez Decl. ¶ 17; Valera Pereira Decl. ¶ 18. Coercing civil detainees into surrendering their rights is not a legitimate objective; federal regulations forbid it. 8 C.F.R. § 287.8(c)(2)(vii); *see Barco Mercado*, 2026 WL 2874458, at *36, *38 (conditions punitive where they posed the "Hobbesian choice" to "self-deport or 'remain detained' for years"). Because Defendants act with "an expressed intent to punish," *Bell*, 441 U.S. at 538, the analysis need go no further.

Intent aside, Defendants can articulate no legitimate nonpunitive objective served by packing seventy men into 225 square feet, Vazquez, *supra* note 2; giving a person one bottle of water for a day in a South Florida summer, Guillemot Decl. ¶ 17; Joya Reyes Decl. ¶ 8; withholding a toothbrush for ten days and a shower for eleven, Arvelo Garcia Decl. ¶ 17; Jane Doe Decl. ¶ 13; shackling people through the night, Arvelo Garcia Decl. ¶¶ 7–8; Vi Asicona Decl. ¶ 8; Whistleblower Letter app. A at 6; refusing to uncuff a man so that he could clean himself after his first bowel movement in four days, Herrera-Velasquez Decl. ¶ 14; making people defecate in front of one another and on camera, Guillemot Decl. ¶ 14; Hernandez-Fuentes Decl. ¶ 6; Joya Reyes Decl. ¶ 14; or operating a de facto jail with no medical care, Vazquez, *supra* note 2; Whistleblower Letter at 2. The government's right to detain people is not a license to subject them "to unsanitary conditions or depriv[e] [them] of sleep and adequate medical care." *See Pablo Sequen*, 810 F. Supp. 3d at 1130.

The best proof that less restrictive alternatives exist is that Defendants have written them down: Directive 11087.2 presumptively limits confinement to twelve hours and requires meals every six hours, safe and clean hold rooms, and access to prescribed medication, and the PBNDS and NDS require minimum square footage, seating, hygiene items, and confidential legal visitation seven days a week. *See* Directive 11087.2 §§ 4.4.1.2–.3, 5.1.1, 5.2.2, 5.7.2; *Barco Mercado*, 2026 WL 2874458, at *4–5 (summarizing NDS hold-room space, seating, and toilet-privacy requirements). Courts treat an agency's own standards as evidence both that conditions falling below them are excessive and that less restrictive means are available. *See, e.g.*, *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1065 (C.D. Cal. 2019) (due process claim sufficiently alleged where conditions of confinement fell below ICE's PBNDS); *S. Poverty L. Ctr. v. U.S. Dep't of Homeland Sec.*, 2020 WL 3265533, at *30 (D.D.C. June 17, 2020) (likelihood of success on the merits for claim that conditions were punitive where ICE failed to comply with its own detention standards related to confidentiality); *Pablo Sequen*, 810 F. Supp. 3d at 1131 ("Given that ICE itself commits to providing such medical care, the government cannot reasonably assert an interest in denying it."). And conditions that fall below what the government provides people

accused of crimes—as Miramar's fall far below the U.S. Marshals Service's standards, *see infra* Part I.A.2—are presumptively punitive for civil detainees. *See Jones v. Blanas*, 393 F.3d 918, 932, 934 (9th Cir. 2004).

Nor can Defendants invoke a shortage of long-term detention space. ICE did not treat its capacity shortfall as an "exceptional circumstance" when it waived the twelve-hour limit, and an agency that fills its hold rooms with its own arrests "cannot actively facilitate a breakdown in [its detention system], and then claim no responsibility or control over it." *Pablo Sequen*, 835 F. Supp. 3d at 1123–24 (quoting *Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 993 (9th Cir. 2025)). Defendants "will not be heard to justify the deprivation of constitutional conditions of confinement on circumstances entirely of their own making[.]" *D.N.N.*, 822 F. Supp. 3d at 566 n.16. It is up to Defendants to conform the facility to constitutional requirements, slow the rate at which they funnel arrestees into it, or hold people somewhere fit for the purpose. *See Barco Mercado*, 800 F. Supp. 3d at 579 (balance of equities favored injunction where injunction would require confinement comply with the confines of the Constitution); *D.N.N.*, 822 F. Supp. 3d at 598 (same); *Pablo Sequen*, 810 F. Supp. 3d at 1132–33 (same).

**2. Defendants Are Deliberately Indifferent to Serious Deprivations.**

Independently, the conditions violate due process because Defendants are deliberately indifferent to them. In this Circuit, the Due Process Clause guarantees detainees at least the basic necessities—food, living space, medical care—that the Eighth Amendment guarantees convicted prisoners. *Hamm*, 774 F.2d at 1574. A plaintiff must show an objectively serious deprivation of which the defendant was subjectively aware and to which the defendant failed to respond reasonably. *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc). Conditions are assessed in combination where together they deprive a person of "a single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Plaintiffs satisfy both elements.

**Overcrowding and floor sleeping**. Miramar affords two or three square feet per person—roughly a tenth of the space *Bell* upheld, and *Bell* upheld it only because detainees spent just "seven or eight hours each day in their rooms" and were otherwise free to move about. 441 U.S. at 543.

Confining pretrial detainees in spaces affording less than twenty-three square feet per person "do[es] not provide minimum decent housing under any circumstances for any period of time." *See Lareau v. Manson*, 651 F.2d 96, 107–08 (2d Cir. 1981). And a bed or mattress is a "constitutional minimum." *Pablo Sequen*, 810 F. Supp. 3d at 1128–30. Courts weigh the space, the duration, the daily hours confined, and the opportunity for exercise. *Ferguson v. Cape Girardeau Cnty.*, 88 F.3d 647, 650 (8th Cir. 1996); *Bell*, 441 U.S. at 543. Every factor runs against Defendants: At Miramar, people sleep on bare concrete or stand all night for want of floor space—for days or weeks, with no common area, no recreation, and no permission to leave the cell. Herrera-Velasquez Decl. ¶¶ 2, 8–10; Joya Reyes Decl. ¶¶ 7, 13; Guillemot Decl. ¶ 13; Arvelo Garcia Decl. ¶ 12; Vi Asicona Decl. ¶ 13; Jane Doe Decl. ¶¶ 4–6.

U.S. Marshals Service standards provide useful comparisons: they require thirty-five square feet per detained person, one toilet for every twelve male and eight female detainees, and one shower for every twelve.[13] Miramar provides two to three square feet per person, one or two open toilets for as many as seventy people—or, in one women's cell, a single toilet for more than thirty—and few or no showers. Vazquez, *supra* note 2; Herrera-Velasquez Decl. ¶¶ 8, 11, 15; Hernandez-Fuentes Decl. ¶¶ 5–6, 16; Guillemot Decl. ¶¶ 9, 14–15; Valera Pereira Decl. ¶¶ 7, 10, 13; Jane Doe Decl. ¶ 13. Deprivations this far below the floor the government sets for people accused of crimes are objectively serious.

**Food, sanitation, and temperature**. Deprivation of adequate food and drinking water is a paradigmatic serious deprivation, *Hamm*, 774 F.2d at 1575, and 7.5 ounces per meal with one bottle of water per day—in an overheated, overcrowded room—is not "reasonably adequate." *Id.*; Vazquez, *supra* note 2. Mr. Guillemot received less than a cup of water a day and lost six pounds in four days. Guillemot Decl. ¶¶ 17, 20. Jane Doe lost eight pounds in seventeen days. Jane Doe Decl. ¶ 18. Denying people the ability to bathe, brush their teeth, change clothes, or obtain

[13] U.S. Dep't of Justice, U.S. Marshals Service, Federal Performance-Based Detention Standards (May 1, 2025), at 79, 94, https://www.usmarshals.gov/sites/default/files/media/document/federal-performance-based-detention-standards-12.pdf.

menstrual products for days or weeks, where dozens share one or two open toilets, is a "deprivation of basic elements of hygiene." *Gates v. Collier*, 501 F.2d 1291, 1301 (5th Cir. 1974); *see D.N.N.*, 822 F. Supp. 3d at 590–91 (people "stuffed into unclean cells by the dozens, without basic hygiene essentials, while exposed to a virtually open unclean toilet"). And heat and ventilation are assessed together, *Chandler v. Crosby*, 379 F.3d 1278, 1294–97 (11th Cir. 2004): Miramar packs people beyond capacity into poorly ventilated, inadequately cooled concrete rooms in a South Florida summer. Herrera-Velasquez Decl. ¶ 16; Hernandez-Fuentes Decl. ¶ 8; Joya Reyes Decl. ¶ 16 (woman fainted after the air conditioning failed). Cold is no safer: A low cell temperature combined with a lack of blankets is the Supreme Court's own example of conditions that together deny the human need for "warmth." *Wilson*, 501 U.S. at 304; *see* Valera Pereira Decl. ¶¶ 8, 16 (cell kept very cold; blankets needed as bedding).

**Medical care**. A facility with no on-site medical staff, no triage system, and minimal access to medication fails to provide constitutionally adequate care. *See Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). People are seized at check-ins, on the street, on the way to work, or on the job—carrying no medication—and held for days with no screening at all, Joya Reyes Decl. ¶¶ 3, 17–18; Hernandez-Fuentes Decl. ¶¶ 3–4, 9; Valera Pereira Decl. ¶ 3; Jane Doe Decl. ¶¶ 20–21, though civil detainees "are entitled to basic medical screening and care when the Government removes their ability to attend to such matters themselves." *D.N.N.*, 822 F. Supp. 3d at 593; *see id.* at 592 (untreated diabetes, hypertension, and HIV are serious medical needs).

Predictably, emergencies are routine. Between July 1, 2025, and July 1, 2026, Miramar Fire Rescue logged 194 calls to the facility's address, 2805 SW 145th Avenue, including 44 for chest pain or heart problems, 21 for trouble breathing, 17 for unconsciousness or fainting, 15 for diabetic emergencies, five for seizures, and two for strokes. Miramar Fire Rescue & Police Call Records, Ex. 12 ("Call Records"). The calls track Defendants' conversion of the field office into a jail: There were 12 from July through September 2025, then 182 from October 2025 through July 1, 2026, including 49 in June 2026 alone. *Id.* On July 1, 2026, the day before Rep. Wasserman Schultz's inspection, Fire Rescue was called eight times, twice for seizures. *Id.* Those figures likely

understate the need: In August 2026, management told officers to call 911 less after complaints from Miramar Fire Rescue. Whistleblower Letter app. A at 10. Two declarants suffered medical emergencies: An ambulance came for Mr. Hernandez-Fuentes, Hernandez-Fuentes Decl. ¶¶ 13–14, and Ms. Joya Reyes lost consciousness. Joya Reyes Decl. ¶ 18.

**Bodily privacy**. People in custody retain a "right to bodily privacy." *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993). Defendants force people to perform intimate bodily functions in view of dozens of others and of surveillance cameras, behind at most a waist-high partition. Guillemot Decl. ¶ 14; Hernandez-Fuentes Decl. ¶ 6; Joya Reyes Decl. ¶ 14; Herrera-Velasquez Decl. ¶¶ 11–12; Valera Pereira Decl. ¶ 10; Jane Doe Decl. ¶¶ 8, 11–12. Three declarants could not bring themselves to have a bowel movement, one for four days. Guillemot Decl. ¶ 14; Herrera-Velasquez Decl. ¶ 14; Arvelo Garcia Decl. ¶ 15. Ms. Valera Pereira, ashamed, went about four days without using the toilet at all. Valera Pereira Decl. ¶ 10. Monitoring cells for safety does not require recording people on the toilet—partitions, camera angling, and masking are simple and standard—yet Defendants keep the cameras trained on the toilets. *See Pablo Sequen*, 810 F. Supp. 3d at 1129 (continuous lighting likely punitive where alternatives were not considered).

**Duration and combination**. Each deprivation is worsened because Defendants inflict it for days or weeks well beyond the Directive's twelve-hour limit.[14] And the conditions compound one another: Crowding, constant light, and bare concrete together deny sleep; open toilets, no showers, and a toilet-side sink together deny sanitation. *Wilson*, 501 U.S. at 304.

**Knowledge and failure to respond**. Defendants' awareness is actual: Detained people complain to the officers who guard them; Defendants' own officers have escalated concerns to management, which responded by cleaning the facility before congressional visits and threatening the officers who spoke up; and a member of Congress documented the conditions in person and in writing. *See supra* Factual Background § C. Such notice, combined with the responsible officials'

---

[14] *See* Guillemot Decl. ¶ 8 (four days); Hernandez-Fuentes Decl. ¶ 2 (five days); Herrera-Velasquez Decl. ¶ 2 (seven days); Joya Reyes Decl. ¶¶ 2, 7 (ten days); Arvelo Garcia Decl. ¶ 3 (ten days); Vi Asicona Decl. ¶ 2 (four days); Valera Pereira Decl. ¶ 6 (nine days); Jane Doe Decl. ¶ 4 (about seventeen days).

failure to respond reasonably to risks created by their own practices, supports deliberate indifference. *See Wade*, 106 F.4th at 1262; *D.N.N.*, 822 F. Supp. 3d at 594 (Directive's requirements "not being met, and Defendants know it"). And the practice persists: When Rep. Wasserman Schultz returned on September 30, after what she described as a week of cleanup, people inside told her they had been held for six days. Sept. 30 Press Release, *supra* note 4. Defendants' subjective awareness is undeniable.

**B. Defendants' Denial of Access to Counsel Violates the First and Fifth Amendments.**

The right to retain and consult a lawyer is protected by the First Amendment's guarantees of speech, association, and petition. *See NAACP v. Button*, 371 U.S. 415, 437 (1963). It does not disappear at the door of a holding cell, *see Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008), and Congress has separately guaranteed that a noncitizen in removal proceedings "shall have the privilege of being represented . . . by counsel of the alien's choosing[,]" 8 U.S.C. § 1229a(b)(4)(A); *see also id.* § 1362; *Frech v. U.S. Att'y Gen.*, 491 F.3d 1277, 1281 (11th Cir. 2007) (right to counsel in removal proceedings is integral to due process). Those guarantees are worthless if a person cannot reach a lawyer. Courts have found violations on far weaker facts: *Torres* held the First Amendment can be violated by mere restrictions on call timing, confidentiality, and scheduling, rejecting the argument that only an "outright ban" would suffice. 411 F. Supp. 3d at 1067–68. And *Barco Mercado*, after trial, held restrictions materially identical to Miramar's—one short monitored call a day, attorneys told their clients were "in transit"—violated the First and Fifth Amendments. 2026 WL 2874458, at *19–22, *38.

Miramar imposes an outright ban on confidential attorney-client communication: no in-person visitation for retained or prospective counsel, no confidential telephone line, no working mechanism to schedule a call, and not even a reliable way to learn that a client is inside the building. *See supra* Factual Background § B; *cf. Barco Mercado*, 2026 WL 2874458, at *38 (26 Federal Plaza "essentially was a black site"). No security rationale is available: Defendants permit confidential calls and seven-day legal visitation at facilities operating under the PBNDS and NDS,

and the Bureau of Prisons permits confidential attorney access to people held on criminal charges. *See* 28 C.F.R. §§ 540.102–.103, 543.13, 551.117(a); *Barco Mercado*, 2026 WL 2874458, at *38 (ICE's belated compliance showed "that it is possible"). And while Defendants block confidential consultation, they press people to waive their rights. *See supra* Factual Background § C; *Gonzalez*, 2025 WL 3204602, at *1 (officers told a detainee "she would be stuck in Broadview until she signed these papers").

**II. Plaintiffs and the Class Will Suffer Irreparable Harm Absent Relief.**

The deprivation of First Amendment rights, even briefly, is itself irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Unconstitutional hold-room conditions inflict "an immediate and irreparable harm, even if it lasts only for the period of class members' detention." *Pablo Sequen*, 810 F. Supp. 3d at 1131. Rights lost while a person is confined for days and then transferred out of the District or removed from the country cannot be restored later by damages. *See* Guillemot Decl. ¶ 26 (transferred out of state several times, still detained in California); Valera Pereira Decl. ¶ 19 (transferred out of state, then removed to Venezuela). The physical harms accumulate—sleep deprivation, dehydration, missed medication, daily medical emergencies. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (relief available against conditions "very likely to cause serious illness and needless suffering the next week or month or year"). Plaintiff John Doe, who has diabetes and hypertension, has been unable to obtain his prescribed medication since arriving at Miramar. Compl. ¶ 38. The harm also outlasts the detention: Declarants describe lasting trauma and scars. Joya Reyes Decl. ¶ 22 ("I feel that I was tortured and traumatized by my experience at Miramar."); Guillemot Decl. ¶ 27; Herrera-Velasquez Decl. ¶ 19; Valera Pereira Decl. ¶ 20 (diagnosed with post-traumatic stress disorder); Jane Doe Decl. ¶¶ 35–36.

**III. The Balance of Equities and the Public Interest Strongly Favor Relief.**

When the opposing party is the government, the balance-of-equities and public-interest factors merge, *Nken v. Holder*, 556 U.S. 418, 435 (2009), and the government "cannot suffer harm from an injunction that merely ends an unlawful practice[.]" *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). The relief sought largely asks Defendants to do what their own Directive and

detention standards already require, and nothing in the order prevents them from arresting, processing, or detaining anyone in a facility built for the purpose. *See D.N.N.*, 822 F. Supp. 3d at 598 (hold-room injunction "would in no way impede Defendants' ability to carry out the Executive's authority in matters of immigration; it merely would require that it be done within the confines of the Constitution"). The relief requested here tracks the terms other courts have imposed. *See Pablo Sequen*, 810 F. Supp. 3d at 1134–35; *Barco Mercado*, 2026 WL 2874458, at *24–25, *43–45.

The public interest points the same way: It is always in the public interest to prevent the violation of constitutional rights. *See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013). And the public has a concrete interest in a system in which people can consult lawyers before making irrevocable decisions. *See Barco Mercado*, 2026 WL 2874458, at *20 (access to a lawyer "often was their only hope of regaining their liberty").

## IV. The Court Should Provisionally Certify a Class and Extend Relief to All Class Members.

Plaintiffs will move to certify a class under Rules 23(a) and 23(b)(2), defined as "[a]ll persons who are now detained, or will in the future be detained, in civil immigration custody at the Miramar Facility," Compl. ¶ 146, and ask the Court to certify that class provisionally for purposes of interim relief. Courts routinely do so when entering emergency relief. *See, e.g., Tefel v. Reno*, 972 F. Supp. 608, 618 (S.D. Fla. 1997); *Pablo Sequen*, 810 F. Supp. 3d at 1121. Certification is especially appropriate for an inherently transitory population, whose claims relate back. *See Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). Because hold rooms are way stations, "it is highly unlikely that anyone would be detained there long enough for a court to certify class claims[.]" *Pablo Sequen*, 810 F. Supp. 3d at 1120; *accord D.N.N.*, 822 F. Supp. 3d at 587.

Commonality is satisfied: Plaintiffs challenge discrete facility-wide practices—no enforced limit on cell population or length of detention, no beds, no medical screening or medication system, no confidential legal access—and determining whether each is constitutional "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-*

*Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rule 23(b)(2) is satisfied because the requested injunction would remedy the challenged practices for the class as a whole. *Id.* at 360–61.[15] *D.N.N.* certified a hold-room class on materially identical questions, 822 F. Supp. 3d at 575–82, and Defendants' likely defense—that the conditions serve a legitimate purpose—is itself a common question that "does not turn on the individual circumstances of a particular detainee[.]" *Id.* at 577. Nor does it matter where in the building people are held—cells, hallway, or garage—for a class limited to designated hold rooms would let Defendants carve out "as much of the putative class as defendants choose to detain in other parts of" the facility. *Barco Mercado*, 2026 WL 2874458, at *41. Courts in New York, California, Illinois, and Maryland certified hold-room classes. *See id.* at *39–43; *Pablo Sequen*, 810 F. Supp. 3d at 1121–26; *Gonzalez*, 2025 WL 3204602, at *1–5; *D.N.N.*, 822 F. Supp. 3d at 581–82.

**V. The Court Should Waive the Bond Requirement.**

Rule 65(c) leaves the amount of security to the Court's discretion, and the Court may require none. *See BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005). Plaintiffs are detained, unable to work, and the requested constitutional safeguards will not cause compensable injury to Defendants that would warrant a bond. Alternatively, a nominal bond suffices. *See D.N.N.*, 822 F. Supp. 3d at 598 (nominal bond of zero dollars); *Barco Mercado*, 800 F. Supp. 3d at 580 (bond of ten dollars).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court provisionally certify the proposed class and enter a temporary restraining order, and thereafter a preliminary injunction, requiring Defendants and the persons described in Rule 65(d)(2) who receive actual notice of the order to:

---

[15] Nor does 8 U.S.C. § 1252(f)(1) bar classwide relief. This is a conditions case; the requested order would not enjoin or restrain "the operation of" 8 U.S.C. §§ 1221–1232, and § 1252(f)(1) "does not prohibit an injunction simply because of collateral effects on a covered provision." *Pablo Sequen*, 810 F. Supp. 3d at 1116 (citation omitted); *Gonzalez*, 2025 WL 3204602, at *5.

1. Cease holding any person in immigration detention at Miramar beyond twelve hours;
2. Ensure that every person has adequate space to sit and to lie down outside any toilet area; provide every person held overnight a clean sleeping mat and blanket; dim the lights overnight sufficiently to permit sleep; and maintain safe and comfortable temperatures through cooling and ventilation adequate to the number of people held;
3. Provide nutritionally adequate meals no less than three times per day at intervals of no more than six hours, and potable drinking water at all times without interruption;
4. Clean each hold room and its restrooms at least three times per day; provide, free and promptly on request, soap, towels, toilet paper, oral-hygiene products, clean clothing, and feminine-hygiene products; and provide daily access to showers;
5. Install privacy partitions on all toilets and reorient, mask, or disable camera surveillance of toilet use; and locate toilets apart from sleeping and eating areas;
6. Provide medical screening by licensed medical personnel upon arrival, licensed medical staffing on site whenever people are held, emergency response and outside referral when indicated, and prompt access to prescribed medication;
7. Permit confidential in-person legal visitation seven days per week, for at least eight hours per day on regular business days and four hours per day on weekends and holidays; provide means for confidential, unmonitored, unrecorded, free calls to current or prospective counsel, without categorical time limits, within three hours of arrival or sooner if transfer, removal, questioning, or presentation of an immigration-related document is expected before that period expires; and provide a reasonable opportunity for a confidential legal call during each subsequent twelve-hour period of confinement;
8. Permit current or prospective counsel to request and schedule confidential calls promptly and, for requests made during business hours, within three hours; maintain a staffed, publicly posted telephone number through which attorneys can confirm whether a person is confined at Miramar and arrange communication; and provide sufficient dedicated telephones and private calling locations to accommodate confidential legal calls;
9. Accurately update each person's location in ICE's Online Detainee Locator System within three hours of arrival at or departure from Miramar; provide prompt written and oral notice of the Court's order and attorney-contact procedures, with a list of legal-service providers, in a language the person understands and with interpretation or other assistance for people with limited English proficiency, communication disabilities, or limited literacy;
10. Refrain from retaliation against any plaintiff, class member, declarant, or witness; file periodic compliance reports; and permit reasonable independent inspection.

**REQUEST FOR HEARING**

Under Local Rule 7.1(b)(2), Plaintiffs request a hearing on the motion for a temporary restraining order at the Court's earliest availability before October 9, 2026, and an evidentiary hearing on the motion for a preliminary injunction on a date the Court sets. A hearing would assist the Court because the motion turns on conditions inside a facility closed to the public and to counsel, and live testimony can resolve any factual disputes Defendants raise. Plaintiffs estimate that the hearing on the temporary restraining order will require approximately one hour and the preliminary-injunction hearing approximately one day.

Dated: October 5, 2026

Respectfully submitted,

By: /s/ *Andrew Udelsman*
Andrew Udelsman

FL Bar No. 1051696
andrew.udelsman@splcenter.org
Anne Janet Anderson
FL Bar No. 18092
annejanet.hernandez@splcenter.org
Maite Garcia
FL Bar No. 99770
maite.garcia@splcenter.org
Jeanette Ynfante*
jeanette.ynfante@splcenter.org
Courtney O'Donnell*
courtney.odonnell@splcenter.org
**Southern Poverty Law Center**
P.O. Box 370037
Miami, FL 33137
Phone: 305-537-0589

*Attorneys for Plaintiffs*

Paul R. Chavez
FL Bar No. 1021395
pchavez@aijustice.org
Jennifer Smith
FL Bar No. 964514
jsmith@aijustice.org
**Americans for Immigrant Justice**
P.O. Box 520037
2200 NW 72nd Ave.
Miami, FL 33152
Phone: 305-573-1106

*Attorneys for Plaintiffs*

**Pro hac vice* application forthcoming

**CERTIFICATE OF SERVICE**

I certify that on October 5, 2026, I filed this motion and its exhibits with the Clerk of Court using CM/ECF, and that on October 5, 2026, I served copies by email on usafls-immigration@usdoj.gov, and on john.ghannam@usdoj.gov, the Assistant U.S. Attorney of record on the habeas case of Plaintiff Orlando Rosales Salmeron (26-cv-26816).

**/s/** *Andrew Udelsman*