Congress of the United States
House of Representatives
Washington, D.C. 20515

September 21, 2026

Mr. David J. Venturella
Acting Director
Immigration and Customs Enforcement
500 12th Street, SW
Washington, DC 20536

Dear Acting Director Venturella:

We have received confidential whistleblower disclosures about the Trump Administration's dangerous and lawless practices and conditions at Immigration and Customs Enforcement (ICE) holding facilities in Miramar and Orlando, Florida.[1] Acting in clear defiance of court orders and ICE's own internal policies, the Trump Administration has created crises at these facilities where brutal conditions put staff, detainees, and the public at imminent risk of serious harm or death.[2] Whistleblowers warn that, among other abuses, ICE is detaining people—including men, women, families, and elderly people with chronic medical conditions—for days to weeks in abusive and life-threatening conditions, including overcrowded cells, prolonged shackling, inadequate access to medical care and hygiene, insufficient food, and limited to no legal access. ICE is simultaneously attempting to cover up these horrific practices. Also alarmingly, allegedly a White House official recently visited the Miramar Holding Facility, suggesting that senior Trump Administration officials are aware of these horrific conditions and allow them to continue. Committee on Oversight and Government Reform Democrats and

---

[1] The confidential whistleblowers are ICE employees who have personal knowledge of the conditions and practices at these facilities. The Miramar Holding Facility is part of the Miramar ICE Sub-Field Office in Miramar, Florida. The Orlando Holding Facility is part of the Orlando Sub-Field Office in Orlando, Florida. Holding facilities contain a block of cells designed to hold multiple people at one time. Holding facilities are used for short-term (less than 12 hours) confinement and therefore lack infrastructure and personnel to detain people for longer. *See*, Immigration and Customs Enforcement, *ICE Directive 11087.2: Operations of ERO Holding Facilities* (Jan. 31, 2024) (online at https://ice.gov/doclib/foia/policy/directive11087.2.pdf) (accessed Sept. 17, 2026).

[2] In June 2025, ICE changed its longstanding policy and allowed holding facilities to detain people for up to 72 hours by issuing a "Nationwide Hold Room Waiver." Following litigation involving inhumane conditions and prolonged detention at a holding facility in San Francisco, California, in June 2026, a judge issued a nationwide order prohibiting stays that exceed 12 hours at holding facilities, stating that ICE had failed to consider its obligation under the Fifth Amendment to not subject civil immigration detainees to punitive conditions of confinement. *See,* Memorandum from Monica S. Burke to ERO Field Office Directors, Nationwide Hold Room Waiver (June 24, 2025) (online at https://iptp-production.s3.amazonaws.com/media/documents/2025.06.24_ICE_-_Nationwide_Hold_Room_Waiver.pdf); *Federal Judge Rules ICE Can't Make Arrests at Immigration Courthouses*, Courthouse News (June 23, 2026) (online at https://courthousenews.com/federal-judge-rules-ice-cant-make-arrests-at-immigration-courthouses/).

Committee on Homeland Security Democrats are investigating these unconscionable allegations. We therefore demand that you immediately cease these illegal and dangerous practices, preserve and submit all evidence of your agency's unlawful actions, and take all necessary steps to prevent further harm.

At the **Miramar Holding Facility**, men and women are reportedly being routinely detained in horrific conditions for up to seven days, in defiance of ICE's own longstanding policy and a June 2026 court order that limits detention at ICE holding facilities to 12 hours.[3] Despite having a rated capacity of 56 people, the facility is allegedly routinely detaining hundreds, including up to 342 people during one day in August. Over a hundred people are said to be detained overnight in the sally port, a warehouse-like structure. People are said to be fully shackled while they sleep.

Allegations indicate that, for three months, the facility was not meaningfully cleaned: a clogged toilet constantly overflowed urine and feces onto the holding cell floor; portable toilets are covered in human waste inside and out; multiple officers became ill and required antibiotics from unhygienic conditions. A woman was seen bleeding through her clothes until a female officer intervened and gave her own feminine hygiene products; the facility does not provide them.

Allegations also indicate that no medical staff are onsite, medical screening is not conducted, and precautions to limit the spread of dangerous illnesses are not being taken, posing grave risk to detainees, staff, and the general public. After a person self-reported tuberculosis, the facility reportedly did not isolate or prevent further exposure. Officers are allegedly forced to rely on 911 and the emergency department for all medical care: people have fainted, reported chest pain, and gone days without required medications for diabetes and hypertension.

The facility appears to be experiencing an overall breakdown of order, leading to chaos. On two separate days within the last month, a detainee managed to escape; the facility was not even aware of one of the escapes until the person was found by local law enforcement two hours later. There has been at least one alleged incident of a violent assault of a staff member; in response, staff repeatedly struck the detainee leaving bumps and abrasions on his body—raising questions about the dangerous conditions that led to this incident, whether staff are equipped to manage a security incident, and whether the amount of force used was limited to what was only necessary and reasonable to gain control of the detainee. The facility also refused to report a sexual abuse and assault incident that personnel witnessed, as required under law and policy.[4]

---

[3] The allegations raised at the Miramar Holding Facility raise multiple potential violations of relevant authorities, including ICE policies, federal regulations, statutes, and court orders. See attached Appendix for a list of relevant authorities that may apply. *See also,* Immigration and Customs Enforcement, *ICE Directive 11087.2: Operations of ERO Holding Facilities* (Jan. 31, 2024) (online at https://ice.gov/doclib/foia/policy/directive11087.2.pdf) (accessed Sept. 13, 2026); *Pablo Sequen v. Albarran*, No. 5:25-cv-06487-PCP, Slip Op., 71 (N.D. Cal. June 23, 2026) (online at https://docs.justia.com/cases/federal/district-courts/california/candce/5%3A2025cv06487/453807/205); *Federal Judge Rules ICE Can't Make Arrests at Immigration Courthouses*, Courthouse News (June 23, 2026) (online at https://courthousenews.com/federal-judge-rules-ice-cant-make-arrests-at-immigration-courthouses/).

[4] Sexual Abuse and Assault Prevention Standards, 6 C.F.R. § 115 (2014); Immigration and Customs Enforcement, *Directive 11062.2: Sexual Abuse and Assault Prevention and Intervention* (May 22, 2025) (online at

At the **Orlando Holding Facility**, ICE was routinely violating long-standing ICE policy and detaining people for two weeks until the June 2026 court order that limits detention at ICE holding facilities to 12 hours.[5] Since then, allegations indicate that the facility has continued to defy the court, routinely holding people for as many as five days. Up to 80 people are reportedly forced to stand or sit on the ground for hours in overcrowded holding cells. Currently, people are said to be shackled 16 hours a day except when they sleep. But for months, people were shackled 24 hours a day for weeks until multiple officers repeatedly complained about this inhumane treatment. Individuals are said to sleep under constant bright lights and on soiled and ripped sleeping mats. Worse, some individuals have been forced to sleep on the concrete floor or upright in chairs because the facility does not have enough mats for everyone. Claims indicate that no changes of clothes or laundry services are provided—the facility bought sheets but has never washed them. Allegedly, only one shower is available for 80 people. The facility is said to limit detainee access to phone calls, including to attorneys.

The facility has detained pregnant women and people with serious medical conditions for days and weeks, including elderly people with colon and prostate cancer, vascular disorders, and HIV/AIDS. No medical staff are onsite. Multiple people have been held for more than a week without access to their prescribed medications; a woman who received emergency gallbladder surgery at a hospital was returned to the facility despite having fresh sutures.

At both facilities, the most egregiously unacceptable conditions have been mitigated after repeated complaints from officers or after significant incidents have occurred, including after the escapes from Miramar and after multiple officers at Miramar required antibiotics due to exposure to unsanitary conditions. In every case, whistleblowers have provided evidence that the efforts at mitigation have only been temporary or fail to fully address the concerns. Management at both facilities have allegedly taken steps to cover up these dangerous and unlawful conditions from members of Congress, including by transferring detainees out of the facilities before congressional visits. At Orlando, facility management allegedly direct officers to delay booking people into the facility to disguise the true length in custody. Officers at both facilities reportedly fear retaliation from management and have faced threats of termination for reporting inhumane conditions and unlawful practices.

These horrific and dangerous conditions are not isolated to the Miramar and Orlando holding facilities. Rather, these allegations mirror credible reporting from holding facilities

---

https://ice.gov/doclib/foia/policy/directive11062.2.pdf).

[5] The allegations raised at the Orlando Holding Facility raise multiple potential violations of relevant authorities, including ICE policies, federal regulations, statutes, and court orders. See attached Appendix for a list of relevant authorities that may apply. *See also*, Immigration and Customs Enforcement, *ICE Directive 11087.2: Operations of ERO Holding Facilities* (Jan. 31, 2024) (online at https://ice.gov/doclib/foia/policy/directive11087.2.pdf) (accessed Sept. 13, 2026); *Pablo Sequen v. Albarran*, No. 5:25-cv-06487-PCP, slip op. at 71 (N.D. Cal. June 23, 2026) (online at https://docs.justia.com/cases/federal/district-courts/california/candce/5%3A2025cv06487/453807/205); *Federal Judge Rules ICE Can't Make Arrests at Immigration Courthouses*, Courthouse News (June 23, 2026) (online at https://courthousenews.com/federal-judge-rules-ice-cant-make-arrests-at-immigration-courthouses/).

around the country.[6] Multiple judges have already ruled against the Trump Administration for creating conditions that are likely to violate constitutional rights at ICE holding facilities.[7]

The Trump Administration's continued attempts to evade accountability; operate dangerous facilities in secrecy; and violate policies, laws, court orders, and constitutional protections will come to light as more employees speak out against these dangerous and deliberate practices. Allegations of threats and retaliation against officers from ICE management raise deeply troubling concerns of violations of laws designed to protect employees who report illegal activity, abuse of authority, gross mismanagement, gross waste of funds, and activity that poses a substantial or specific danger to public health or safety.[8]

We will demand accountability for any act of retaliation taken in response to these protected whistleblower disclosures and any future disclosures from ICE employees who bravely come forward to report unlawful activity and dangerous conditions. We expect that you will take immediate and meaningful steps to remind the workforce of their obligation to report abuse and misconduct and the prohibitions against retaliation under ICE policies and laws.[9] We also expect that you will cease any efforts underway within ICE headquarters (HQ) and field offices to retaliate against agency personnel who report complaints.

In Appendix A, you will find a detailed list of all allegations at each facility alongside the relevant ICE policy, federal regulations, statutes, and court orders that ICE appears to have violated through its operations of the Miramar and Orlando holding facilities. To aid in our investigation into these inhumane and unlawful practices, we request that you provide answers to the following questions by October 5, 2026:

1. Please state the specific steps that ICE has taken to immediately and meaningfully prohibit and cease all retaliatory and adverse actions against employees who report misconduct and abuse.

---

[6] *Revealed: ICE Violates Its Own Policy by Holding People in Secretive Rooms for Days or Weeks*, The Guardian (Oct. 30, 2025) (online at https://theguardian.com/us-news/2025/oct/30/ice-hidden-detention-sites); *ICE Officials Warned of Dangerous Crowding. See How They Kept Packing People In*, Washington Post (July 22, 2026) (online at https://washingtonpost.com/immigration/interactive/2026/07/22/ice-officials-warned-dangerous-crowding-see-how-they-kept-packing-people/).

[7] *Judge: Baltimore ICE Hold Rooms Violated Fifth Amendment, Orders Immediate Limits on Detainees*, WMAR 2 ABC (Mar. 6, 2026) (online at https://wmar2news.com/news/region/baltimore-city/judge-baltimore-ice-hold-rooms-violated-fifth-amendment-orders-immediate-limits-on-detainees); *Lawyers Unveil New Disturbing Details of Overcrowding at 26 Federal Plaza*, Documented (May 28, 2026) (online at https://documentedny.com/2026/05/28/immigrant-detainees-ice-federal-plaza-trump-detention/); *Judge Orders Improvements at a Chicago-Area Immigration Facility After Claims of Inhumane Conditions*, AP News (Nov. 5, 2025) (online at https://apnews.com/article/chicago-illinois-immigration-ice-broadview-1b3cabd5c66382a8ba390c54bc50481f); *Judge Orders ICE to Allow Immigrant Detainees in Downtown LA to See Lawyers*, NBC Los Angeles (Nov. 14, 2025) (online at https://nbclosangeles.com/news/local/judge-orders-ice-to-allow-immigrant-detainees-in-downtown-la-to-see-lawyers/3804958/).

[8] 5 U.S. Code § 2302 (b)(8).

[9] *Id.*; Immigration and Customs Enforcement, *Directive 1033.1, Employee Code of Conduct* (Aug. 7, 2012) (online at https://ice.gov/doclib/foia/policy/directorate-1033.pdf (accessed Sept. 17, 2026)

2. Please state the specific ICE policies and standards that apply to ICE holding facilities located in ICE field offices or sub-field offices.

3. Please describe whether a different set of ICE policies or standards apply to ICE holding facilities when they detain individuals for 12-72 hours and more than 72 hours.

4. For each month since September 2025, please provide the average length of stay and maximum length of stay at the Miramar Holding Facility and the Orlando Holding Facility.

5. What steps has ICE HQ, the Miami Field Office, the Miramar Holding Facility, and the Orlando Holding Facility each individually taken to implement the June 2026 judge's order in *Pablo Sequen v. Albarran* which vacated ICE's June 24, 2025, memorandum titled "Nationwide Hold Room Waiver"?

6. Please provide the name and title of the responsible official who approves operational decisions at the Orlando Holding Facility.

   a. If different, please provide the name and title of the responsible official who approved using the Orlando Holding Facility for multi-day use, including more than 72 hours after ICE issued the Nationwide Hold Room Waiver and more than 12 hours after the June 2026 court order.

   b. If different, please provide the name and title of the responsible official who approved detaining more people than the approved capacity at the Orlando Holding Facility.

7. Please provide the name and title of the responsible official who approves operational decisions at the Miramar Holding Facility.

   a. If different, please provide the name and title of the responsible official who approved using the Miramar Holding Facility for multi-day use, including more than 72 hours after ICE issued the Nationwide Hold Room Waiver and more than 12 hours after the June 2026 court order.

   b. If different, please provide the name and title of the responsible official who approved detaining more people than the approved capacity at the Miramar Holding Facility.

   c. Please provide the name and title of the responsible official who approved using the Miramar Holding Facility sally port to process and detain people, including overnight.

8. Please provide the name and title of the responsible official for reporting data and information about the Miramar Holding Facility to the Miami Field Office and to ICE HQ.

   a. What data and information are reported?

   b. What is the name and title of the responsible official in the Miami Field Office who receives this data and information?

   c. What is the name and title of the responsible official in ICE HQ who receives this data and information?

9. Please provide the name and title of the responsible official who reports data and information about the Orlando Holding Facility to the Miami Field Office and to ICE HQ.

   a. What data and information are reported?

   b. What is the name and title of the responsible official in the Miami Field Office who receives this data and information?

   c. What is the name and title of the official responsible in ICE HQ who receives this data and information?

10. Since January 20, 2025, how many complaints about conditions of detention and incidents of misconduct, use of force, fights/assaults, sexual abuse, retaliation, escape attempts, and significant medical and mental health-related events (e.g., infectious disease exposure) have been reported to the Integrity Coordination Center related to the Orlando Holding Facility and the Miramar Holding Facility? For complaints about conditions of detention, please identify the sub-category of the complaint, e.g., medical care, sanitation, legal access, telephone access, use of restraints. Please disaggregate by category and facility.

    a. How many investigations into each category and at each facility have been opened by the Office of Professional Responsibility?

    b. How many management inquiries into each category and at each facility have been opened by the Enforcement Removal Operations Administrative Inquiry Unit?

To aid in our investigation into these dangerous and unlawful practices, we demand that you preserve and submit to us the following related to both the Miramar Sub-Field Office and Orlando Sub-Field Office by October 5, 2026:

1. **Electronic communications involving ICE HQ, the Miami Field Office, the Miramar Sub-Field Office, and the Orlando Sub-Field Office related to**:[10]

    a. The approval and use of the Miramar Holding Facility and Orlando Holding Facility for multi-day use, including for detentions that are more than 72 hours even after ICE issued the Nationwide Hold Room Waiver and more than 12 hours even after the June 2026 court order.

    b. The approval to detain more people than the approved capacity at the Miramar Holding Facility and Orlando Holding Facility.

    c. The approval and use of the Miramar Holding Facility sally port to process and detain people, including overnight.

    d. Communications about overcrowding; requests for sanitation services and denials; requests for medical care and denials; urgent medical needs and 911 calls; requests for additional food and water and denials; supervision and staffing concerns; significant incidents including uses of force, sexual abuse, assaults/fights, escapes; prolonged detention (>12 hours); bed-space/transfer requests and denials; congressional oversight visits; and reprimands or adverse consequences for staff complaints.

2. **Occupancy and Safety Records**:

    a. The floor plan of each facility indicating the approved occupancy of each area within the facility, including the location and numbers of toilets, sinks, and showers.

    b. Fire Marshal records and certificates of occupancy.

    c. Emergency response plans and riot/disturbance response equipment inventories.

    d. Since September 2025, documentation indicating the date of fire drills and evacuation exercises, including associated after-action reports.

[10] Electronic communications include draft and final versions of emails, email attachments, Teams messages, SMS messages, Signal messages, SharePoint/OneDrive records, phone/voice mail or recordings/records of verbal communications.

3. **Staffing records**:

   a. Organizational charts with names and titles for the Miami Field Office, Orlando Sub-Field Office, and Miramar Sub-Field Office. Please identify which officials have responsibility for processing operations.

   b. Fiscal Year (FY) 24, FY 25, and FY 26 staffing analyses for each Sub-Office.

   c. FY 24, FY 25, and FY 26 staffing rosters including deportation officers, supervisory deportation officers, medical contract staff, janitorial contract staff, and National Guard personnel. Please identify which staff are assigned to or oversee processing.

   d. Training records for each staff performing processing at the holding facility, including training records on ICE's Sexual Abuse and Assault Prevention and Intervention policy and use of force and restraints.

   e. Staffing/shift schedules, overtime records, post assignments, and supervisory coverage records for staff performing processing.

4. **Detainee records**:

   a. Current detainee roster, including book-in date, and total population count.

   b. Average daily population in FY 2021, 2022, 2023, 2024, 2025, and 2026.

   c. Daily population counts since September 2025.

   d. The detainee roster, including book-in date, on the 1st, 10th, and 20th of each month since September 2025.

   e. A list of all pregnant women, unaccompanied minors, and family units detained at the facility since September 2025, including book-in and book-out dates and ages.

5. **Supervision records for every month from September 2025 to the present**:

   a. For every month, provide three processing shift reports. Provide a morning supervisor shift report on the 1st of each month; an afternoon supervisor shift report on the 10th of each month; and a night supervisor shift report on the 20th of each month.

   b. Records of the 15-minute hold room checks on the 15th of each month.

   c. Daily situation reports on the 1st, 10th, and 20th of each month.

d. Specific to the Miramar Holding Facility:

i. On the day of the alleged escape attempt on or around August 28, 2026, the supervisory shift reports, 15-minute hold room checks, and daily situation reports.

ii. On the day of the alleged escape attempt on or around September 7, 2026, the supervisory shift reports, 15-minute hold room checks, and daily situation reports.

6. **Facility safety and security records since September 2025**:

a. Incident reports and after-action reviews associated with all sexual abuse incidents, uses of force, fights/assaults, disturbance reports, and escape attempts.

b. The CCTV footage associated with each incident above.

c. All incident reports documented by National Guard personnel.

d. On the 15th of each month, restraint logs indicating justification, duration, supervisory reviews, medical checks, and documentation supporting continued use.

7. **911/Fire rescue and medical records since September 2025 related to**:

a. Logs of all 911/Fire Rescue calls.

b. The associated daily situation reports and shift supervisor reports on the day of each 911/Fire Rescue call.

c. For each individual who was transported to the emergency department, all ICE incident reports, EMS reports, transport records, written communications between ICE and emergency services, and the individual's intake medical screening form and Sexual Abuse and Assault Prevention and Intervention screening form.

d. Invoices and reimbursement records for each 911/EMS emergency transport.

8. **Environmental health and safety records since September 2025**:

a. Inspection reports from external entities conducting environmental health and safety inspections, such as workplace safety, Fire Marshal inspections, and sanitation.

b. Work orders associated with plumbing, ventilation, heating/cooling, air quality/mold, and fire/safety.

c. All records related to employee injuries and illnesses and any employee safety complaints with redactions for personally identifiable information as appropriate.

9. **Contracts since September 2025 related to**:

a. Janitorial services and associated cleaning schedules, vendor invoices, and service logs.

b. Portable toilet vendors and associated invoices and service tickets.

c. Medical services and associated staffing, schedules, and vacancies.

d. Provision of food and associated menus, nutritional analysis, delivery records, and invoices.

10. **Staff complaints and detainee grievances since September 2025 related to**:

a. Sanitation and hygiene, including requests for cleaning and responses/denials.

b. Medical care, including requests for medical support and responses/denials.

c. Provision of food and water, including requests for additional food and water and responses/denials.

11. **Inspection reports since September 2025 from the following entities**:

a. DHS Office of Inspector General.

b. ERO inspection contractor.

c. ICE Office of Detention Oversight (ODO) reports including reports from the ODO Assisted Self-Inspection Process.

d. Reports from ERO's FY 24, FY 25, and FY 26 Holding Facilities Self-Assessment Tool (or current equivalent).

The Committee on Oversight and Government Reform is the principal oversight committee of the House of Representatives and has broad authority to investigate "any matter" at "any time" under House Rule X. The Committee on Homeland Security is the principal committee of the House of Representatives with jurisdiction for overall homeland security policy

and has special oversight functions of "all Government activities relating to homeland security, including the interaction of all departments and agencies with the Department of Homeland Security" under House Rule X. If you have any questions regarding this letter, please contact Committee Democratic staff at (202) 225-5051. Thank you for your prompt attention to this matter.

Sincerely,

Robert Garcia
Ranking Member
Committee on Oversight and
Government Reform

Bennie G. Thompson
Ranking Member
Committee on Homeland Security

Maxwell Alejandro Frost
Member of Congress

Enclosure: Appendix A

cc: The Honorable James Comer, Chairman
Committee on Oversight and Government Reform

The Honorable Andrew R. Garbarino, Chairman
Committee on Homeland Security

Joseph V. Cuffari, Inspector General
Office of Inspector General, Department of Homeland Security

# Appendix A:

# ICE Whistleblower Disclosures of Unlawful and Inhumane Conditions and Practices at the Orlando Holding Facility & Miramar Holding Facility

Alleged Violations ICE Policies, Federal Regulations, Statutes, and Court Orders


1. Prolonged Detention Allegations ........ 2
2. Overcrowding Allegations ........ 3
3. Insufficient Staffing Allegations ........ 4
4. Facility Security and Safety Allegations ........ 5
5. Shackling Allegations ........ 6
6. Hygiene, Sanitation, and Ventilation Allegations ........ 7
7. Medical Care Allegations ........ 10
8. Detention of Vulnerable Populations Allegations ........ 11
9. Food Allegations ........ 12
10. Sleeping Conditions and Deprivation Allegations ........ 13
11. Telephone and Legal Access Allegations ........ 14
12. Access to Recreation Allegations ........ 15
13. Booking and Record-Keeping Allegations ........ 16
14. Obstructing Congressional Oversight Allegations ........ 16
15. Retaliation Allegations ........ 17

| **1. Prolonged Detention Allegations** |
| --- |
| **Miramar ICE Sub-Field Office** |
| Despite the June 2026 court order, beginning in June 2026, the facility has routinely detained people for approximately five to seven days.<br><br>In one case, a woman who was approximately seven months pregnant was detained for three weeks until she was finally released on an order of supervision.<br><br>Facility management has attributed the prolonged detention to insufficient bedspace at nearby long-term detention facilities. |
| **Orlando ICE Sub-Field Office** |
| Prior to June 2026, the facility routinely detained people for approximately two weeks: 1) a person with hypertension was detained for approximately 17 days; 2) a person in their 60s with several vascular disorders, including hypertension and blood clots, was detained for approximately 15 days; a different person in their 60s with HIV/AIDS was initially detained for less than 24 hours, released, but then re-detained for longer than two weeks. During their detention, these individuals required multiple trips to the emergency department.<br><br>Following a June 2026 court order, the facility began limiting the length in detention. However, the facility is continuing to detain people for an average of 48 hours, with occasional holds up to five days.<br><br>Facility management has attributed the prolonged detention to insufficient bed-space at long-term ICE detention facilities as well as the arrest "quotas" put in place by the Miami Field Office management. |
| **Alleged Violations of Relevant Authorities[1]** |
| ICE Directive 11087.2, Operations of ERO Holdings Facilities (ICE Hold Room Directive) defines a holding facility as a facility used for "short-term confinement" (Section 3.2). ICE holding facilities are prohibited from detaining people for more than 12 hours absent exceptional circumstances (Section 5.1). |

[1] The authorities identified throughout the appendix—ICE policies, federal regulations, statutes, legal opinions, and court orders—are not exhaustive; additional applicable requirements may exist. Beyond these potential violations, the documented allegations also raise serious constitutional concerns. Courts across the country have already ruled against the Trump Administration for creating conditions that are likely to violate constitutional rights at ICE holding facilities, including by: restricting attorney-client communications in violation of the First and Fifth Amendments; imposing punitive conditions of confinement in violation of the Fifth Amendment; and exhibiting deliberate indifference to detainees' health and safety, also in violation of the Fifth Amendment. See, *Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP (N.D. Cal.); *D.N.N. v. Liggins*, No. 1:25-CV-01613-JRR (D. Md.); *Barco Mercado v. Noem*, No. 1:25-CV-06568 (S.D.N.Y.); *Moreno Gonzalez v. Noem*, No. 1:25-CV-13323 (N.D. Ill.); *Vasquez Perdomo v. Noem*, No. 2:25-CV-05605 (C.D. Cal.).

ICE applies the same 12-hour requirement to hold rooms located inside of its long-term detention facilities, which are used for processing people into and out of the facility (*See*, 2026 NDS, Standard 2.5, Hold Rooms in Detention Facilities).

On June 24, 2025, ICE issued the Nationwide Hold Room Waiver, granting ICE holding facilities the ability to detain people for 72 hours. On June 23, 2026, U.S. District Judge P. Casey Pitts issued a nationwide order prohibiting stays that exceed 12 hours at holding facilities, stating that ICE had failed to consider its obligation under the Fifth Amendment to not subject civil immigration detainees to punitive conditions of confinement (See, *Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP (N.D. Cal. June 23, 2026)).

## 2. Overcrowding Allegations

### Miramar ICE Sub-Field Office

The facility is routinely detaining hundreds of people, including up to 342 during one day in August 2026.

Between 50-70 people are routinely held in holding cells rated for 21 people. Between 12-15 people are routinely detained in holding cells rated for seven people.

At one point, the posted capacity for each holding cell was removed but the placards have since been reposted.

The facility is also detaining large numbers of people in the sally port (a large warehouse-like structure) and open processing areas in addition to the holding cells. More than one hundred people have been forced to sit and sleep on the concrete floor of the sally port.

### Orlando ICE Sub-Field Office

The facility is routinely detaining more people in the holding cells than is safe to do so. Between 50-80 people are routinely held in the holding cells. At times, there is standing room only in the holding cells.

### Alleged Violations of Relevant Authorities

The ICE Hold Room Directive does not include requirements related to capacity constraints and overcrowding, such as minimum square feet per person, sufficient seating, or requirements to post the maximum room capacity outside of the room.

Multiple occupancy hold rooms within long-term detention facilities are required to provide 43 square feet of unencumbered space for each individual (*See*, 2026 NDS, Standard 2.5, Hold Rooms in Detention Facilities).

Hold rooms in long-term detention facilities must also have "sufficient seating to accommodate the maximum room capacity, which must be posted outside the hold room" (*See*, 2026 NDS, Standard 2.5, Hold Rooms in Detention Facilities).

**3. Insufficient Staffing Allegations**

**Miramar ICE Sub-Field Office**

The facility does not have sufficient staffing and supervision: from June through August 2026, approximately five officers were present during the midnight shift to supervise hundreds of people. During hospital runs, which require two officers, only three officers have been left to supervise more than 300 people.

After two detainees managed to escape on or around August 28, 2026, and on or around September 7, 2026, facility management increased the staffing to approximately 10 officers during the midnight shift.

There are an insufficient number of supervisory staff. For approximately six weeks, there were no supervisory staff present during the afternoon and midnight shifts.

**Orlando ICE Sub-Field Office**

The facility does not have sufficient staffing and supervision: two to three officers work during night, afternoon, and weekend shifts; five to ten officers work during day shifts.

There are an insufficient number of supervisory staff and supervisory staff do not generally enter the areas of the facility where detainees are held. Supervisory staff are generally only present during regular business hours, leaving officers who were hired in the last year to run all operations—including signing warrants and removal orders, in violation of agency policies. There is limited to no supervisory staff present at the holding facility on the weekend. Supervisory staff generally do not answer their phones after hours.

When newly hired officers were onboarded, they received little to minimal training before being deployed to the Orlando Holding Facility.

**Alleged Violations of Relevant Authorities**

The ICE Hold Room Directive requires that "Each holding facility shall maintain sufficient supervision of detainees, including through appropriate staffing levels" (Section 2.1).

## 4. Facility Security and Safety Allegations

### Miramar ICE Sub-Field Office

Two individuals have escaped from the facility: one on or around August 28, 2026, and one on or around September 7, 2026. On August 28, a detainee jumped two fences and ran about two blocks from the facility before he turned himself in to ICE deportation officers. On September 7, a second person escaped and was able to get approximately 8 miles away from the facility before they were apprehended by the Hialeah police department. The facility only became aware of the escape after the person had been apprehended—approximately two hours later. Given the lack of supervision and insufficient record-keeping, management at the facility have no way of knowing whether anyone else successfully escaped that day.

A female officer was urging someone who was upset about being detained for five days to sign paperwork. The person had ankle chains on his arms because the facility had run out of handcuffs. The person grabbed and choked the officer to the point that she almost passed out. Four or five officers repeatedly struck the individual leaving bumps and abrasions on his face and body.

Physical fights have broken out among the detained population. The facility is not equipped to respond to a mass disturbance event involving hundreds of people.

A member of the National Guard (who was deployed to support facility operations) witnessed a detainee expose his genitals to another detainee and reported it to facility management. The facility did not take required regulatory steps to report the incident of sexual abuse and assault.

Some staff, including some supervisors, are not aware of or trained on ICE's sexual abuse and assault policies and procedures required by DHS's regulation under the Prison Rape Elimination Act (PREA), including screening and reporting requirements.

The facility is not performing or documenting regular visual monitoring and physical hold room checks every 15 minutes as required by ICE policy.

### Orlando ICE Sub-Field Office

Staff at the facility are not conducting required sexual abuse and assault screening under DHS's Prison Rape Elimination Act (PREA) regulations.

Physical fights have broken out among the detained population. Facility staff are concerned that if there is a riot or mass disturbance, they do not have sufficient staffing to respond, are not trained on how to respond, and do not have the necessary equipment to respond.

### Alleged Violations of Relevant Authorities

The ICE Hold Room Directive requires officers to "account for and continuously monitor detainees" including by performing "direct supervision, which shall include regular visual

monitoring" and "physical hold room conduct checks … at least every 15 minutes." Officers are required to log each hold check with the date, time, and any important observations (Section 5.1).

Consistent with DHS's PREA regulations, the ICE Hold Room Directive requires officers to screen each individual for risk of victimization or abusiveness (Section 5.10) and includes reporting and response requirements following any allegation of sexual abuse and assault (Section 5.11).

ICE's long-term detention facilities are required to have a "comprehensive security policy," including "security inspections," "perimeter security," and "population counts" (*See*, NDS 2026, Standard 2.3 Facility Security and Control).

One set of ICE's detention standards for long-term detention facilities requires facilities to have in place "contingency plans to quickly and effectively respond to emergency situations and to minimize their severity" (*See*, Performance Based National Detention Standards, Standard 1.1, Emergency Plans).

## 5. Shackling Allegations

**Miramar ICE Sub-Field Office**

Individuals in the sally-port (a large warehouse-like structure) are fully shackled for approximately 8-10 hours while they sleep, including handcuffs, leg irons, and belly chains. During the day, the facility removes the handcuffs and belly chains for people detained in the sally port.

**Orlando ICE Sub-Field Office**

Initially, the facility's Assistant Field Office Director (AFOD) instructed staff to keep people shackled continuously for 24 hours a day while detained for "officer safety" due to insufficient staffing levels.

After multiple officers repeatedly expressed concern, including through formal complaints, the AFOD allowed people to be unshackled only during sleep, leaving them shackled for 16 hours a day.

The facility has shackled elderly people with serious health issues and limited mobility.

**Alleged Violations of Relevant Authorities**

The ICE Hold Room Directive does not include requirements related to the use of restraints.

ICE Directive 11032.4, Identification and Monitoring of Pregnant, Postpartum, or Nursing Individuals generally prohibits using restraints on pregnant women in custody except in extraordinary circumstances (Section 2.3).

At ICE's long-term detention facilities, restraints are restricted to limited circumstances when they "may be used immediately to prevent the detainee from harming themselves, others, or causing serious property damage" (*See*, 2026 NDS, Standard 2.8, Use of Force and Restraints).

One set of ICE's detention standards establishes a presumption that restraints are not used for more than two hours, requiring a supervisor to check every two hours whether restraints are still necessary (*See,* 2011 Performance Based National Detention Standards, Standard 2.15, Use of Force and Restraints).

## 6. Hygiene, Sanitation, and Ventilation Allegations

**Miramar ICE Sub-Field Office**

Between June and August 2026, the holding cells were not meaningfully cleaned other than to remove trash. Large trash bags of waste have accumulated outside of the facility, which has attracted rats.

The toilet/sink unit in one of the large holding cells is currently damaged and unusable. The toilet/sink unit in the other large holding cell was consistently clogged, leading to urine and feces overflowing onto the floor of the holding cell; these plumbing issues have now been addressed.

The holding cells emit an overpowering odor of bodily waste.

Four portable toilets are completely soiled with urine and feces inside and on the ground surrounding them. Despite multiple complaints from staff over several weeks, facility management has refused to have the portable toilets serviced. People carry the urine and feces on their shoes to all areas of the facility. No soap, water, or hand sanitizer is provided for handwashing after using the portable toilets.

Individuals are allowed to shower once when they arrive in the staff locker room.

Hygiene products such as hand soap, shampoo, and menstrual products are limited or not provided. People detained in the sally port have brushed their teeth outside using water from a jug and hose. After a female officer noticed that a detained woman was bleeding down her leg, she intervened by providing spare clothing and the officer's own menstrual products.

The facility does not provide clothing or laundry services, leading people to wear the same unwashed clothes, including underwear, for as long as they are detained. Sheets for sleeping are never washed.

| |
|---|
| Initially, the facility forced detainees to sleep on the concrete floor or on chairs. After staff and detainee complaints, the facility purchased 1-inch-thick sleeping mats. People are now provided with disposable mylar foil blankets to sleep.<br><br>Hundreds of people are detained in the sally port (a large warehouse-like structure) that does not have adequate ventilation. People are exposed to high outdoor temperatures and humidity. Two large fans are currently used to circulate the stagnant and germ-filled air.<br><br>The lack of sanitation and ventilation throughout the facility has caused detainees and employees to get sick. Multiple employees required antibiotics after they fell ill from the unhygienic conditions. |
| **Orlando ICE Sub-Field Office** |
| The facility has only one shower despite at times holding up to 80 people.<br><br>Initially, the facility did not provide people with showers, and officers were forced to sneak people into a single shower at night once supervisory staff had left. Currently, showers are provided on Monday, Wednesday, and Friday.<br><br>The facility does not consistently provide hygiene products such as hand soap, shampoo, mouthwash, and deodorant. These items are only provided if requested. Officers have used their own money to purchase hygiene items.<br><br>The facility does not provide clothing or laundry services, leading both men and women to wear the same unwashed clothes, including underwear, for as long as they are detained. The facility obtained a handful of sheets, blankets, and sleeping bags to give to the women who are detained at the facility. These items were not washed for more than six months.<br><br>The facility purchased thin sleeping mats, but they are ripped and unsanitary. Officers have used their own funds to buy Lysol wipes to clean the mats.<br><br>People use paper towels to dry themselves after showering.<br><br>For many months, the facility's contracted cleaning staff did not clean the holding cells on a daily basis. But even now, the cleaning of the holding cells is not sufficient. Staff move everyone who is detained into a single holding cell during the cleaning.<br><br>Air vents have not been cleaned and contain visible black mold. Individuals have reported respiratory discomfort, headaches, and sinus irritation.<br><br>The facility experienced an outbreak of COVID-19 approximately two months ago. Individuals diagnosed with COVID-19 were isolated inside interview rooms for multiple days.<br><br>The heater was not working for over a month in winter. At one point, the facility temperature dropped to 40 degrees Fahrenheit and officers were wearing gloves and winter hats while |

working. No additional clothing was provided to the individuals detained; an officer used their funds to buy mylar foil blankets for the detainees.

The air conditioning broke as temperatures rose in 2026. Staff opened all exterior and interior doors, including the doors to the holding cells, to increase ventilation due to the suffocating temperatures. Shop fans were used to increase ventilation. The air conditioning was repaired over two months later.

**Alleged Violations of Relevant Authorities**

The ICE Hold Room Directive requires that hold rooms are "safe, clean, equipped with restroom facilities" (Section 4.4.1); that people in detention "have regular access to restroom facilities" (Section 5.2); and that people be "permit[ted] to shower (where showers are available)" (Section 5.6). The policy does not specify the location or number of toilets and showers or the frequency for showers.

The ICE Hold Room Directive also does not include requirements related to clothing, laundry services, sanitation, temperatures, or ventilation other than requiring that hold rooms are "safe [and] clean" (Section 4.4.1).

In contrast, hold rooms in long-term detention facilities are required to provide people "with basic personal hygiene items, e.g., potable water, disposable cups, soap, toilet paper, feminine hygiene items, diapers, and sanitary wipes." They are also required to "ensure that sanitation and temperatures in hold rooms are maintained at acceptable levels." (*See*, 2026 NDS, Standard 2.5 Hold Rooms in Detention Facilities).

Within one set of ICE's detention standards, long-term detention facilities are explicitly required to provide at least one shower for every 12 people, one toilet for every 12 male inmates, and at least one toilet for every eight women (*See*, 2011 Performance Based National Detention Standards, Standard 4.5, Personal Hygiene).

ICE's long-term detention facilities are required to provide "clean clothing, linens, and towels on a regular basis to ensure proper hygiene. Socks and undergarments will be exchanged daily, outer garments at least twice weekly and sheets, towels, and pillowcases at least weekly" (*See*, 2026 NDS, Standard 4.4, Personal Hygiene).

Long-term detention facilities are required to meet "recognized standards of hygiene, including those from OSHA, the EPA, the FDA, the NFPA (including the Life Safety Code (NFPA 101)), and the CDC" (*See*, 2026 NDS, Standard 1.2, Environmental Health and Safety).

## 7. Medical Care Allegations

### Miramar ICE Sub-Field Office

The facility has no dedicated area for medical care, no sterile medicine refrigerator, and does not contract for on-site medical staff.

The facility does not conduct medical screening, including for infectious diseases like tuberculosis (TB). The facility learned they had detained someone with TB after the person self-reported it. The facility did not take any steps to isolate the individual or prevent further exposure after determining that the individual would be transferred out of the facility soon.

The facility has detained people with high-risk and chronic medical conditions, including high blood pressure and diabetes, and is not equipped to provide them basic care and access to medication. The facility is also unequipped to manage mental health conditions: in September 2026, a person was forcefully banging his head against the cell window.

The facility is forced to rely on emergency department visits and calls to Miramar Fire Rescue/911 for medical conditions that otherwise could have been prevented or treated by on-site medical staff.

Individuals have fainted, reported chest pain, and become unwell. More than a dozen people were transported to the hospital in August 2026. Multiple calls to 911 were made during a single week in August in order to receive medication for individuals who reported having high blood pressure and diabetes. In September 2026, a person was transported to the hospital for throwing up blood.

If individuals arrive with medication in their property, they do not receive access to it because officers are not authorized or trained to distribute medication or to determine whether the purported medication is actually an illicit drug. If individuals are prescribed medication from the hospital while they are detained, officers provide access despite not being trained or authorized by medical personnel to do so.

In August, facility management advised officers to stop calling 911 for non-emergency situations due to complaints from Miramar Fire Rescue/911.

### Orlando ICE Sub-Field Office

The facility has no dedicated area for medical care, has no sterile medicine refrigerator, and does not contract for on-site medical staff.

Officers are not trained or qualified to conduct medical screening. With minimal to no supervision from management, officers fill out the medical screening forms themselves without asking the individuals about their own medical history or concerns.

The facility has detained people with high-risk and chronic medical conditions, including high blood pressure, diabetes, cancer, vascular disorders, and HIV/AIDS, and is not equipped to provide them basic care and access to medication. The facility is also unequipped to manage people with serious mental health conditions.

Officers hand medication from the individual's personal property to them, without knowledge of what the medication is or appropriate dosage.

For months, officers have relied on emergency department visits and 911 calls for medical conditions that otherwise could have been prevented or treated by on-site medical staff. More recently, officers bring detainees to a nearby urgent care.

A person with hypertension was taken to the hospital and prescribed medication but the facility did not obtain the medication for three days.

A woman who received emergency gallbladder surgery at a hospital was returned to the facility despite having fresh sutures, increasing her risk of a serious infection. Officers—not medical professionals—administered her opioids. The opioids were not kept in a secure location.

Multiple people have been held for more than a week without access to their prescribed medications.

**Alleged Violations of Relevant Authorities**

The Hold Room Directive does not include requirements related to medical screening, medical staffing, or health care services but does require staff to "monitor detainees for any apparent indication of a mental or physical health condition… that may require supervision or emergency medical care" (Section 5.1) and to provide people with "prescribed medication" (Section. 5.7).

Long-term detention facilities are required to provide an initial screening and ongoing services for medical, dental, and mental health care to be carried out by licensed and trained medical personnel. Further, medication can only be distributed by medical staff, and, in their absence, by properly trained detention officers if permitted under state law (*See*, 2026 NDS, Standard 4.3, Medical Care).

## 8. Detention of Vulnerable Populations Allegations

**Miramar ICE Sub-Field Office**

The facility detained a woman who was approximately seven months pregnant. When she was initially brought to the facility, she was in leg chains and handcuffs. When pregnant women are detained, they do not receive any specialized care, supplements, or additional food.

**Orlando ICE Sub-Field Office**

The facility detained a woman who was approximately seven months pregnant. When pregnant women are detained, they do not receive any specialized care, supplements, or additional food. Recently, the facility has sought to avoid detaining pregnant women.

The facility has detained people in their 60s, 70s, and 80s, including a person in their 60s with several vascular disorders, including hypertension and blood clots, and another person in their 60s with HIV/AIDS who was initially released but then re-detained.

**Alleged Violations of Relevant Authorities**

The ICE Hold Room Directive prohibits detaining unaccompanied children, elderly people, and families unless they have "demonstrated or threatened violent behavior, have a history of criminal activity, or pose an escape risk." Children must also be detained in the "least restrictive setting appropriate to their age and special needs" and held apart from non-family member adults (Section 4.4.1).

The Hold Room Directive requires that pregnant women must be detained in the least restrictive setting available and receive "regular access to meals, snacks, milk, and juice" (Section 5.2 and 5.3).

Under ICE's Pregnancy Directive, ICE has an established presumption to not detain, arrest, or take into custody anyone known to be pregnant, postpartum, or nursing. If detained, ICE generally prohibits restraining pregnant and postpartum women except in extraordinary circumstances (*See*, ICE Directive 11032.4, Section 2 and 2.3).

Long-term detention facilities are required to provide pregnant women with additional nutritional and caloric requirements and access to prenatal and specialized care (*See*, 2026 NDS, Standard 4.3, Medical Care).

## 9. Food Allegations

**Miramar ICE Sub-Field Office**

The facility provides the same meal for breakfast, lunch, and dinner. All of the food provided is shelf-stable and is not refrigerated; no fresh food is provided.

The facility does not accommodate medical or religious dietary restrictions.

One water bottle is provided with each meal. In one instance, the facility ran out of water bottles, forcing a supervisor to use his own funds to purchase several pallets of water.

**Orlando ICE Sub-Field Office**

In place of meals, the facility provides StarKist tuna lunch kits, ramen noodle cups, or Hormel Compleat microwave meals—amounting to approximately 570 to 900 calories per day. Occasionally one of the nearby detention facilities provides the holding facility with sandwiches.

On multiple occasions, facility management has allowed the Orlando Holding Facility to run out of food, prompting officers to use their own funds to buy ingredients to make sandwiches.

The facility does not accommodate medical or religious dietary restrictions. People with diabetes have been frequently transported to the hospital due to receiving food with high levels of sodium and starches.

The facility lacks the proper refrigeration system to store food, leading officers to store it in the single refrigerator used by staff.

**Alleged Violations of Relevant Authorities**

The ICE Hold Room Directive requires that "detainees are provided a meal at least every six hours" (Section 4.4.1).

**10. Sleeping Conditions and Deprivation Allegations**

**Miramar ICE Sub-Field Office**

The lights do not turn off or dim. People spend the duration of their detention under constant bright lights.

Initially, the facility forced detainees to sleep on the concrete floor or on chairs. After staff and detainee complaints, the facility purchased 1-inch-thick sleeping mats. The facility also purchased sheets; however, the sheets are never washed, raising serious sanitation and hygiene concerns. People are now provided with disposable mylar foil blankets.

**Orlando ICE Sub-Field Office**

The lights do not turn off or dim. People spend the duration of their detention under constant bright lights.

The facility does not have enough sleeping mats for everyone, leading people to sleep on the bare floor or on a bench.

The facility obtained a handful of sheets, blankets, and sleeping bags specifically for women. Due to the limited number, women are forced to share the items. The sheets, blankets, and sleeping bags were not washed for more than six months.

Men are forced to sleep without sheets and blankets, including during winter months when temperatures dropped to less than 40 degrees Fahrenheit. After multiple complaints from staff and detainees, an officer purchased mylar foil blankets with his own funds. The mylar foil blankets are re-used for weeks at a time. Detainees are not automatically given the mylar blankets—they must be requested.

**Alleged Violations of Relevant Authorities**

ICE Hold Room Directive and ICE detention standards do not include requirements relating to lighting, sleep deprivation, or beds and sheets. Some courts have held that sleep deprivation caused by leaving bright lights on continuously is a form of cruel and unusual punishment prohibited under the Eighth Amendment.

At hold rooms in ICE's long-term detention facilities, bunks, cots, and beds are generally prohibited "except for detainees who are ill, with a disability, are minors, and/or pregnant women" (*See*, 2026 NDS, Standard 2.5, Hold Rooms in Detention Facilities).

## 11. Telephone and Legal Access Allegations

### Miramar ICE Sub-Field Office

Legal access and family communication are generally restricted.

Individuals are offered an approximately 2-minute phone call when they first enter the facility. No additional phone calls are allowed.

Officers have been instructed not to facilitate phone calls to attorneys. People are told that they must wait until after they are transferred out of the facility to call an attorney.

Supervisors have instructed officers to isolate individuals who have filed writs of habeas corpus (i.e., legal petitions to the court to contest the legality of their detention) to prevent these individuals from encouraging other people to file such petitions. Once a habeas is filed, the facility releases the individual to avoid the cost of going to court with the expectation that they will eventually arrest the person again.

### Orlando ICE Sub-Field Office

Legal access and family communication are generally restricted.

For several months, people were not allowed to make any calls for the duration of their detention, including to their lawyers. After repeated complaints from staff, the facility allowed only 5-minute calls after business hours, which created an additional barrier to contacting attorneys.

Currently, the facility allows phone calls for certain circumstances, such as calls to obtain documents for voluntary departure. Generally, people are told that they must wait until after they are transferred out of the facility to call an attorney.

**Alleged Violations of Relevant Authorities**

The ICE Hold Room Directive does not include requirements related to telephone access or legal access.

Long-term detention facilities are required to provide people with the opportunity to make a free telephone call on arrival (*See*, 2026 NDS, Standard 2.1, Admission and Release). Throughout an individual's detention, long-term detention facilities are also required to provide "reasonable and equitable access to telephones and [advanced communication services] during established waking hours" (*See*, 2026 NDS, Standard 5.4, Telephone Access and Advanced Communication Services).

Long-term detention facilities are required to provide people with unrestricted "telephone or video calls … to legal representatives or to obtain representation" that are "no shorter than 20 minutes" (*See,* 2026 NDS, Standard 5.4, Telephone Access).

Long-term detention facilities are also required to allow "legal visitation seven days a week, including holidays" (*See,* 2026 NDS, Standard 5.5, Visitation).

## 12. Access to Recreation Allegations

**Miramar ICE Sub-Field Office**

No access to recreation is provided.

**Orlando ICE Sub-Field Office**

No access to recreation is provided.

People have been detained for up to two weeks at a time without seeing the light of day or breathing fresh air.

**Alleged Violations of Relevant Authorities**

The ICE Hold Room Directive does not include requirements related to recreation.

Long-term detention facilities are required to provide "outdoor recreation at least one hour per day, a minimum of five days per week." If only indoor recreation is available, the facility is required to provide access to natural light "for at least one hour each day" (*See*, 2026 NDS, Standard 1.2, Environmental Health and Safety).

## 13. Booking and Record-Keeping Allegations

**Miramar ICE Sub-Field Office**

Due to insufficient staffing and the large volume of individuals, the facility is not consistently maintaining a detention log for every individual booked into and out of the facility.
The facility is not inputting information into internal ICE databases, such as EARM/EADM, to track individuals in custody.

**Orlando ICE Sub-Field Office**

Facility management is directing officers not to book people into the facility without management approval, in part because once someone is booked-in, the holding facility has been directed by ICE headquarters to not release anyone.

As a result, some people have been left off the books for days, resulting in staff being forced to backdate records. More recently, the facility is not booking people in for more than 24 hours after they arrive in an attempt to obscure the fact that they have been detained for more than 12 hours.

The facility previously deleted booking records for individuals they accidentally detained against court orders or after individuals were released on orders of recognizance.

Throughout 2025 and early 2026, the facility engaged in a "rebooking" loophole with the Orange County Jail to circumvent laws requiring someone's release from custody within 72 hours if charges are not filed. To get around the law, the Orlando Holding Facility would book people out of the Orange County Jail, temporarily detain them at the holding facility for approximately 12 hours, and then "rebook" them back into the Orange County Jail. Some individuals were subjected to this rebooking practice for weeks. This practice is no longer occurring.

**Alleged Violations of Relevant Authorities**

The ICE Hold Room Directive requires staff to maintain a detention log for every individual brought into custody, including by documenting the exact time someone has entered and left custody (Section 5.8).

## 14. Obstructing Congressional Oversight Allegations

**Miramar ICE Sub-Field Office**

Prior to Congressional visits or oversight inspections, the facility has removed every detainee out of the facility and cleaned it up. Staff have been told to refer Members of Congress to ICE Public Affairs if they ask any questions.

**Orlando ICE Sub-Field Office**

Prior to Congressional visits or oversight inspections, the facility has transferred the majority of detainees out of the facility.

The facility has also been cleaned in advance of oversight visits, including one from Congressman Maxwell Frost. Evidence of the inhumane conditions, such as the unsanitary sleeping mats, were hidden from view. Prior to the visit, staff were informed that they did not need to engage with the Congressman: staff understood this to mean that they were not supposed to speak with him. The Congressman was not provided a tour of the whole holding facility.

Facility management did not allow Representative Frost to enter the facility for two unannounced oversight visits.

**Alleged Violations of Relevant Authorities**

Even the Department of Justice's Office of Legal Counsel has long recognized that Members of Congress have the authority and duty to "conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws" (*See*, Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch, Vol. 9 Opinions of the Office of Legal Counsel (1985)).

The Homeland Security and Further Additional Continuing Appropriations Act (Pub. L. 119-86 (2026)), grants members of Congress access to all ICE detention facilities, including holding facilities, with no advance notice, and their staff with one day notice. A March 2026 federal court order reaffirmed Congress's right to conduct unannounced visits to ICE detention facilities and holding facilities (See, *Neguse v. ICE*, No. 25-cv-02463 (D.D.C. Mar. 2, 2026)).

## 15. Retaliation Allegations

**Miramar ICE Sub-Field Office**

Facility leadership has attempted to silence officers who raise complaints and concerns about inhumane conditions and practices by threatening retaliation through adverse employment actions.

**Orlando ICE Sub-Field Office**

In an attempt to silence officers who raise complaints and concerns about inhumane conditions and practices, facility management has threatened to fire or bring criminal charges against officers who leak information to the media.

Facility leadership intimidated new hires against making complaints by reminding them that during their one-year probationary period, they can be fired at any time for any reason.

| |
|---|
| Multiple officers have raised complaints to the Department of Homeland Security Office of Inspector General (OIG) and via the ICE Office of Professional Responsibility's Joint Intake Center. Management has told officers to not report complaints to the DHS OIG and instead report them internally within ICE. |
| **Alleged Violations of Relevant Authorities** |
| ICE Directive 1033.1, Employee Code of Conduct requires all employees to "maintain the highest standards of integrity and professionalism" (Section 2); the policy also requires supervisors to communicate "to their employees that discrimination, harassment, a hostile work environment, and retaliation will not be condoned or tolerated" (Section 4.3). The policy requires both employees and supervisors to report misconduct (Section 4.3 and 4.4).<br><br>5 U.S. Code § 2302 (b)(8) protects federal employees from retaliation based on disclosing evidence of violations of laws, rules, or regulations; gross mismanagement; gross waste of funds; abuse of authority; or a substantial and specific danger to public health or safety. |