**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
MIAMI DIVISION

ORLANDO ROSALES SALMERON and JOHN DOE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; DAVID J. VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCOS D. CHARLES, in his official capacity as Executive Associate Director for Enforcement and Removal Operations; MATTHEW ELLISTON, in his official capacity as Field Office Director, ICE Enforcement and Removal Operations, Miami Field Office; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and U.S. CUSTOMS AND BORDER PROTECTION,

Defendants.

Case No. 1:26-cv-26911-BB

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR EXPEDITED MOTION FOR A PRELIMINARY INJUNCTION**

Defendants concede that the Miramar Facility ("Miramar") is a short-term facility designed for detention not to exceed 12 hours, and they admit that they hold people there for days. ECF No. 29 at 4; Decl. of Angel A. Cata ¶¶ 4, 29, ECF No. 29-1 ("Cata Decl."). ICE's own Directive limits hold-room confinement to twelve hours "absent exceptional circumstances." Directive 11087.2 § 5.1(1), ECF No. 6-11. Defendants do not attempt to show that such circumstances justified any of the multi-day detentions their own records confirm. *See* Cata Decl. ¶¶ 25–26, 29.

Instead, Defendants first argue that Plaintiffs' Motion for Preliminary Injunction (ECF No. 6) is moot because the people who described conditions at Miramar are no longer there. But a hold

room is temporary by design, and the law has long refused to let a defendant defeat review of short-term detention by moving people through it. Second, Defendants assert that conditions at Miramar are acceptable because an Assistant Field Office Director says so in the most general terms. His assertions are vague and conclusory and warrant little weight against Plaintiffs' detailed evidence. As for the assertion that the conditions described "do not reflect current or recent operations," Cata Decl. ¶ 7, four men describe the same conditions at Miramar in late October—after this suit was filed and within about two weeks of Mr. Cata's November 4 declaration. *See* Decl. of John Doe 2 ("Doe 2 Decl."), Ex. 1;[1] Decl. of Bryan Jose Villalobos Corea ("Villalobos Decl."), Ex. 2; Decl. of Gleiber Roa Castaneda ("Roa Castaneda Decl."), Ex. 3; Decl. of Oralex Villatorro Perez ("Villatorro Perez Decl."), Ex. 4.

## ARGUMENT

### I. The Motion Is Not Moot Because the Class Claims Relate Back to the Filing of the Complaint, When Both Plaintiffs Were Held at Miramar.

When Plaintiffs filed suit on October 2, 2026, both were detained at Miramar. ECF No. 1 ¶¶ 27, 37. Defendants' records confirm that Mr. Rosales Salmeron was held there from September 28 through October 3. Cata Decl. ¶ 29.

Their subsequent departure from Miramar does not moot the class claims. "Some claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980). "In such cases, the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991); *see also Stein v. Buccaneers Ltd. P'ship*, 772 F.3d 698, 704–07 (11th Cir. 2014) (holding that "relation back is to the 'filing of the complaint'"). The Supreme Court's paradigmatic example of an "inherently transitory" claim is a "class action challenging the constitutionality of temporary pretrial detentions." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013). The doctrine fits this case: Defendants describe Miramar as "a short-term ERO

[1] John Doe 2 submits his declaration under a pseudonym for the reasons set out in Plaintiffs' pending pseudonym motions. *See* ECF Nos. 18, 19, 31. The typed declaration is followed by his handwritten original.

holding facility" where "[t]he typical length of stay . . . is short." Cata Decl. ¶¶ 4, 24. They cannot rely on the brevity of Miramar stays as a defense on the merits and then use that same brevity to put the facility beyond review. The length of any stay is also in Defendants' hands; Mr. Cata attributes extended stays to "exceptional circumstances arising anywhere in the DHS system." *Id.* ¶ 26. The "exceedingly unpredictable" duration of detention and the government's control over transfers further support application of the "inherently transitory" exception to mootness. *See D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 587 (D. Md. 2026).

Defendants' contrary points misstate the record and the law. They say Plaintiffs "have not argued that their claims are inherently transitory." ECF No. 29 at 3. Plaintiffs did. ECF No. 6 at 18; ECF No. 9 at 9–10. Defendants also say the exception applies only where "certification is in fact decided while the controversy remains live." ECF No. 29 at 3. *Riverside* holds the opposite: The class claims there survived even though "the class was not certified until after the named plaintiffs' claims had become moot." 500 U.S. at 52. The cases Defendants cite for the proposition that a transfer moots a conditions claim do not address the inherently transitory exception. *See* ECF No. 29 at 2–3 (citing cases). *Zatler v. Wainwright*, 802 F.2d 397 (11th Cir. 1986), and *Wahl v. McIver*, 773 F.2d 1169 (11th Cir. 1985), involved individual prisoners, not class actions. And the plaintiff in *McKinnon v. Talladega County* ostensibly sought to represent a class, but he never moved for class certification. 745 F.2d 1360, 1362 n.1, 1365 (11th Cir. 1984). Here, by contrast, Plaintiffs moved for class certification four days after filing their Complaint. *See* ECF No. 9.

Defendants say this case is "in the same procedural posture as *D.N.N. v. Liggins*" when that court first denied relief. ECF No. 29 at 2. They omit what that court held. In the July 25, 2025 opinion Defendants attach, the court rejected the government's mootness argument, finding "that the claims at issue are inherently transitory such that the relation back exception to mootness applies." ECF No. 29-2 at 16–19. The court denied the preliminary injunction as moot only because it simultaneously denied class certification for lack of evidence on adequacy and commonality—grounds Defendants have not raised in opposing this motion. *Id.* at 19–29. On a renewed motion, the same court certified a class, again rejected the government's mootness argument, and entered a preliminary injunction. *D.N.N.*, 822 F. Supp. 3d at 558–59, 582, 586–87. It explained that if the

government were right, "the Executive would effectively be insulated from any form of injunctive relief on exercise of its sole power and discretion to moot an individual's claim." *Id.* at 587. The Northern District of California reached the same conclusion about a San Francisco hold room, where "it is highly unlikely that anyone would be detained there long enough for a court to certify class claims." *Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084, 1120 (N.D. Cal. 2025). Plaintiffs cited both decisions on this point. ECF No. 6 at 18. Defendants address neither.

Mr. Cata does not say that the conditions described by ICE's own officers never existed. He says they "do not reflect current or recent operations." Cata Decl. ¶ 7. Defendants identify no rescinded practice, no date on which anything changed, and no reason for any change. Nor do they invoke the "voluntary cessation" doctrine, which would require Defendants to show that "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). In any event, declarations from four men detained at Miramar in late October show that the challenged conditions persist. *See infra* Part II.D.

## II. Mr. Cata's Conclusory Declaration Does Not Rebut Plaintiffs' Evidence of Fifth and First Amendment Violations.

Plaintiffs supported their motion with sworn declarations from eight people held at Miramar between April and September 2026, a legal assistant who could not reach a client there, ICE officers' accounts to Congress, and fire-rescue call records. ECF Nos. 6-1 to 6-12. Defendants answer with one declaration from an official who does not claim to have observed the hold rooms and who qualifies his statements as made to "the best of [his] knowledge, information, belief, and reasonable inquiry." Cata Decl. ¶ 3; *cf. Pace v. Capobianco*, 283 F.3d 1275, 1278–79 (11th Cir. 2002) (affidavit statements based "upon information and belief" do not create genuine issues of fact). His denials leave most of Plaintiffs' evidence unrebutted.

### A. ICE's Own Records Show That Multi-Day Detention Is the Norm.

Mr. Cata says extended stays beyond 12 hours are "the exception." Cata Decl. ¶ 24. But the only data he provides—his check of ICE records for the named Plaintiff and the declarants—shows the opposite. Of the eight people whose records he reviewed, six were held at Miramar for

three to nine days: Mr. Rosales Salmeron (five days), Mr. Arvelo Garcia (nine), Ms. Joya Reyes (eight), Ms. Valera Pereira (eight), Mr. Herrera-Velasquez (five), and Mr. Vi Asicona (three). *Id.* ¶ 29. An exception that covers six of eight people is the rule. For the other two, ICE lists a single date, while the declarants describe in detail their experiences at Miramar over the course of four and five days. *Id.*; Guillemot Decl. ¶ 8, ECF No. 6-5; Hernandez-Fuentes Decl. ¶ 2, ECF No. 6-4. That discrepancy, like the other date differences in Mr. Cata's chart, does not bear on whether Miramar holds people for days. On that question, Defendants' records and Plaintiffs' evidence agree. Mr. Villatorro Perez, held in late October, met about fifteen people at Miramar who had been held well beyond twelve hours, at least three for more than a week. Villatorro Perez Decl. ¶ 14.

**B. Mr. Cata's Generic Denials Do Not Answer Plaintiffs' Detailed Evidence of Punitive Conditions.**

As to specific conditions at Miramar, Mr. Cata's conclusory denials are unresponsive to the concerns raised in the Complaint and Motion for Preliminary Injunction. The question is whether the conditions at Miramar, taken together, are excessive in relation to a legitimate governmental objective. *Bell v. Wolfish*, 441 U.S. 520, 538–39 (1979). Plaintiffs challenge the combined effects of overcrowding, inadequate sleeping arrangements, unsanitary conditions, and unmet medical needs during prolonged confinement. *See* ECF No. 6 at 9–16.

Regarding overcrowding, Mr. Cata denies only that detainees are held in "spaces providing only two or three square feet per person." Cata Decl. ¶ 9. He does not say how much space they do have; four square feet apiece would satisfy his denial. The declarants describe about seventy men in a room of roughly 16 by 21 feet, Herrera-Velasquez Decl. ¶¶ 2, 8, ECF No. 6-2; twenty-nine women in a cell with "not even enough room to sit on the ground," Joya Reyes Decl. ¶ 13, ECF No. 6-3; women stepping over one another to reach the toilet at night, Jane Doe Decl. ¶¶ 5–6, 8, ECF No. 6-9. Tellingly, Defendants' brief does not dispute crowding. *See* ECF No. 29 at 5 (recognizing that "crowded conditions in a holding facility are not ideal").

Mr. Cata says detainees are not required to sleep on bare concrete "without mats, blankets, or other provisions." Cata Decl. ¶ 10. The declarants slept sitting up or in shifts beside open toilets, with at most an aluminum blanket, and some stood all night for lack of floor space. Herrera-

Velasquez Decl. ¶¶ 9–10; Guillemot Decl. ¶¶ 10, 12; Valera Pereira Decl. ¶ 8, ECF No. 6-8; Jane Doe Decl. ¶¶ 6, 9, 34. Two spent days shackled in a garage with 150 to 200 men. Arvelo Garcia Decl. ¶¶ 4–12, ECF No. 6-6; Vi Asicona Decl. ¶¶ 8–9, ECF No. 6-7. Mr. Cata does not deny it; he says only that restraints are "consistent with security needs and policy." Cata Decl. ¶ 13.

Regarding sanitation and privacy, Mr. Cata says the restrooms are "properly maintained and cleaned" and people "are not required to step through urine or feces." Cata Decl. ¶ 11. Mr. Arvelo Garcia, shackled at the ankles, could not avoid the urine covering the portable-toilet floors and tracked it back to where the men slept. Arvelo Garcia Decl. ¶¶ 7, 10–11. A guard refused to uncuff Mr. Herrera-Velasquez so he could clean himself after his first bowel movement in four days. Herrera-Velasquez Decl. ¶ 14. Mr. Cata does not dispute that the toilets sit in open view of people and cameras. Guillemot Decl. ¶ 14; Joya Reyes Decl. ¶ 14; Valera Pereira Decl. ¶ 10.

Regarding food, water, and hygiene, Mr. Cata says detainees receive hygiene items, water, and food "appropriate for the duration of their stay." Cata Decl. ¶ 12. Again, he provides neither details nor an explanation of what ICE deems "appropriate." Officers gave Mr. Guillemot one 200-milliliter bottle of water a day and refused his requests for more; he lost six pounds in four days. Guillemot Decl. ¶¶ 17–18, 20. Jane Doe was allowed **one shower in seventeen days**. Jane Doe Decl. ¶¶ 13–14. Ms. Joya Reyes received a three-minute shower, handcuffed and without soap, after ten days in the same clothes. Joya Reyes Decl. ¶ 19.

As to medical care, Mr. Cata says detainees with medical conditions are not held "without adequate medical care." Cata Decl. ¶ 28. He does not say whether Miramar has medical staff or screens anyone. Ms. Joya Reyes's repeated requests for care were ignored or refused; on her sixth day, she lost consciousness. Joya Reyes Decl. ¶¶ 15, 17–18. Mr. Hernandez-Fuentes, who has high blood pressure, received his medication sporadically; on about his fourth day he began shaking, and an ambulance was called. Hernandez-Fuentes Decl. ¶¶ 9, 12–14. Miramar Fire Rescue logged 194 calls to the facility's address in one year. ECF No. 6-12. Mr. Cata does not mention them.

Throughout, where the declarants describe what they saw and endured, Mr. Cata restates the allegation in the negative or recites policy. *Pablo Sequen* rejected a materially similar ICE declaration that offered no "specific observations" and appeared to rest on policy documents,

because the existence of a policy "does not . . . demonstrate that ICE is actually complying with" it. 810 F. Supp. 3d at 1111–12.

The declarants are corroborated by ICE's own officers. They told members of Congress that Miramar, rated for 56 people, held as many as 342 on a single day in August 2026; that more than a hundred people slept in the sally port in handcuffs, leg irons, and belly chains; and that a cell toilet overflowed urine and feces onto the floor. Whistleblower Letter at 2 & app. A at 3, 6–7, ECF No. 6-1. Defendants respond that the whistleblower letter is unsworn, ECF No. 29 at 7, and that the conditions it describes "do not reflect current or recent operations," Cata Decl. ¶ 7—which does not deny that they existed. Neither requires the Court to disregard the letter. *Levi Strauss & Co. v. Sunrise International Trading Inc.*, the case Defendants cite, holds that at the preliminary injunction stage "a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" 51 F.3d 982, 985 (11th Cir. 1995). And the letter does not stand alone: The officers' accounts match the sworn declarations.

### C. Mr. Cata's Assurances Do Not Rebut Evidence That Defendants Cut Detained People Off from Counsel and Press Them to Leave.

Mr. Cata says detainees may call counsel "upon arrival and on request," that counsel may email ERO, and that legal calls are "accommodated consistent with hold room and security." Cata Decl. ¶¶ 15–16, 19. He does not say whether any call is confidential, how long it may last, whether lawyers may visit, or how a lawyer can arrange a call. Ms. Joya Reyes asked for a call as many as fifty times before getting one on her third day; on one day, the only call offered was at 3:00 a.m. Joya Reyes Decl. ¶¶ 9–10, 12. Mr. Hernandez-Fuentes was allowed no call in five days. Hernandez-Fuentes Decl. ¶ 15. Ms. Valera Pereira, who had asylum counsel, was told to wait until she was transferred. Valera Pereira Decl. ¶ 17. Attorneys are not allowed into the detention area. Jane Doe Decl. ¶ 26. And when a legal assistant tried ICE's designated phone extension and email addresses, she reached a full voicemail box and got no reply. Hurst Decl. ¶¶ 3–5, ECF No. 6-10. In late October, Mr. Villatorro Perez asked repeatedly to use the phone and to speak with a lawyer; officers told him "[l]ater," and never allowed him to use a phone. Villatorro Perez Decl. ¶¶ 11–12.

Others were limited to calls of four to ten minutes, with no visits. Doe 2 Decl. ¶ 11; Villalobos Decl. ¶ 28; *see also* Roa Castaneda Decl. ¶ 16 (calls of five to ten minutes).

*Haitian Refugee Center, Inc. v. Baker*, 953 F.2d 1498 (11th Cir. 1992) (per curiam), and *Cuban American Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412 (11th Cir. 1995), addressed legal organizations' asserted rights of access to migrants held outside the United States, not the rights of people detained within it to communicate with counsel. *See* ECF No. 29 at 5–6. Federal law protects that right. 8 U.S.C. §§ 1229a(b)(4)(A), 1362. Nor does *Lewis v. Casey*, 518 U.S. 343, 349–53 (1996), which addressed prisoners' access to courts through law libraries and legal assistance, resolve Plaintiffs' distinct statutory and First Amendment rights to confidential communication with counsel. Plaintiffs' evidence describes systemic barriers, not isolated inconvenience. *See* ECF No. 6 at 16–17.

Mr. Cata also says that voluntary departure forms are presented "in accordance with applicable law and policy" and signed "knowingly and voluntarily." Cata Decl. ¶¶ 21, 23. He does not claim to have watched a single presentation. The declarants did. Officers told Ms. Valera Pereira that her asylum case would be denied, Valera Pereira Decl. ¶ 18; told Ms. Joya Reyes that she would be held longer if she refused, Joya Reyes Decl. ¶ 20; told Mr. Herrera-Velasquez that his appeal would be hard and he should sign, Herrera-Velasquez Decl. ¶ 17; and pressed hardest on women who were crying, warning that those who stayed could spend ten or fifteen years in prison, Jane Doe Decl. ¶¶ 27–30; *see also* Doe 2 Decl. ¶ 12; Villalobos Decl. ¶¶ 29–30. In late October, officers told Mr. Roa Castaneda and his wife that signing would get them out of detention sooner; no one translated the documents, which were not in Spanish, or said they could consult a lawyer first. Roa Castaneda Decl. ¶¶ 18–19, 21. A one-sentence assertion that waivers are knowing and voluntary does not rebut this evidence.

**D. Recent Declarations Describe Continuing Conditions at Miramar.**

Four declarations describing confinement after this suit was filed show that the challenged conditions persist. Mr. Villalobos spent six nights at Miramar, from about October 19 or 20 to October 25 or 26. Villalobos Decl. ¶ 3. His room held 40 to 50 men; by his estimate it had space for about ten. *Id.* ¶¶ 4–5. Men slept against the toilet and on top of one another. *Id.* ¶¶ 6–7. A single

exposed toilet served everyone, the floor was wet with what appeared to be urine, and there was no soap. *Id.* ¶¶ 9–10, 12. He was permitted to shower once, after repeated begging. *Id.* ¶¶ 13–14. For his first three days every meal was a peanut butter and jelly sandwich, and when bottled water ran out, officers told the men to drink from the sink near the toilet. *Id.* ¶¶ 21, 25.

John Doe 2 was held from October 19 to 21 in a small room with 30 to 40 other men "at all times." Doe 2 Decl. ¶¶ 3–4. The room smelled of feces, and the lights never went off. *Id.* ¶ 4. The men slept so close together that he was "practically hugging" those beside him. *Id.* ¶ 6. One sink and one open toilet served the room, with cameras "facing directly toward the toilet"; the floor around it was "filthy and wet with water and urine"; and some men, including him one night, had to sleep in the toilet area because there was nowhere else to lie down. *Id.* ¶ 7. He received no hygiene items on arrival, slept under used blankets taken from the floor, was never allowed to shower, and wore the same clothes for three days. *Id.* ¶¶ 5, 8. Every morning at about 7:00 a.m., officers asked the room, "Who wants to go back to their country?" He watched many men sign. *Id.* ¶ 12.

Mr. Roa Castaneda was held for about four days, around October 19 to 22, with 25 to 28 men in a room he judged fit for 12 to 15. Roa Castaneda Decl. ¶¶ 4–5. Men slept on the floor near the toilets and on top of the sinks. *Id.* ¶ 9. The two toilets were exposed, and he covered himself with his aluminum blanket to use one. *Id.* ¶¶ 11–12. He never saw anyone clean the room, was never allowed to shower, and received no medical screening. *Id.* ¶¶ 13–14, 17.

Mr. Villatorro Perez was held overnight on October 28 and 29 in a room he judged fit for 12 to 15 people. More than 50 men were inside, and officers kept bringing more until there was no longer room for everyone to sit. Villatorro Perez Decl. ¶¶ 2, 5. There were no beds or blankets, only a foil sheet too small to cover him. *Id.* ¶ 6. The room was hot and had no air conditioning; officers brought in a fan and removed it five minutes later. *Id.* ¶ 7. The one toilet stood in the open, and after guards shoved him from the doorway, he had to stand in the toilet area. *Id.* ¶¶ 8, 10. For his entire stay he was given one piece of bread with ham and one bottle of water; the food was dated April and May. *Id.* ¶ 9. He reported at intake that he was under medical care and taking medication, but he received no care. *Id.* ¶ 16.

These accounts contradict the core of the Cata declaration.[2] *Compare* Cata Decl. ¶¶ 7, 10–12, 15, 22, 24, 27–28, *with* Doe 2 Decl. ¶¶ 3–12, Villalobos Decl. ¶¶ 3–30, Roa Castaneda Decl. ¶¶ 4–21, *and* Villatorro Perez Decl. ¶¶ 5–16. They respond directly to Defendants' new factual assertion that the challenged conditions are not current, and Defendants will have them a week before the November 19 hearing. *See Pablo Sequen*, 810 F. Supp. 3d at 1104 n.34 (considering reply declarations "directly responsive to factual assertions made by the government in its opposition").

## III. Plaintiffs Have Shown Irreparable Harm, and the Equities Favor Relief.

Defendants' irreparable-harm argument restates their mootness argument. ECF No. 29 at 7–8. But Plaintiffs seek relief for a class whose members are held at Miramar now, and the record shows they are exposed to the same conditions. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), concerned one man's speculative chance of a future chokehold, not a facility that holds dozens or hundreds of people in the same rooms every day. Days of unsanitary, overcrowded confinement without medical screening threaten physical harm that no later judgment can repair, and the loss of First Amendment freedoms is irreparable in itself. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *D.N.N.*, 822 F. Supp. 3d at 596–97. Finally, the equities favor relief: The injunction Plaintiffs seek would largely require Defendants to follow their own Directive. It "would in no way impede Defendants' ability to carry out the Executive's authority in matters of immigration; it merely would require that it be done within the confines of the Constitution." *D.N.N.*, 822 F. Supp. 3d at 598.

## CONCLUSION

The Court should provisionally certify the class and grant the preliminary injunction.

---

[2] Plaintiffs' attorneys and investigators have spoken with additional people held at Miramar well beyond twelve hours since this case was filed, and Plaintiffs intend to file further declarations before the November 19 hearing. That work is slowed by potential declarants' fear of retaliation and by ICE's frequent transfers to facilities where legal calls must be scheduled weeks in advance.

Plaintiffs understand that the November 19 hearing is a "Motion Hearing," *see* ECF No. 30, not an evidentiary hearing. They renew their request for an evidentiary hearing at a later date, ECF No. 6 at 21, to the extent the Court concludes that Mr. Cata's declaration raises a genuine issue of material fact.

Dated: November 12, 2026

Respectfully submitted,

By: /s/ Andrew Udelsman

Paul R. Chavez
FL Bar No. 1021395
pchavez@aijustice.org
Jennifer Smith
FL Bar No. 964514
jsmith@aijustice.org
**Americans for Immigrant Justice**
P.O. Box 520037
2200 NW 72nd Ave.
Miami, FL 33152
Phone: 305-573-1106

*Attorneys for Plaintiffs*

Andrew Udelsman
FL Bar No. 1051696
andrew.udelsman@splcenter.org
Anne Janet Anderson
FL Bar No. 18092
annejanet.hernandez@splcenter.org
Maite Garcia
FL Bar No. 99770
maite.garcia@splcenter.org
Jeanette Ynfante*
jeanette.ynfante@splcenter.org
Courtney O'Donnell*
courtney.odonnell@splcenter.org
**Southern Poverty Law Center**
2 S. Biscayne Blvd., Suite 3200
Miami, FL 33131
Phone: 786-390-2698

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*